**No. 25-2532**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

BECKY SPENGLER,

  Plaintiff-Appellant

v.

COOPERATIVE EDUCATIONAL SERVICE AGENCY 7, also
known as CESA 7, et al.,

  Defendants-Appellees.

---

**Appeal From The Eastern District of Wisconsin**
**District Court Case No. 22-CV-1199**
**The Honorable William C. Griesbach, Presiding**

---

**BRIEF OF PLAINTIFF-APPELLANT**
**BECKY SPENGLER**

---

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY S.C.
Ross W. Townsend
George Burnett
Attorneys for Plaintiff-Appellant


POST OFFICE ADDRESS:
231 South Adams Street
P.O. Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
State Bar No. 1011622
E-mail: rwt@lcojlaw.com

- 1 -

- 2 -

## I.  DISCLOSURE STATEMENT

On September 16, 2025, counsel for Plaintiff filed with this Court the following

disclosure statements required by F.R.A.P. 26.1 and Cir. Rule 26.1.  (See Docs. 9, 10).

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2532

Short Caption: Spengler v. Cooperative Educations Service Agency 7 et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Becky Spengler

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Conway, Olejniczak & Jerry S.C.

(3)    If the party, amicus or intervenor is a corporation:

   i)       Identify all its parent corporations, if any; and

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Ross W. Townsend                    Date: 9/16/2025

Attorney's Printed Name:  Ross W. Townsend

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [✓]  **No** [ ]

Address:  231 S Adams St

   Green Bay, WI 54301

Phone Number: 920-437-0476                    Fax Number:  920-437-2868

E-Mail Address: rwt@lcojlaw.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2532_____

Short Caption: Spengler v. Cooperative Educations Service Agency 7 et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Becky Spengler

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Conway, Olejniczak & Jerry S.C.

(3)    If the party, amicus or intervenor is a corporation:

     i)       Identify all its parent corporations, if any; and

     ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ George Burnett    Date: 9/16/2025

Attorney's Printed Name:  George Burnett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address:  231 S Adams St

     Green Bay, WI 54301

Phone Number: 920-437-0476    Fax Number:  920-437-2868

E-Mail Address: gb@lcojlaw.com

rev. 12/19 AK

## II.  TABLE OF CONTENTS

I.  DISCLOSURE STATEMENT.................................................................................2

II.  TABLE OF CONTENTS...................................................................................3

III.  TABLE OF AUTHORITIES ............................................................................5

IV.  JURISDICTIONAL STATEMENT...................................................................7

V.  STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................8

VI.  STATEMENT OF THE CASE.........................................................................9

VII.  SUMMARY OF ARGUMENT.....................................................................10

VIII.  ARGUMENT ...........................................................................................13

    A.  Procedural Posture..................................................................................13

    B.  Summary Judgment Standard and Standard of Review.......................................13

    C.  Background. .........................................................................................14

    D.  Analysis. .............................................................................................16

        1.  The District Court erroneously dismissed Plaintiff's Title VII race discrimination claims. ...........................................................................................16

            a.  Plaintiff properly pled and supported her Title VII race discrimination claims. ..17

                (i)  The First Component:  DPI believes that all White people (including Plaintiff) have racial bias and culpability for racial inequity while making no similar claims regarding people of color.................................................19

                (ii)  The Second Component:  As a condition of keeping her position as Integration Director, Defendants demanded that Plaintiff agree with DPI on matters of race and "demonstrate" her "commitment" to DPI's ideology.................................................................................23

                (iii)  The Third Component:  Defendants' demands on Plaintiff to agree with DPI on matters of race were different and more onerous than the demands made on employees of color........................................................28

            b.  The District Court's decision to dismiss Plaintiff's race discrimination claims was erroneous. .......................................................................30

                (i)  The District Court erred by finding that Plaintiff is not asserting a race discrimination claim in this case. ...........................................................30

                (ii)  The District Court made inaccurate assumptions and statements regarding Plaintiff's race discrimination claims. ..............................................31

                (iii)  The District Court erred by finding that Plaintiff failed to present evidence to support the second and third components of her race discrimination claims which assert that Defendants compelled her to confess to racial bias as a condition of her ongoing employment........................................34

         2.  The District Court erroneously dismissed Plaintiff's Title VII retaliation claims. ......37

a. Plaintiff properly pled and adequately supported her Title VII retaliation claims. ...................................................................................38

   (i) Plaintiff repeatedly and clearly opposed Defendants' unlawful demands that she agree with DPI's racially discriminatory beliefs about race. ...........38

   (ii) Defendants took adverse employment actions against Plaintiff because she opposed Defendants' unlawful demands that she agree with DPI's racially discriminatory beliefs regarding race. .......................................................44

b. The District Court erroneously failed to consider compelling evidence that the explanations proffered by Defendants for taking adverse actions against Plaintiff were false and pretextual. ...................................................................50

   (i) DPI's claims regarding Plaintiff's bad behavior during six monthly meetings are false. ...................................................................................51

   (ii) Defendants' claims regarding Plaintiff's poor job performance are false......56

3. The District Court erroneously dismissed Plaintiff's Equal Protection claims............57

4. The District Court erroneously dismissed Plaintiff's First Amendment claims. .........58

IX.  CONCLUSION.................................................................................................61

X.  CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS.............................................62

XI.  CIRCUIT RULE 25(a) CERTIFICATION ........................................................63

XII.  CERTIFICATE OF SERVICE........................................................................64

# III.  TABLE OF AUTHORITIES

**Cases**                                                                                                                      **Page(s)**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................58

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ...........................................................58

*Bostock v. Clayton County*, 590 U.S. 644 (2020) .........................................................28

*Bravo v. Midland Credit Mgmt.*, 812 F.3d 599 (7th Cir. 2016) ...............................59, 60

*Burke v. Heuerman*, 2025 WL 1643020 .......................................................................58

*Comcast Corp. v. National Association of African-American Owned Media*,
589 U.S. 327 (2020) ......................................................................................................17

*Cox v. Froedtert*, 2018 WL 8624494 ...........................................................................58

*Crawford v. Metropolitan Gov't of Nashville*, 555 U.S. 271 (2009) ..........................38

*Doe v. Smith*, 429 F.3d 706 (7th Cir. 2005) ...................................................................58

*Fine v. Ryan Int'l. Airlines*, 305 F.3d 746 (7th Cir. 2002) ......................................37, 38

*Global Imaging Acquisitions Group v. Rubenstein*, 2015 WL 5618803 .....................58

*Harris v. Allen County Board of Commissioners*, 890 F.3d 680 (7th Cir. 2018) .........17

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887 (7th Cir. 2018) .........13, 17

*Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697 (7th Cir. 2015) .....................................17

*Miller v. Polaris Labs*, 797 F.3d 486 (7th Cir. 2015) .............................................37, 38

*Mozee v. Jeffboat, Inc.*, 746 F.2d 365 (7th Cir. 1984) .............................................40, 41

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) ......................................................29

*Murphy v. Caterpillar Inc.*, 140 F.4th 900 (7th Cir. 2025) .............................50, 56, 57

*Runkel v. City of Springfield*, 51 F.4th 736 (7th Cir. 2022) .............................13, 14, 17

*Schoper v. Bd. of Trustees of Western Ill. Univ.*, 119 F.4th 527 (7th Cir. 2024) ..........13

*Scott v. Harris*, 550 U.S. 372 (2007) .......................................................................51, 52

*St Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) ..............................................50

*Williams v. Seniff*, 342 F.3d 774 (7th Cir. 2003) .........................................................57

**Federal Statutes**

28 U.S.C. §1291 ...................................................................................................7

28 U.S.C. §1331 ...................................................................................................7

29 U.S.C. §2601 ...................................................................................................7

42 U.S.C. §1983 ...................................................................................................7

42 U.S.C. §2000d ...................................................................................................7

42 U.S.C. §2000e ...................................................................................................7

42 U.S.C. §2000e-2(a)(1)) ....................................................8, 17, 28, 29, 32

42 U.S.C. §2000e-2(m) ........................................................................................17

42 U.S.C. §2000e-3(a)) ...................................................8, 37, 45, 46, 55

**State Statutes**

Wis. Stat. §116.01 ...................................................................................................14

**Rules**

Fed.R.Civ.P. 56(a) ...................................................................................................13

Fed.R.Civ.P. 8 ...................................................................................................58, 59

**Other**

"To Coach for Equity, Start by Looking Within",
Sharon Helmke, THE LEARNING PROFESSIONAL, Vol. 42 No. 3 (June 2021)................................22

"What if…White People Took Responsibility for Our Role in this Moment?",
Kathleen Osta, NATIONAL EQUITY PROJECT (May 30, 2020) ........................................... 22, 40, 45

## IV.  JURISDICTIONAL STATEMENT

District Court Jurisdiction.  U.S. district courts have original jurisdiction over all civil actions arising under the laws of the United States.  28 U.S.C. §1331.  Plaintiff raised her claims under Titles VI and VII of the Civil Rights Act of 1964, (42 U.S.C. §§2000d and 2000e, et seq.), Section 1983 (42 U.S.C. §1983), and the federal Family Medical Leave Act (29 U.S.C. §2601, et seq.).  Because all of Plaintiff's claims were raised under federal law, the U.S. District Court for the Eastern District of Wisconsin had original jurisdiction over all of the claims in this case.

Circuit Court Jurisdiction.  U.S. circuit courts have appellate jurisdiction over appeals from final decisions of the U.S. district courts.  28 U.S.C. §1291.  On August 4, 2025, the District Court granted both Defendants' Motions for Summary Judgment, dismissed Plaintiff's claims in their entirety (Appen.:1-40)[1], and entered final judgment in Defendants' favor.  (Appen.:41).  On August 29, 2025, Plaintiff filed her Notice of Appeal.  (ECF 149). [2]  Consequently, this Court has appellate jurisdiction over this appeal.

---

[1]  With this brief, Plaintiff is filing her "Required Short Appendix" and her "Separate Appendix."  The documents in both appendices are numbered consecutively and are cited herein as "Appen.:__".

[2]  The appellate record is cited herein as "ECF __:__."  The number prior to the colon references the docket number assigned to the document by the District Court as reflected in the District Court Civil Docket sheet filed in this Court as Document 1-2.  The number after the colon refers to either the page number assigned to the document by the District Court or, in the case of a document with numbered paragraphs, to the cited paragraph number.  For citations to deposition transcripts, the number after the colon refers to the page of the original transcript.

## V.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Did the District Court err by fundamentally misunderstanding and misstating Plaintiff's race discrimination claims, by ignoring and/or misconstruing relevant evidence, and by concluding that a reasonable jury could not rely on the evidence presented to conclude that Defendants discriminated against Plaintiff on the basis of her race in violation of Title VII (42 U.S.C. §2000e-2(a)(1))?

2.  Did the District Court err by failing to apply the proper legal standard to Plaintiff's Title VII retaliation claims, by ignoring relevant evidence, by misconstruing and misapplying other evidence, and by concluding that a reasonable jury could not rely on the evidence presented to conclude that Defendants retaliated against Plaintiff because she opposed practices made unlawful by Title VII (42 U.S.C. §2000e-3(a))?

3.  Did the District Court err by dismissing Plaintiff's Equal Protection claims against CESA 7 based on the same faulty reasoning that it used to dismiss Plaintiff's Title VII claims?

4.  Did the District Court err by concluding that Plaintiff failed to plead that CESA 7 violated her rights under the First Amendment by retaliating against her because of what she believed and what she refused to believe, and by then dismissing Plaintiff's First Amendment claims on that basis?

## VI.  STATEMENT OF THE CASE

Plaintiff asserts that DPI and CESA 7 violated Title VII of the Civil Rights Act of 1964 by discriminating against her on the basis of her race and retaliating against her because she opposed Defendants' unlawful conduct.  Plaintiff also contends that CESA 7 discriminated against her on the basis of her race in violation of the Equal Protection clause of the U.S. Constitution and retaliated against her because of what she believed and what she declined to believe in violation of the First Amendment of the U.S. Constitution.

In the District Court, both Defendants filed motions for summary judgment, and on August 4, 2025, the Court granted those motions and entered judgment for Defendants on all of Plaintiff's claims.  (Appen.:1-40, 41).  On August 29, 2025, Plaintiff filed her Notice of Appeal, (ECF 149), and she now challenges that portion of the District Court's decision and judgment which dismissed her Title VII race discrimination and retaliation claims as well as her Equal Protection and First Amendment claims.

## VII.  SUMMARY OF ARGUMENT

1.  Plaintiff asserts that Defendants violated Title VII by discriminating against her because she is White.  Plaintiff's race discrimination claims have three components:  First, the evidence shows that DPI believes that all White people have racial bias and are culpable for racial inequity.  DPI holds no such beliefs regarding people of any other race.  Second, the evidence shows that, as a condition of keeping her position, Defendants demanded that Plaintiff affirmatively agree with DPI on matters of race.  By doing so, Defendants made Plaintiff's beliefs about race a term and a condition of her employment.  Third, because DPI believes that all White people have racial bias and culpability for racial inequity, and because Defendants demanded that Plaintiff agree with DPI on matters of race, Defendants' demand to agree with DPI was equivalent to a demand that Plaintiff personally confess to having racial bias and culpability for racial inequity.  Because Defendants made no such demand on people of any other race, and because the only reason for such disparate terms and conditions of employment was Plaintiff's race, Defendants violated Title VII.  Furthermore, after Plaintiff failed to meet the discriminatory terms and conditions for continuing in her role, DPI isolated Plaintiff and barred her from attending meetings, and then terminated its employment relationship with Plaintiff.  Further, both Defendants then removed Plaintiff from her role as Integration Director.  The District Court erroneously concluded that Plaintiff failed to offer evidence upon which a reasonable jury could conclude that Title VII was violated and, on that basis, dismissed Plaintiff's race discrimination claims.

The District Court clearly misunderstood Plaintiff's race discrimination claims.  In its decision, the Court made ten erroneous or irrelevant statements about what Plaintiff is claiming in this case.  The Court ignored relevant evidence, and applied – but misinterpreted – evidence

that Plaintiff did not offer to prove the point at issue. The Court then relied upon its erroneous conclusions about what Plaintiff is claiming, and dismissed Plaintiff's race discrimination claims.

2. Plaintiff also asserts that Defendants violated Title VII by retaliating against her because she opposed conduct made unlawful by Title VII. The District Court did not conduct a distinct analysis of Plaintiff's retaliation claims. Instead, to the extent that the Court analyzed Plaintiff's retaliation claims at all, the Court considered those claims together with its erroneous analysis of Plaintiff's race discrimination claims, applying the same standard to Plaintiff's retaliation claims as it applied to her race discrimination claims. The Court's failure to consider the proper elements of Plaintiff's retaliation claims contributed to the Court's erroneous decision to dismiss those claims.

Meanwhile, Plaintiff produced substantial evidence that she opposed Defendants' unlawful conduct, including Defendants' efforts to compel Plaintiff – because she is White – to personally confess to racial bias and culpability for racial inequity while imposing no such obligations on persons of color. The evidence shows that, because of Plaintiff's opposition, DPI isolated Plaintiff and barred her from attending meetings, and then terminated its employment relationship with Plaintiff. Both Defendants then removed Plaintiff from her role as Integration Director.

The Court also erred because it failed to properly consider substantial evidence produced by Plaintiff that, in this litigation, both Defendants provided demonstrably false and pretextual reasons for the adverse actions that they took against Plaintiff. Because material evidence of pretext dictates that motions for summary judgment must be denied, Defendants' motions in this case should have been denied.

- 11 -

3.  Plaintiff also asserts that CESA 7 discriminated against her in violation of the Equal Protection Clause of the U.S. Constitution.  CESA 7 and the District Court both noted that the standard for Equal Protection claims is identical to the standard for Title VII claims, and they both concluded that, because Plaintiff's Title VII claims failed, then it follows that Plaintiff's Equal Protection claim also fails.  Neither CESA 7 nor the Court offered any other basis for dismissal of Plaintiff's Equal Protection claim.  Because the Court erred in dismissing Plaintiff's Title VII claims, it necessarily follows that it was also error to dismiss Plaintiff's Equal Protection claim.

4.  Finally, Plaintiff asserts that CESA 7 violated her rights under the First Amendment by retaliating against her because of what she believed and what she declined to believe.  The District Court held that, because Plaintiff did not plead such a claim, CESA 7 had no notice of that claim, and the claim must be dismissed.  In so ruling, the District Court overlooked plain language in Plaintiff's complaint (some of which the Court quoted in its decision) that Plaintiff objected to being forced to abandon her beliefs regarding race and embracing DPI's beliefs. Further, record evidence makes clear that, long before summary judgment, through discovery, CESA 7 was fully aware of Plaintiff's claims.  The Court erred by dismissing Plaintiff's First Amendment claim.

## VIII.  ARGUMENT

### A.  Procedural Posture.

On August 4, 2025, the District Court granted both Defendants' Motions for Summary

Judgment, dismissed Plaintiff's claims in their entirety, and entered final judgment in

Defendants' favor.  On August 29, 2025, Plaintiff filed her Notice of Appeal.  In this appeal,

Plaintiff challenges the District Court's ruling dismissing her Title VII discrimination and

retaliation claims, her Equal Protection claims, and her First Amendment claims.

### B.  Summary Judgment Standard and Standard of Review.

Summary judgment is properly granted only where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed.R.Civ.P. 56(a).  A dispute of fact is "genuine" if a reasonable jury could rely on that

evidence to return a verdict in favor of the non-movant.  *Runkel v. City of Springfield*, 51 F.4th

736, 741 (7th Cir. 2022).  In deciding a motion for summary judgment, a district court has a

narrowly-defined role.

> On summary judgment a court may not make credibility determinations, weigh the
> evidence, or decide which inferences to draw from the facts; these are jobs for a
> factfinder.  Rather, the court has one task and one task only: to decide, based on the
> evidence of record, whether there is any material dispute of fact that requires a trial.
> Summary judgment is not appropriate if the evidence is such that a reasonable jury could
> return a verdict for the nonmoving party.  We must look therefore at the evidence as a
> jury might, construing the record in the light most favorable to the nonmovant and
> avoiding the temptation to decide which party's version of the facts is more likely true.

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

On appeal, a circuit court applies a de novo standard of review to the decision of the

district court granting summary judgment, *Schoper v. Bd. of Trustees of Western Ill. Univ.*, 119

F.4th 527, 532 (7th Cir. 2024), and gives the non-movant the benefit of any conflicting evidence

- 13 -

and any favorable inferences that might be reasonably drawn from the evidence. *Runkel, supra*, 51 F.4th at 741.

## C. Background.

The Wisconsin Department of Public Instruction ("DPI") is the state agency that advances public education in Wisconsin. (Appen.:2). The Special Education Team is part of DPI and serves students with learning and emotional disabilities. (ECF 118:1). Two initiatives of the Special Education Team are directly relevant to this case: The Regional Special Education Network (the "RSN") initiative, and the Research to Practice Inclusive Communities ("RPIC") initiative. (ECF 118:2-3). The RSN initiative was overseen by DPI employee Erin Faasuamalie. (ECF 62:5). The RPIC initiative was overseen by DPI employee Rachel Fregien. (ECF 73:4-5). Both Faasuamalie and Fregien reported to Assistant Director of Special Education for DPI, Lynn Winn, (ECF 65:5-6), and Winn reported to Director of Special Education for DPI, Julia Hartwig. (ECF 77:5).

The RSN and RPIC initiatives were designed to provide support and training to school administrators and directors of special education ("school-based coaches") within the various school districts across the State who would then assist students who have disabilities and Individual Education Plans ("IEPs") to achieve better educational outcomes. (ECF 115:4).

DPI implemented the RSN and RPIC initiatives through interagency agreements with Cooperative Educational Service Agencies ("CESAs"). (Appen.:3). CESAs are statutorily-created entities that serve and support local school districts within defined geographic territories. Wis. Stat. §116.01. CESA 7 is one of the twelve CESAs in the state, and CESA 7's territory covers 38 school districts in northeast Wisconsin. (Appen.:3). In July of 2018, CESA 7 hired Plaintiff as its "Integration Director" to direct and manage DPI's RSN and RPIC initiatives in

- 14 -

CESA 7's territory.  (ECF 115:4).  Plaintiff's work on the RSN and RPIC initiatives was overseen by DPI employees Faasuamalie and Fregien.  Plaintiff was also supervised by Jeff Dickert, Agency Administrator for CESA 7.  (ECF 64:11).  In 2022, Dickert retired and was replaced as Agency Administrator by Colleen Timm.  (ECF 61:7-8).

In 2019 and 2020, DPI began to move the primary focus of the RSN and RPIC initiatives away from students with disabilities and IEPs and toward issues of race, racism and racial "equity."  (ECF 115:6-7).  By 2021, a substantial portion of the time and resources of the RSN and RPIC initiatives was focused on training school-based coaches to address issues of race and racial equity.  (Id.)  As part of that evolution, DPI adopted beliefs regarding race which assert (among other things) that all White people have racial bias, and all White people are culpable for racial inequity.  (See discussion at section D.1.a.(i), pp. 19-23, below.)  DPI adopted no similar beliefs regarding people of any other race.  (Id.)  DPI sometimes refers to agreement with its beliefs regarding race as "having an Equity Mindset."  (Appen.:49-50).

Although Plaintiff did not agree with DPI on matters of race, she still fulfilled her contractual obligation to follow DPI's lead and apply DPI's beliefs in her work in the school districts that she served.  (ECF 119:12; ECF 119-1).  Plaintiff did not share her contrary views in those school districts or otherwise seek to undermine DPI's beliefs within the districts that she served.  (Id.)  In fact, throughout her time as Integration Director, Plaintiff was lauded by DPI and CESA 7 and by the school-based coaches that she supported.  (Id.)  But, in Defendants' view, Plaintiff's good performance was not good enough.

In addition to doing the job that she was hired to do, in 2021 and 2022, Defendants demanded that, as a condition of retaining her position, Plaintiff must also personally agree with DPI on matters of race, and she must then adequately demonstrate her agreement to Defendants.

- 15 -

(See discussion at D.1.a.(ii), pp. 23-27, below).  Because Plaintiff is White, and because DPI believes that all White people have racial bias and culpability for racial inequity, Defendants' demand to agree with DPI was tantamount to a demand that Plaintiff personally accept and believe that she has racial bias and culpability for racial inequity.

Plaintiff made clear that she was willing and able to continue to effectively perform the job that she was hired to do, but she refused to abandon her own personal views regarding race or otherwise pledge fealty to DPI's ideology.  (Appen.:84-85; ECF 83-7:27; ECF 64-10).  As a result, beginning in October of 2021, DPI punished Plaintiff by isolating her and excluding her from attending and participating in regularly-scheduled meetings and training sessions with her peers from both the RSN and RPIC initiatives.  Then, after Plaintiff's employment contract expired at the end of June 2022, DPI terminated its employment relationship with Plaintiff, and both Defendants removed Plaintiff from her role as Integration Director.  (See discussion at section D.2.a.(ii)., pp. 44-50, below).

**D.  Analysis.**

This appeal addresses the District Court's erroneous dismissal of Plaintiff's Title VII race discrimination claims, Title VII retaliation claims, Equal Protection claims, and First Amendment free speech claims.

### 1.  The District Court erroneously dismissed Plaintiff's Title VII race discrimination claims.

The District Court plainly misunderstood Plaintiff's race discrimination claims.  In fact, the Court's decision dismissing those claims contains at least ten erroneous and/or irrelevant statements about Plaintiff's claims which demonstrate that the Court did not understand the basis of Plaintiff's race discrimination claims in this case.  Because the Court misunderstood

Plaintiff's race discrimination claims, the Court's rationale for dismissing those claims is completely unmoored from Plaintiff's actual claims, the facts, and the controlling law.

Before addressing what Plaintiff *does not* claim (as reflected in the Court's decision), it is necessary to first address what Plaintiff *does* claim.

### a. Plaintiff properly pled and supported her Title VII race discrimination claims.

Title VII of the Civil Rights Act of 1964 provides in relevant part that, "It shall be an unlawful employment practice for an employer[3] to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his … terms, conditions or privileges of employment because of such individual's race…." 42 U.S.C. §2000e-2(a)(1). Title VII is violated when the employee's protected characteristic is a "motivating factor" in her employer's adverse employment actions. 42 U.S.C. §2000e-2(m); *Runkel, supra*, 51 F.4th at 743.[4]

---

[3] In the District Court, DPI argued that CESA 7 was Plaintiff's employer and DPI was not, and that Plaintiff's Title VII claims against DPI must therefore fail. (ECF 101:13-21). In response, Plaintiff pointed out that DPI was her "indirect employer," and she cited *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 703 (7th Cir. 2015); *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 906 (7th Cir. 2018); and *Harris v. Allen County Board of Commissioners*, 890 F.3d 680, 684 (7th Cir. 2018) in support. (ECF 117:27-31). Those cases stand for the rule that a third party is an employee's "indirect employer" for purposes of Title VII where that third party exercises sufficient control over the worker. (ECF 117:29). Plaintiff pointed to the extensive control that DPI exercised over virtually every aspect of Plaintiff's work including evidence that (i) DPI was intricately involved in hiring Plaintiff, (ii) the vast majority of Plaintiff's work time was spent on work for DPI on the RSN and RPIC initiatives, (iii) the applicable contracts gave DPI control over not-only what Plaintiff did but how she did it, (iv) DPI regularly trained Plaintiff and the other coaches regarding how to do her job, (v) DPI monitored and critiqued Plaintiff's job performance, (vi) DPI provided funding which covered 92% of Plaintiff's wages, (vii) DPI made the decision to exclude Plaintiff from monthly meetings, (viii) DPI terminated Plaintiff's (indirect) employment with DPI, and (ix) DPI insisted that CESA 7 remove Plaintiff from the Integration Director role, which CESA 7 then did. (ECF 117:29-31; ECF 119:1-3). A jury could rely on that evidence to reasonably conclude that DPI exercised sufficient control over Plaintiff's work to qualify as Plaintiff's "indirect employer" for purposes of Title VII.

[4] Title VII is also violated in cases where, "but for" a plaintiff's protected status, her employer would have treated her differently. *Comcast Corp. v. National Association of African-American Owned Media*,

Plaintiff's race discrimination claims have the following three components:

- First Component: DPI believes that all White people have racial bias and are culpable for racial inequity. DPI has adopted no similar beliefs regarding people of color.

- Second Component: As a condition of continuing in her role, Defendants demanded that Plaintiff agree with DPI on matters of race and demonstrate to Defendants' satisfaction that she had abandoned contrary beliefs and embraced DPI's beliefs.

- Third Component: Because DPI believes that all White people (including Plaintiff) have racial bias and culpability for racial inequity, and because Defendants demanded that Plaintiff agree with DPI on matters of race, it logically follows that Defendants' demand that Plaintiff agree with DPI included a demand that Plaintiff personally accept and believe that, "Solely because **I** am White, **I** have racial bias, and **I** must share in the blame for racial inequities." By contrast, Defendants' demands on employees of color to agree with DPI required them to agree only that, "Solely because **they** (White people) are White, **they** have racial bias, and **they** are to blame for racial inequities." Because these disparate terms and conditions of employment were imposed on Plaintiff solely because of her race, Title VII was violated.

As discussed following, the evidence in this case will lead a reasonable jury to conclusions consistent with each of the three components of Plaintiff's race discrimination claims.

---

589 U.S. 327, 337 (2020). A showing of "but for" causation is a higher standard which, if met, entitles a plaintiff to a broader range of remedies under Title VII. (Id.)

**(i)  The First Component:  DPI believes that all White people (including Plaintiff) have racial bias and culpability for racial inequity while making no similar claims regarding people of color.**

A reasonable jury will rely on the evidence presented to conclude that DPI believes that all White people have racial bias and culpability for racial inequities while making no similar claims regarding people of any other race.  Supporting evidence includes:

(A)   DPI's publication, "Equity: Wisconsin's Model to Inform Culturally Responsive Practices" (Appen.:67-69):

> Those of us of the dominant race or culture need to work especially hard to examine power, privilege and bias, to see the invisible.  This is particularly relevant in Wisconsin, where 95% of educators and 90% of administrators are White….  With this step, we own up to our implicit biases and other hidden barriers to success in our classrooms and schools ….  [A]s a school system [we must] recognize that our historical policies and practices have benefited some of our students at the expense of others.  We acknowledge our own practices and beliefs as the leverage points for change.

(B)   DPI's "Equity Mindset Cards" (ECF 116-28:1):

> Our educational system greatly disadvantages our student of color…. The Department of Public Education has made a commitment to address these unacceptable opportunity gaps at the systems level, knowing the inequities stem from the system…. Inequity is a result of systems and practices that benefit members of dominant groups and harm or provide little benefit to others.

(C)   DPI's Coaching Competency Practice Profile ("CCPP") defines "Whiteness" and "White Supremacy" in critical terms, (Appen.:46), but contains no definition or discussion critical of any other race.

(D)   The CCPP defines "Whiteness" as "the dominant cultural space," and "refers to the specific dimensions of racism that serve to elevate White people over people of color." (Id.)  The definition distinguishes and divides the White race from all other races and claims that White people seek to "elevate" White people "over" people of color.  The CCPP makes no such claim regarding any other race.

- 19 -

(E)   The CCPP definition of "Whiteness" also claims that the "purpose [of Whiteness is] to keep others on the margin." (Id.) This element of the definition attributes a malevolent "purpose" to White people – to keep people of color "on the margin." The CCPP makes no such claim regarding any other race.

(F)   The CCPP also defines "White Supremacy" as "a collection of ideas that encourage us to value Whiteness (white norms, white culture and white people) more highly and above other cultures." (Id.) Thus, according to DPI, if White people value their own "norms" or "culture" over the norms or culture of any other people, they are engaging in "White Supremacy." The CCPP makes no such claim regarding any other race.

(G)   The CCPP includes examples of coaching behaviors by White coaches[5] falling into three categories: "expected," "developmental," or "unacceptable." (Appen.:48-50). Those examples include:

---

[5] Although the examples in the CCPP do not specifically use the adjective "White" to describe "coaches," a reasonable jury could infer that, within the context of race, the examples in the CCPP apply only to White coaches. Evidence in support of that conclusion includes, first, all coaches were White. (ECF 115:3). Second, the CCPP defines "Whiteness" and "White Privilege" as significant social problems while providing no similar definitions, critiques or conclusions regarding any other race. (Appen.:46). Third, in light of the definition of "Whiteness" and within the context of race, the CCPP's references to "coaches" in the examples logically apply only to White coaches. For example, since "Whiteness" occupies the "dominant cultural space," and since "inequity is a result of *systems* and practices that benefit members of dominant groups and harm or provide little benefit to others," (ECF 116-28:1), a coach of color could not possibly exercise racial "power and privilege" to "systematically" disadvantage White people (as the first example cited above states). Similarly, the "social and personal identities" of a Black coach could not "uphold [racial] inequities" which negatively affect White students (as the second example above states). Within the context of racial bias, the examples in the CCPP can logically be applied only to White coaches. Fourth, because the CCPP was designed to address *both racial and ableist* bias in coaches, the authors of that document necessarily excluded the word "White" to describe "coaches" in the examples. To include that word in the examples would have made the examples inapplicable in the case of ableist bias by a coach of color. In fact, DPI's reply brief in the District Court argues that the CCPP examples cannot be limited to White coaches because those examples must also apply to coaches of color who engage in ableist bias, as in the case of a Black gym teacher who has ableist bias against a disabled student. (ECF 128:11). But DPI's example of ableist bias does not rebut Plaintiff's point pertaining to racial bias. DPI's argument does not (and cannot) assert that the examples in the CCPP might apply just as well to a Black gym teacher who has *racial* bias against a White student.

- 20 -

o  An "expected" behavior is "the willingness and ability to see and speak to how [their racial] power and privilege are at work to systematically advantage some while simultaneously disadvantage others," while an "unacceptable variation" is the White coach who is "unwilling and/or unable" to see or admit that they have racial "power and privilege" which they use to "advantage some while simultaneously disadvantage others."  (Appen.:49).  DPI makes no allowance for the possibility that even one White coach might not have racial "power and privilege" or that, if she does, she might not use that racial "power and privilege" to "systematically advantage some while simultaneously disadvantage others."  DPI presumes that all White coaches have these negative beliefs and character flaws.

o  The behavior "expected" of a White coach "intentionally disrupts the ways in which their social and personal identities uphold [racial] inequities," while an "unacceptable variation" is a White coach who fails to recognize that particular negative character flaw in him or herself.  (Appen.:49).  Thus, without discussion or debate, the CCPP concludes as a matter of fact that all White coaches have "social and personal identities" that "uphold [racial] inequities."  DPI makes no allowance for the possibility that even one coach might not have such a character flaw.  To hammer that point home, the CCPP concludes that any attempt by any White coach to claim that their identity does not "uphold [racial] inequities" is guilty of an "unacceptable variation" requiring further "professional development."  (Id.)

---

Within the context of racial bias, a reasonable jury could infer that the examples in the CCPP apply only to White coaches.

o   A third example is the coach who "regularly articulates the … biases … they

bring to the coaching conversation and reflects on the impact of them," while

an "unacceptable variation" is the coach who "fails to connect emotional

responses to the beliefs and biases that underlie them."  (Appen.:59).  Again,

DPI simply states as fact that all White coaches have racial "bias," and any

coach who claims to be an exception to DPI's rule is guilty of an

"unacceptable variation."

(H)   As part of the RSN and RPIC initiatives, DPI adopted and endorsed at least nine

different articles almost all of which single out the White race for criticism.  (ECF 115-

1 to 115-9).  DPI neither adopted nor endorsed any similar articles regarding any other

race.  The articles endorsed by DPI included:

o   "To Coach for Equity, Start by Looking Within."  (ECF 115-7).  Author Sharon

Helmke describes her "own journey as a White educator," and confesses that,

because she is White, she still struggles with her own racial bias:

> It's incredibly painful to see myself in the profiles of white privilege and bias
> in education I read about….  Refusing to look at our actions and examine our
> own bias is more than just tacit acceptance.  It's active participation…. Only
> when you're aware of your blind spots and prejudices can you work to change
> the outcomes that follow from them.

According to Helmke (and, by endorsement of her article, DPI), all White people

are guilty of "active participation" in spreading racial bias until such time as they

"look at [their] actions and examine [their] own bias."

o   "What if … White People Took Responsibility for Our Role in this Moment?"

(ECF 115-4).  Author Kathleen Osta (who is White) addresses her article to

"justice minded white people," and in reference to the murder of George Floyd,

states that "We don't always … understand our direct role in contributing to, reproducing, and benefiting from a world where this kind of racial violence and terror are possible."  She concludes by observing that all White people are racists until such time as they become "anti-racist" by fully engaging in the fight against racism.

> There is no such thing as a 'not racist' – our actions are either racist or anti-racist…. We don't get spend our time being 'neutral' white people – because there is no neutral….  As white people committed to justice, it is our responsibility to move beyond the idea that we are 'not-racist' and therefore, not implicated in racism, to an understanding of ourselves as either racist, by virtue of our action or inaction, or anti-racist by virtue of what we are willing to interrupt, demand, and put on the line.

In these examples, DPI indicates that all White people have racial bias and culpability for racial inequity.  Nothing in the record indicates that DPI ever made any such observations, comments or critiques regarding people of any other race.  Based on this evidence (and the additional facts listed and cited at ECF 119:8-10), a reasonable jury could infer that, according to DPI, all White people and only White people have racial bias and culpability for racial inequity.

**(ii)  The Second Component:  As a condition of keeping her position as Integration Director, Defendants demanded that Plaintiff agree with DPI on matters of race and "demonstrate" her "commitment" to DPI's ideology.**

A reasonable jury could rely on the evidence presented to conclude that, as a condition of keeping her job, Defendants demanded ideological conformity from Plaintiff.  Supporting evidence includes:

(A)  According to DPI, the first "competency" of a successful coach is having an "Equity Mindset."  (Appen.:49-50).  The word "mindset" indicates that a successful coach has thoughts and opinions (i.e. a "mindset") regarding race that is consistent with DPI's idea of "equity."

- 23 -

(B)   In DPI's view, a coach with an Equity Mindset is a coach who, among other things, uses introspection to develop her "knowledge of self," "critical consciousness," and "self-awareness." (Appen.:49). However, the CCPP does not allow for the possibility that introspection might lead the coach to conclude that she does not have racial bias or other race-based shortcomings. In fact, the CCPP makes clear that any such conclusion is "unacceptable" and means that the coach needs more introspection or "professional development". (Appen.:48-49).

- o "Developing one's knowledge of self and understanding of the historical context of who has benefited and who has not is essential for effective, transformative system change." (App.:49).

- o A "component of the [equity mindset] competency" is that the coach "analyzes oppressive beliefs and feelings within oneself." (Id.)

- o The "expected use" of an "equity mindset" by coaches includes "the willingness and ability to see and speak how their power and privilege are at work to systematically advantage some while simultaneously disadvantage others." (Id.)

- o "The coach models self-awareness … when examining their social and personal identities. The coach intentionally disrupts the ways in which their social and personal identities uphold inequities." (Id.)

- o "Unacceptable variations" include coaches who are "unwilling and/or unable to see and speak to how their power and privilege are at work to systematically advantage some while simultaneously disadvantage others." (Id.)

- o "Unacceptable variations" also include the coach who "rarely models self-awareness" and the coach who "does not recognize the ways in which their social and personal identities uphold inequities." (Id.)

(C) DPI publication "Equity: Wisconsin's Model to Inform Culturally Responsive Practices" (Appen.:66-67) also demands introspection, but, like the CCPP, only introspection that ultimately leads to agreement with DPI is acceptable:

- o "Becoming self-aware means that individuals recognize that we bring our race and culture to every teaching and learning interaction and relationship…. As schools have historically reflected the norms of the dominant culture, those of us of the dominant race or culture need to work especially hard to examine power, privilege and bias, to see the invisible. This is particularly relevant in Wisconsin, where 95% of educators and 90% of administrators are White…." (Appen.:67).

- o "These assumptions, unexamined, create barriers to providing historically marginalized students full access…. With this step, we own up to our implicit biases and other hidden barriers to success in our classrooms and schools." (Appen.:68).

- o The school system must "recognize that our historical policies and practices have benefited some of our students at the expense of others. We acknowledge our own practices and beliefs as the leverage points for change." (Appen.:69).

(D) Evidence that Defendants demanded that Plaintiff agree with DPI on matters of race also includes the fact that DPI criticized Plaintiff because she did not agree with DPI.

- o Plaintiff's Interrogatory 15: "Identify and describe in detail all 'concerns' that you had with regard to how Plaintiff was 'carrying out the terms of the contract'…."

(ECF 83-1:16-17).  DPI's response, in part, cited Plaintiff's failure to embrace DPI's Equity Mindset, stating that, "The Coaching Competency Practice Profile outlined expectations for a competent coach, and Plaintiff was not demonstrating the competencies outlined therein."  (Id.)

- o Plaintiff's Interrogatory 16:  "Describe what [DPI] meant when [DPI] informed CESA 7 that [DPI was] not certain that Plaintiff has 'an equity mindset.'"  (ECF 83-1:17-18).  DPI: "Employees of DPI had reason to question whether Spengler had an equity mindset based on the equity mindset competency criteria in the Coaching Competency Practice Profile…."  (Id.)

- o Plaintiff's Interrogatory 26:  "List and describe every shortcoming in Plaintiff's job performance during school years 2019-2020, 2020-2021, and 2021-2022…."  (ECF 83-4:2-9).  DPI, in part:  In September 2021, "Spengler began pushing back on the equity mindset idea."  (ECF 83-4:3).

(E)  In her deposition testimony, Plaintiff testified repeatedly that, according to DPI, doing her job was not enough; she must also agree and wholeheartedly embrace DPI's beliefs. (e.g., ECF 59:12, 16, 22, 147-48).

(F)  Each academic year, DPI and CESA 7 signed an "integrated contract" which, among other things, defined the tasks and qualifications that DPI demanded of the Integration Director.  Beginning with the integrated contract for the 2022-23 school year, DPI included specific requirements that the Integration Director "have a *demonstrated commitment* to examining their personal biases in the areas of race and ability," and to engaging "in professional learning to support interrogating the ways one's race, culture and understanding" affect the services provided to school-based coaches.  (Appen.:72-

- 26 -

73).  DPI's document treated as fact that Plaintiff (as Integration Director) had "personal biases in the areas of race and ability," and made no allowance for the possibility that Plaintiff might not have any such biases to "examine."  The document further demanded that Plaintiff satisfactorily "demonstrate" her "commitment" to the ongoing "examination" of her "personal biases." (Id.)

(G)  Defendants made clear that the demands made by DPI in the 2022-23 integrated contract were "non-negotiable," that Plaintiff could no longer "pushback" or "question" DPI's beliefs regarding race, and that any failure by Plaintiff to wholeheartedly demonstrate that she was in agreement with DPI would result in prompt termination of Plaintiff's role as Integration Director and termination of the contract between DPI and CESA 7.  (ECF 114:61-63).

(H)  Evidence that Defendants demanded that Plaintiff agree with DPI on matters of race also includes the fact that Defendants punished Plaintiff because she did not agree with DPI.  As discussed in detail at section D.2.a.(ii), pp. 44-50, below, because Plaintiff refused to agree with DPI, (i) DPI isolated Plaintiff and banned her from attending and participating in all recurring RSN and RPIC meetings, (ii) DPI terminated its indirect employment relationship with Plaintiff, and (iii) both Defendants permanently removed Plaintiff from her role as Integration Director.

Based on the evidence presented by Plaintiff, a reasonable jury could infer and conclude that DPI demanded that, as a condition of retaining her role, Plaintiff must agree with DPI on matters of race.

**(iii)  The Third Component:  Defendants' demands on Plaintiff to agree with DPI on matters of race were different and more onerous than the demands made on employees of color.**

When Defendants insisted that, as a condition of remaining in her role, Plaintiff must agree with DPI, Defendants made Plaintiff's beliefs about race a "term and condition" of her employment.  42 U.S.C. §2000e-2(a)(1).  Because the beliefs that Defendants demanded of Plaintiff were not the same and were more onerous than the beliefs that Defendants demanded of employees of color, and because the only basis for that disparity was Plaintiff's race, Defendants violated Title VII.

In *Bostock v. Clayton County,* 590 U.S. 644, 658 (2020), the Supreme Court suggested that, in a disparate treatment case, causation could be analyzed by changing one critical factor of a situation at a time.  In this case, the District Court applied that methodology and changed one critical factor - the race of CESA 7's Integration Director.  (Appen.:21).  The Court considered what would have happened if Plaintiff's job as Integration Director had been held by a Black person such as conservative author Thomas Sowell.  The Court found that DPI would not have permitted Sowell to keep his job if he, like Plaintiff, had refused to agree with DPI.  The Court concluded that, because Defendants would have treated a Black Integration Director just as it treated Plaintiff, there was no disparate treatment.  (Id.)

The District Court erred because it stopped one step short of completing the proper analysis.  Although Defendants would have likely demanded that Sowell (as Integration Director) agree with DPI on matters of race, and that – if he refused – Defendants would have likely removed Sowell from the role, the Court failed to complete the analysis by considering the fact that Defendants' demand on Sowell for ideological conformity would not have been the same as the demand that Defendants made on Plaintiff.

For Plaintiff, the demand that she agree with DPI was a demand that she must personally confess that, "Because I am White, I have racial bias and I am culpable for racial inequity." Meanwhile, because Sowell is Black, Defendants' demand on Sowell to agree with DPI would have been a demand that he agree that, "All White people have racial bias and culpability for racial inequity – *but not me because I'm not White.*" Unlike Plaintiff, if Sowell were CESA 7's Integration Director, he could have agreed with DPI on matters of race without confessing to *his own* racial bias and foibles or otherwise accepting *personal culpability* for racial inequities. Had the District Court completed the analysis, the race-based disparity in Defendants' treatment of Plaintiff would have been evident.

In *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024), the Supreme Court explained that Title VII "targets practices that 'treat a person worse' because of [race].… [T]hat 'worse' treatment must pertain to – must be with respect to – employment 'terms or conditions.'" By demanding that, as a condition of keeping her role, Plaintiff believe the same things about race as DPI, Defendants made Plaintiff's beliefs a "term" and a "condition" of her employment. 42 U.S.C. §2000e-2(a)(1). Because Defendants demanded that Plaintiff believe something about herself that was more onerous and repugnant[6] than what Defendants would have required Thomas Sowell to believe about himself, a reasonable jury could conclude that Defendants treated Plaintiff worse because of her race, that such worse treatment pertained to the terms and conditions of her employment, and that Title VII was violated. *Muldrow, supra*, 601 U.S. at 354. Thus, Defendants' race-based, disparate treatment of Plaintiff violated Title VII.

---

[6] Demanding that Plaintiff confess to racial bias is, as the District Court recognized, "no small matter…. [and] racists are despised by the vast majority of people, and racism is properly viewed in this country as a serious moral and intellectual failing." (Appen.:25).

- 29 -

Defendants further discriminated against Plaintiff because of her race by punishing Plaintiff for failing to meet DPI's discriminatory terms and conditions of employment. As discussed below at section D.2.a.(ii), pp. 44-50, because Plaintiff did not agree with DPI on matters of race, (i) DPI isolated Plaintiff and banned her from attending and participating in regularly scheduled meetings for the RSN and RPIC initiatives, (ii) DPI terminated its employment relationship with Plaintiff, and (iii) both Defendants permanently removed Plaintiff from her position as Integration Director. Defendants would not have taken the same adverse actions against Thomas Sowell because, in the first instance, Defendants would not have insisted that Sowell personally confess to having racial bias and culpability for racial inequity. Because Defendants set racially discriminatory terms and conditions of employment on Plaintiff and then punished Plaintiff for failing to meet those terms and conditions, Defendants discriminated against Plaintiff on the basis of her race in violation of Title VII.

### b. The District Court's decision to dismiss Plaintiff's race discrimination claim was erroneous.

The District Court's opinion contains no less than ten erroneous and/or irrelevant statements about Plaintiff's race discrimination claims. The District Court clearly misunderstood Plaintiff's race discrimination claims.

### (i) The District Court erred by finding that Plaintiff is not asserting a race discrimination claim in this case.

The District Court erred first by finding that, "Plaintiff, who is White, does not claim that she was subjected to discrimination by DPI or CESA 7 because she is White." (Appen.:19). As noted above, that is simply not correct. Plaintiff plainly *does* claim that Defendants subjected her to racially discriminatory terms and conditions of employment by demanding that she confess to racial bias and culpability for racial inequity while making no such demands on

employees of color. Plaintiff's Complaint clearly alleges that Defendants discriminated against her on the basis of race, (ECF 33:49-57.a., 60.a.-c., e.-h., k., n.-o., s., 61.), and, in her briefs opposing Defendants' motions for summary judgment, Plaintiff argued in support of her race discrimination claims. (ECF 117:38-42; ECF 113:10-25). Indeed, although both Defendants argued that Plaintiff's disparate treatment claims were deficient, neither Defendant argued in this case that Plaintiff did not raise such claims. Further, during the June 13, 2025 hearing on Defendants' motions, the Court asked Plaintiff's counsel to list Plaintiff's claims, and, among those claims, counsel stated, "we assert that both of the defendants, DPI and CESA 7, discriminated against the plaintiff on the basis of her race." (ECF 158:4) The Court subsequently asked counsel, "So, as to each defendant, you have … Title VII claims for disparate treatment," to which counsel responded, "Correct." (ECF 158:6).

The Court's finding that Plaintiff is not asserting a race discrimination claim in this case is erroneous.

### (ii) The District Court made inaccurate assumptions and statements regarding Plaintiff's race discrimination claims.

The District Court found that, "Plaintiff's claim is predicated on a narrow legal question: Does the adoption and promotion of the tenets of critical race theory by DPI and CESA 7 constitute a violation of … Title VII of the Civil Rights Act?" (Appen.:19-20). With all due respect, that is not the predicate of any of Plaintiff's claims – including her race discrimination claim. To be clear, Plaintiff does not assert in this lawsuit that DPI violated Title VII simply because it adopted or promoted beliefs regarding race that are consistent with critical race theory or are inconsistent with Plaintiff's own personal beliefs. To the contrary, if, after DPI adopted its views on race, Defendants had permitted Plaintiff to continue to do her job while keeping her

own beliefs and views regarding race (just as she had done during the four preceding years), then this would be a very different case. But that is not what Defendants did.

Although Plaintiff was willing and able to continue to do the job she had done successfully for four years, (ECF 64:10; ECF 83-7:27; ECF 119:12; ECF 119-1; Appen.:84-85), Defendants refused to allow her to continue to do so unless she abandoned her own beliefs, and wholly embraced DPI's beliefs regarding race, including the belief that, because she is White, she has racial bias and culpability for racial inequity, all while making no such demands on employees of color. Because Defendants made Plaintiff's beliefs a term and a condition of her employment, and because they demanded that Plaintiff agree that she has racial bias and culpability for racial inequity because she is White, and because Defendants did not apply those same terms and conditions of employment to employees of color, Defendants violated Title VII. 42 U.S.C. §2000e-2(a)(1).

After its initial erroneous comment regarding the "predicate" of Plaintiff's claims, the Court went on to make and rely upon at least six more erroneous and/or irrelevant statements about Plaintiff's disparate treatment claims:

- "Being demoted for objecting to an employer's opinion or ideology is not the same as being fired because of one's race." (Appen.:21). Plaintiff does not dispute the Court's statement, but the statement does not fairly reflect any of Plaintiff's claims.

- "The question presented in this case is whether … the adoption of critical race theory by DPI and CESA 7 violated her rights under Title VII…." (Appen.:22). That is not "the question presented in this case." In fact, that question is not relevant to this case at all.

- "DPI's embrace of [CRT] does not, by itself, constitute a violation of Title VII."
  (Appen.:25). Plaintiff does not dispute the Court's statement, but that statement does not
  fairly reflect Plaintiff's claims.

- "Title VII… prohibits discrimination on the basis of race, not ideology." (Appen.:25).
  Again, that Court's observation does not fairly reflect Plaintiff's race discrimination
  claims.

- "The fatal flaw in Plaintiff's theory of liability is that the Civil Rights Act proscribes
  racially discriminatory actions; it does not proscribe theories or ideas." (Appen.:25). The
  "actions v. theories" distinction drawn by the Court is not a "fatal flaw in Plaintiff's
  theory of liability" because it is not – in any way – a part of Plaintiff's theory of liability.
  Plaintiff is not complaining in this case that DPI violated Title VII by adopting "theories
  or ideas." Rather, Plaintiff alleges that Defendants violated Title VII by demanding that
  Plaintiff *agree* with those theories or ideas, including the theory or idea that, because she
  is White, she has racial bias and culpability for racial inequity, all while making no such
  demands on employees of color.

- "Plaintiff contends" that "a Black person who was fired because he refused to confess to
  having [the flaw of being a racist] would properly be viewed as suffering discrimination
  on account of race, and if it would amount to a violation of Title VII to condition a black
  employee's employment on such a condition, it would likewise constitute a violation of
  Title VII to impose a similar condition on white employees…." (Appen.:25-26).
  Plaintiff has never "contended" any such thing. In fact, the argument attributed to
  Plaintiff by the Court is logical and legal nonsense. Plaintiff contends first that DPI
  believes all White people have racial bias and culpability for racial inequity while

- 33 -

holding no such beliefs regarding people of color, and second, that Defendants demanded that Plaintiff agree with DPI, meaning third, that Defendants demanded that Plaintiff accept and believe that, because she is White, she has racial bias and culpability for racial inequity.

The District Court erred because it ignored and/or misconstrued Plaintiff's race discrimination claims, created different theories of recovery that Plaintiff never asserted, attributed those theories to Plaintiff, and then dismissed Plaintiff's race discrimination claims because Plaintiff failed to support the meritless theories of recovery that the Court attributed to her.

> **(iii)  The District Court erred by finding that Plaintiff failed to present evidence to support the second and third components of her race discrimination claims which assert that Defendants compelled her to confess to racial bias as a condition of her ongoing employment.**

As discussed above at sections D.1.a.(ii) and (iii), pp. 23-30, the second and third components of Plaintiff's race discrimination claims are that Defendants demanded that, as a condition of keeping her job, Plaintiff agree with DPI which, in turn, required her to agree that, because she is White, she has racial bias and culpability for racial inequity.  The District Court understood that Plaintiff was making such allegations.  (Appen.:25).  However, the Court then erroneously concluded that Plaintiff "has not submitted evidence from which a reasonable jury could conclude that she was required to admit to being a racist as a condition of her maintaining her position."  (Appen.:25-26).  While it is true that Defendants never overtly demanded that Plaintiff utter the precise words, "I am a racist," the evidence presented plainly indicates (and would allow a jury to reasonably conclude and infer that) first, DPI believes that all White people (including Plaintiff) have racial bias and culpability for racial inequity (see section D.1.a.(i), pp. 19-23, above), and second, that as a condition of continuing in her role, Plaintiff was required to agree with DPI on matters of race, (see section D.1.a.(ii), pp. 23-27, above), and

- 34 -

third, that Defendants' demand that Plaintiff agree with DPI necessarily included a demand to agree with DPI's belief that, because she is White, Plaintiff has racial bias and culpability for racial inequity.  (See section D.1.a.(iii), pp. 28-30, above).

The Court's finding that Plaintiff failed to support the second and third components of her race discrimination claims is erroneous because it completely ignores the extensive evidence presented by Plaintiff in support of those components of her claims at sections D.1.a. (ii) and (iii), pp. 23-30, samples of which include relevant provisions of the 2022-23 Integrated Contract, the CCPP, the MICRP, and the Equity Mindset Cards.  From that evidence, a jury could reasonably conclude or infer that Defendants demanded that Plaintiff confess to racial bias as a condition of keeping her job.

Instead of relying on (or even acknowledging) the substantial body of evidence cited by Plaintiff supporting her point, the Court cited three pieces of evidence that Plaintiff did *not* cite as support for the point that Defendants demanded that she confess to racial bias.  (Appen.:26-32).  Two of the three pieces of evidence reviewed by the Court are articles endorsed by DPI as part of the RSN and RPIC initiatives.  Plaintiff did <u>not</u> cite those articles as evidence that she was compelled to admit to racial bias.  Rather, those articles were among nine total articles offered by Plaintiff in support of the first component of her race discrimination claims - her allegation that DPI believes all White people have racial bias and culpability for racial inequity.  (See section D.1.a.(i), pp. 19-23, above.)  Plaintiff cited the articles because the authors of those articles – like DPI – believe that White people are flawed in matters of race.  The fact that these authors chose to write articles specifically addressing the weaknesses, blind spots, and bad behaviors unique to White people is evidence that, in the view of these authors (and DPI by its endorsement), White people are not like other people in matters of race.  In fact, the article written by Kathleen Osta

and cited by the Court ("What if … White People Took Responsibility for Our Role in This Moment") unambiguously states that all White people are racists and continue to be racists until – by hard work and determination – some of them become "anti-racists."  Osta writes,

> There is no such thing as a 'not racist' – our actions are either racist or anti-racist…. We don't get spend our time being 'neutral' white people – because there is no neutral….  As white people committed to justice, it is our responsibility to move beyond the idea that we are 'not-racist' and therefore, not implicated in racism, to an understanding of ourselves as either racist, by virtue of our action or inaction, or anti-racist by virtue of what we are willing to interrupt, demand, and put on the line.

Nothing in the record suggests that DPI held such beliefs regarding people of color, and a reasonable jury could infer from the evidence that these authors (and, by its endorsement, DPI) believe that all White people have racial bias.

As the third piece of evidence cited by the Court in support of its conclusion that Defendants did not demand that Plaintiff confess to racial bias, the Court states that, "Plaintiff seems to view her exchange with … Faasuamalie during the September 15, 2021 RSN meeting as proof that she was required to confess to being a racist as a condition of her employment." (Appen.:28-32).  Plaintiff has never expressed any such view.  The Court spends four pages of its decision to recount the exchange and concludes that "[Plaintiff] interprets DPI's reaction to her inadvertent group message as proof that a condition of her employment was the requirement that she admit being a racist…."  (Appen.:31-32).  Again, Plaintiff has never made any such argument or otherwise relied on her exchange with Faasuamalie to support her claim that DPI required her to confess to being a racist.  (Plaintiff cited the events of the September 15, 2021 RSN meeting only as support for her retaliation claims – not her race discrimination claims.  As discussed below at section D.2.a.(i) and (ii), (pp. 38-41, 45-46), to the extent that the events of the September 15 meeting are relevant at all, Plaintiff cited those events to demonstrate that (i)

Plaintiff opposed DPI's unlawful race discrimination and (ii) DPI retaliated against Plaintiff because of that opposition.)

The District Court ignored the evidence offered by Plaintiff which demonstrates that Defendants demanded that Plaintiff agree with DPI on matters of race and ultimately confess that she has racial bias and culpability for racial inequity. Then the Court cited irrelevant evidence that Plaintiff never offered in support of the point, and further erred by misconstruing even that evidence. Finally, the Court erroneously concluded that "Plaintiff has failed to offer evidence" that Defendants demanded that she admit to racial bias. (Appen.:32).

**2. The District Court erroneously dismissed Plaintiff's Title VII retaliation claim.**

Title VII provides in relevant part that, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. §2000e-3(a). To prove a Title VII retaliation claim, a plaintiff must establish that (i) she engaged in "protected activity," (ii) she suffered an adverse employment action, and (iii) there exists a causal link between the protected activity and the adverse employment action. *Miller v. Polaris Labs*, 797 F.3d 486, 492 (7th Cir. 2015). A plaintiff raising a Title VII retaliation claim need not prove that she opposed an action that actually violated Title VII; all that is required is that the plaintiff reasonably believed in good faith that the practice she opposed violated Title VII. *Fine v. Ryan Int'l. Airlines*, 305 F.3d 746, 752 (7th Cir. 2002).

In this case, the District Court did not distinguish Plaintiff's retaliation claims from her race discrimination claims. A distinct analysis is critical because the elements of a Title VII retaliation claim are not the same as the elements of a Title VII discrimination claim. *Miller, supra,* 797 F.3d at 492*; Fine, supra,* 305 F.3d at 752. The Court's opinion does not include any

evaluation whatsoever of the elements of a Title VII retaliation claim. *Miller, supra*. Instead, to the extent that the Court analyzed Plaintiff's retaliation claims at all, it does so only as part of its analysis of Plaintiff's Title VII race discrimination claims. The Court's analysis was, at best, incomplete, and had the Court properly analyzed Plaintiff's Title VII retaliation claims, it would have been evident that Plaintiff presented ample evidence in support of each of the three elements of her retaliation claims.

### a. Plaintiff properly pled and adequately supported her Title VII retaliation claims.

In the District Court, Plaintiff pointed to evidence sufficient for a reasonable jury to conclude or infer that she met all three elements of her Title VII retaliation claims.

### (i) Plaintiff repeatedly and clearly opposed Defendants' unlawful demands that she agree with DPI's racially discriminatory beliefs about race.

The first element of a retaliation claim obligates a plaintiff to demonstrate that she engaged in "protected activity," one example of which is "opposition" to a practice made unlawful by Title VII. *Miller, supra*, 797 F.3d at 492. The Supreme Court has noted that, because the term "oppose" is not defined by Title VII, that word "carries its ordinary meaning" which includes "to resist or antagonize," "to confront, resist, withstand," or "to be hostile or adverse to, as in opinion." *Crawford v. Metropolitan Gov't of Nashville*, 555 U.S. 271, 276-77 (2009). To constitute "protected opposition," a plaintiff need not prove that the conduct she opposed actually violated Title VII. Rather, all that is required is that she, in good faith, believed that it did so. *Fine, supra*, 305 F.3d at 752.

In the District Court, Plaintiff produced substantial evidence of her good faith opposition to Defendants' unlawful conduct. Such evidence included her deposition testimony (e.g., ECF 59:12-16, 22), and a 12 page spreadsheet referencing dozens of statements, recordings, emails,

and other documents which constituted or were indicative of Plaintiff's opposition.  A reasonable jury could rely on that evidence to conclude that Plaintiff opposed DPI's beliefs about race, including its belief that, because Plaintiff is White, she has racial bias and culpability for racial inequity.  (See ECF 85-26:9-20.)  Samples of that evidence includes:

(A) Plaintiff repeatedly testified in her deposition that Defendants discriminated against her because of her race, and that she opposed and objected to that discrimination.  (e.g. ECF 59:12-16, 22).

(B) 6-17-21 Meeting – Plaintiff, Winn and Faasuamalie.  Plaintiff complained to DPI of illegal race discrimination against her.  (ECF 115:34).

(C) 8-11-21 RSN Meeting.  Plaintiff to DPI: "Within the last few years … the vehicle is racial equity….  And in terms of ways of being and in terms of mindsets, there are things that I don't necessarily agree with…."  (ECF 116-3:11, 13).

(D) 9-8-21 RPIC Meeting.  Plaintiff to DPI: "There seems to be an assumption that we all take at face value what is presented to us as fact…. It's really not fact, right? ... It seems that there's an assumption … that systemic racism exists, number one, and number two, it is the cause for race-based gaps.  And I'm saying I don't know if I believe that." (ECF 116-4:9-12).

(E) 9-15-21 RSN Meeting.  Plaintiff to DPI: "If we think about Dr. Martin Luther King's quote about being judged on the content of your character and not the color of your skin, right?  What I hear people saying is we thought that was right to be colorblind, but it's not….  We thought it was right, but now we know it's wrong.  And I'm saying, how do you know that?"  (ECF 116-5:3-5)

(F)   9-15-21 RSN Meeting.  Plaintiff in "Chat": "This seems to assume that systemic racism is a fact, and not a theory, and that everyone has blind spots with regard to race.  I'm curious about that and how someone does this work if they have a counter belief to that."  (ECF 81-41:4).

(G)   9-15-21 RSN Meeting.  Plaintiff wrote in a "Chat":

> You will not believe the recording today. I got them to say I can't do this work if I don't believe in all this antiracism BS.  [ECF 81-41:6].

Three points about the Chat:

- First, Plaintiff's use of the term "BS" clearly demonstrates her "opposition" to DPI's beliefs regarding "antiracism."  As used by DPI, "antiracism" is a term of art which means more than just "not racist."  The "antiracism BS" to which Plaintiff refers is a direct reference to DPI's belief that White people cannot be "not racist," and that all White people (including Plaintiff) are racists unless and until they become "anti-racists."  See e.g., article endorsed by DPI, "What if … White People Took Responsibility for Our Role in this Moment?" which explains that White people cannot be "not racist," and that all White people are "racists" until they become "anti-racists."  (ECF 115-4:3, 4).  See also Plaintiff's deposition. (ECF 59:16, 22).

- Second, although an employee "may not engage in conduct which is 'excessively disloyal or hostile or disruptive and damaging to the employer's business' and then claim the shield of §704(a) as protection against adverse action…. 'A court must balance the setting in which the activity arises and the interests and motivations of both employer and employee.'"  *Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 374 (7th Cir. 1984)(internal citations omitted).  Plaintiff's Chat could hardly be described as

shocking or out-of-bounds, and the use of the abbreviation "BS" is hardly unusual or shocking - even in the workplace. (ECF 119:24.) The video recordings and transcripts of the meetings at issue make clear that Plaintiff did nothing during the September 15 meeting (or any of the other five meetings) to justify the reaction that followed her respectful opposition to DPI's unlawful ideas regarding race. Under the balancing test articulated in *Mozee, supra*, Plaintiff's Chat was appropriate in tenor, tone and content. Indeed, if Plaintiff's Chat constituted the sort of conduct that the *Mozee* Court described as "excessively disloyal or hostile or disruptive and damaging to the employer's business," then it is hard to imagine any sort of opposition by any employee to her employer's unlawful practices that could possibly survive the *Mozee* test.

- <u>Third</u>, with regard to Plaintiff's statement that she "got them to say…", Plaintiff had repeatedly asked DPI if she would be permitted to continue to perform her job if she did not agree with DPI's beliefs on race. DPI had repeatedly given her an incomplete or unclear answer to that question. (e.g.s, ECF 116-3:13-14; ECF 116-4:9-10; ECF 83-9:37; ECF 81-41:4-5). Finally, during the September 15 meeting, DPI gave a straightforward answer to that question, (ECF 116-5:9), leading Plaintiff to tell her husband (or so she thought) [7] that she finally "got them" to give a clear answer and say that she could not do the work if she did not believe. (ECF 81-41:6).

(H)  9-16-21 call, Plaintiff and Fregien. (ECF 83-7). Plaintiff: "I have some concerns personally about how to do to carry out the work." (ECF 83-7:2). Those concerns are

---

[7] Plaintiff intended to send the Chat to her husband, but accidentally sent it to the RSN group instead.

focused on sections 1.a., 1.b., and 1.c. of the Equity Mindset competency.  (ECF 83-7:6).  Language does not leave room for other explanations for "breaks in the system;" DPI's views are a theory – not fact.  (ECF 83-7:7).  "There doesn't appear to be room in there to not believe."  (ECF 83-7:8).  Plaintiff's "counterbelief" to DPI's belief is "identifying as being non-racial, so not seeing color as a means to determine achievement levels….  We used to talk about MLK a lot and we used to say … children would be judged by the content of their character and not the color of their skin, and as somebody who identifies as nonracial, I don't see race as being a deciding factor."  (ECF 83-7:15-16).  Fregien:  "I don't think you can put your personal feelings aside and still do the job."  (ECF 83-7:29).

(I)     9-20-21 meeting, Plaintiff, Dickert and Timm.  Plaintiff raises concerns re DPI's ideology that divides all people by race, its "insistence that all White people have racial bias," and its belief that denying racial bias was an "unacceptable variation."  (ECF 115:38).  After meeting, Plaintiff emailed Dickert, attaching CCPP and Equity Mindset cards and calling Dickert's attention to "the equity language in 1A, 1B, and 1C" of the CCPP.  (ECF 64-4).

(J)     9-20-21 email, Dickert to Honisch.  "Becky says she has been fighting the 'everyone is a racist' thing."  (ECF 64-5).

(K)     9-21-21 Dickert notes re meeting with DPI.  DPI is "not sure" that Plaintiff has "equity mindset;" she has "issues with equity," she "is opposed to Equity work".  (ECF 64-6).

(L)     10-5-21 email, Dickert to Hartwig.  Plaintiff is "feeling bullied for disagreeing with DPI on this lead into coaching work," which is "a breakdown of one's whiteness."  (ECF 64-11).

(M)  10-11-21 Dickert notes re meeting with Winn and Hartwig.  "Much of the work is about equity."  "DPI believes in systemic racism – [Plaintiff's] presence is a problem."  (ECF 64-14).

(N)  2-23-22 Conversation transcript, Dickert and Plaintiff.  Dickert: "[DPI] will be taking away the RPIC coach … [and] they will not fund you in the RSN position.…  What they would say is you're not compatible for the work that they're requiring to have done.…  They don't feel that you can do the work based on what they're training and what they consider your inability to move in the direction that they want to move in and that you wouldn't be able to do that for them, in the equity work that they're trying to promote."  (ECF 110-1:1-3).

(O)  2-24-22 email, Hartwig to Dickert.  "I am sending this email to let you know that it is our preference that Becky Spengler not be assigned to the RPIC and RSN projects for the 2022-23 contract as we have concerns with how she has been carrying out the terms of the contract."  (ECF 64-22).  Plaintiff's Interrogatory 15 to DPI:  Identify those "concerns."  DPI's sworn response, in part:  The CCPP "outlined expectations for a competent coach, and Plaintiff was not demonstrating the competencies outlined therein."  (ECF 83-1:16-17, 30).

(P)  Plaintiff's Interrogatory No. 26 to DPI: "list and describe every shortcoming in Plaintiff's job performance…."  DPI's sworn response, in part:  In September of 2021, "Spengler began pushing back on the equity mindset idea."  (ECF 83-4:2-3).

(Q)  3-9-22 email, Dickert to Winn and Hartwig. "We need another meeting … evidence of DPI bullying CESA 7 employee who has philosophical belief in contrast to DPI's belief in 'privilege' and 'bias.'"  (ECF 64-23:2).

- 43 -

(R)   3-19-21 email, Plaintiff to Dickert, attaching five-page document citing "examples of how I believe DPI has discriminated against me for my political views and for questioning the work around white privilege, etc." (ECF 84-24, ECF 84-25).

(S)   5-12-22 email, Plaintiff to Dickert and Timm. After 5-3-22 discussion with Timm (ECF 114:61) and 5-11-22 meeting (ECF 114:62-63) in which Dickert and Timm asked Plaintiff if she was willing to commit to DPI's views on race without pushback or questioning, Plaintiff writes: "I have successfully performed this work – including the anti-racist work that DPI is now emphasizing – for several years with great success…. I am committed to continue to perform that work just as I have in the past…. I will continue to maintain my own personal views and opinions regarding race, and I will not agree to waive my right to express those views in the same respectful manner as any other employee of DPI or CESA 7…. I am not a racist nor do I harbor bias toward any person based on race, and I will not confess to sins that I have not committed. I will not agree to keep silent regarding DPI's racist philosophy, policies, and plan of action. Instead, I will retain my right to continue to oppose racial discrimination in the workplace." (Appen.:84-85).

> **(ii) Defendants took adverse employment actions against Plaintiff because she opposed Defendants' unlawful demands that she agree with DPI's racially discriminatory beliefs regarding race.**

Defendants took adverse action against Plaintiff because she opposed Defendants' unlawful insistence that she agree with DPI's racially discriminatory beliefs about race. Evidence supporting those conclusions includes the following:

(A)   During the September 15, 2021 RSN meeting, Plaintiff intended to send a Chat to her husband but accidentally sent that chat to the RSN group which said, in relevant part, that:

> You will not believe the recording today. I got them to say I can't do this work if I don't believe in all this antiracism BS.

By calling DPI's beliefs "BS," Plaintiff made it clear that she opposed DPI's beliefs regarding "antiracism." (ECF 118:100.)  "Anti-racism" is a term of art coined by Ibram X. Kendi and used by Kathleen Osta in her article (which DPI endorsed), "What if … White People Took Responsibility for Our Role in this Moment?" (ECF 115-4:3-4). Osta explains that "there is no such thing as a 'not racist' – our actions are either racist or anti-racist…. We don't get to spend our time being 'neutral' white people – because there is no neutral…. As White people committed to justice, it is our responsibility to move beyond the idea that we are 'not racist' and therefore, not implicated in racism, to an understanding of ourselves as either racist, by virtue of our action or inaction, or anti-racist by virtue of what we are willing to interrupt…." (Id.)  Because "anti-racism" presumes that all White people (and only White people) are racists until they become "anti-racists," and because Plaintiff opposed DPI's efforts to compel her to agree with that racist belief (calling it "BS"), Plaintiff's Chat was protected opposition to conduct made illegal by Title VII.

Because Plaintiff's opposition was "protected" against retaliation by Title VII, it was unlawful for DPI to take action against Plaintiff because of the Chat.  42 U.S.C. §2000e-3(a).  And yet, that is precisely what DPI did.  In her deposition, Julia Hartwig testified the Chat "was the final straw," and after addressing the Chat in a meeting with CESA 7 on September 21, 2021, DPI barred Plaintiff from attending any future

- 45 -

monthly meetings of the RSN and RPIC initiatives.  (ECF 77:137-38; ECF 64-40).  (See also DPI's brief - ECF 101:8 - The Chat was "the tipping point.")  By acknowledging that it took adverse action against Plaintiff because of the Chat, DPI has admitted to unlawfully retaliating against Plaintiff because of her protected opposition to DPI's illegal conduct.  42 U.S.C. §2000e-3(a).

(B)  9-15-21 RSN Meeting:  Plaintiff:  "It sounds like in order to do the work, you have to agree with this, and that means being told how to feel.  And I don't know what to do with that because you can't tell somebody how to feel."  Faasuamalie:  "That's fair.  Yeah, I agree."  (ECF 116-5:9).

(C)  9-16-21 call, Plaintiff and Fregien.  Fregien: "I don't think you can put your personal feelings [about race] aside and still do the job."  (ECF 83-7:29).

(D)  9-21-21 Dickert notes re meeting with DPI.  According to DPI, Plaintiff may not have "equity mindset," has "issues with equity," "is opposed to Equity work".  (ECF 64-6).  Plaintiff's Interrogatory 16 asked DPI to explain what DPI meant by its claim that Plaintiff may not have "an equity mindset."  DPI's response, in part: "Employees of DPI had reason to question whether Spengler had an equity mindset based on the equity mindset competency criteria in the Coaching Competency Practice Profile…."  (ECF 83-1:17-18).

(E)  10-4-21 email, Hartwig to Dickert.  "[DPI's] strong preference is that Becky no longer be assigned to the RSN and RPIC projects….  We request that she not attend statewide meetings for either of these projects … due to the significant negative impact she continues to have on … the projects."  (ECF 64-9).

(F)  10-5-21 Plaintiff's notes summarizing 10-5-21 meeting with Dickert.  Plaintiff, "They [DPI] do not believe I have an equity mindset.  They would like me removed from the work of RSN and RPIC."  (ECF 84-13).

(G)  10-11-21 Dickert notes re meeting with Winn and Hartwig.  "DPI believes in systemic racism - her presence is a problem."  (ECF 64-14).

(H)  2-23-22 Dickert notes re meeting with Winn and Hartwig.  "No to Becky Spengler in the position 2022-23.  DPI will send me confirmation email."  (ECF 64-20).

(I)  2-23-22 Conversation transcript, Dickert and Plaintiff.  Dickert: "They [DPI] notified me that, they will be taking away the RPIC coach … and then they will be taking away your RSN, they will not fund you in the RSN position.  …  What they would say is you're not compatible for the work that they're requiring to have done.… They don't feel that you can do the work based on what they're training and what they consider your inability to move in the direction that they want to move in and that you wouldn't be able to do that for them, in the equity work that they're trying to promote."  (ECF 110-1:1-3).

(J)  2-24-22 email, Hartwig to Dickert.  "I am sending this email to let you know that it is our preference that Becky Spengler not be assigned to the RPIC and RSN projects for the 2022-23 contract as we have concerns with how she has been carrying out the terms of the contract."  (ECF 64-22).  Plaintiff's Interrogatory 15 asks DPI to identify those "concerns."  DPI's sworn response, in part:  The CCPP "outlined expectations for a competent coach, and Plaintiff was not demonstrating the competencies outlined therein."  (ECF 83-1:16-17).

(K) Plaintiff's Interrogatory No. 26 to DPI: "list and describe every shortcoming in Plaintiff's job performance…." DPI's sworn response, in part: In September of 2021, "Spengler began pushing back on the equity mindset idea." (ECF 83-4:3).

(L) 5-3-22 Dickert notes re meeting with DPI regarding Plaintiff and 2022-23 integrated contract. "Not clear in past – Now 2022-23 integrated contract." "Clear DPI expectations for 2022-23." If Plaintiff fails to comply, DPI will "Terminate on 30 days for cause and convenience. If Becky [is in the role], supports in place." (ECF 64-26).

(M) 5-3-22 Discussion, Plaintiff and Timm. Timm: The points in integrated contract are non-negotiable. Plaintiff can keep Integration Director role if (i) she will "commit to the role" as outlined in the integrated contract, and (ii) she does her job without pushback or questioning. (ECF 114:61; ECF 58:131-34).

(N) 5-11-22 Dickert notes (incorrectly dated as "4/11/22") re meeting with Plaintiff and Timm. Discuss new equity provisions on page 3 of 2022-23 integrated contract. If Plaintiff commits, then Plaintiff can retain her role and DPI will monitor Plaintiff and terminate on 30 days' notice if she steps out of line. (ECF 64-56. See also ECF 58:137-40).

(O) 5-12-22 email, Plaintiff to Dickert and Timm. "I am not a racist nor do I harbor bias toward any person based on race, and I will not confess to sins that I have not committed. I will not agree to keep silent regarding DPI's racist philosophy, policies, and plan of action. Instead, I will retain my right to continue to oppose racial discrimination in the workplace." (Appen.:84-85).

(P) 5-17-22 Dickert notes re meeting with Plaintiff and Timm. After Plaintiff states that she will not abandon her personal beliefs re race or agree with DPI, CESA 7 removes

- 48 -

Plaintiff from Integration Director role, and Plaintiff's (indirect) employment relationship with DPI terminates. Timm offers Plaintiff new role with CESA 7. (ECF 64-59. See also ECF 58:158-59).

(Q) CESA 7's Interrogatories 16, 19 and 20 asked Plaintiff to identify the factual basis of Plaintiff's claims raised in paragraphs 37.b., 37.e., and 41.b. of Plaintiff's Complaint which assert, in essence, that CESA 7 was aware of, and participated in, DPI's demands that, as a condition of keeping her job, Plaintiff must agree with DPI on matters of race. (ECF 85-12:2-7). In Plaintiff's meticulous and detailed responses to those three interrogatories (which cover 10 pages, and include a lengthy spreadsheet of evidence – ECF 85-12:2-7, 18-22) as well as her deposition testimony (ECF 58:158-59), Plaintiff offered substantial evidence (i) that DPI was demanding that Plaintiff abandon her beliefs on race and embrace DPI's beliefs, (ii) that CESA 7 was aware of those demands, (iii) that CESA 7 refused to permit Plaintiff to remain in her role unless she conceded to DPI's demands and agreed to abandon her beliefs on race and wholly embrace DPI's beliefs, and (iv) that because Plaintiff refused to abandon her beliefs and embrace DPI's beliefs on race, CESA 7 would not allow Plaintiff to keep her job as Integration Director. (ECF 85-12:4-6, 18-22; ECF 58:158-59).

A reasonable jury could rely on these facts to conclude that, because Plaintiff opposed DPI's beliefs regarding race – including DPI's beliefs that, because she is White, she has racial bias and culpability for racial inequity while holding no such beliefs regarding people of other races – and because Plaintiff opposed and refused Defendants' demands that Plaintiff abandon her beliefs and embrace DPI's beliefs, DPI isolated her and excluded her from monthly meetings, DPI

- 49 -

terminated its indirect employment relationship with Plaintiff, and both Defendants permanently

removed Plaintiff from the Integration Director role.

### b. The District Court erroneously failed to consider compelling evidence that the explanations proffered by Defendants for taking adverse actions against Plaintiff were false and pretextual.

The Supreme Court has said that, if the finder of fact concludes that a defendant-

employer in a Title VII case has lied about the reasons given for the adverse actions at issue, then

the finder of fact may rely on the defendant's dishonesty to conclude that the real reason was the

illegal, discriminatory reason initially asserted by the plaintiff.  *St Mary's Honor Center v. Hicks*,

509 U.S. 502, 511 (1993).  In *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 911-12, 914-15 (7th Cir.

2025), this Court recently examined that principle in the summary judgment context and stated

that,

> Statements in *Bless* and *Hitchock* and other cases to the effect that the plaintiff must 'also show that the explanations are a pretext for the prohibited animus' should not be understood to require additional evidence from a plaintiff, such as some further indication of unlawful animus.  Pretext does not require an inference of unlawful animus, but it does permit that inference.  This principle means that when a plaintiff has offered evidence permitting a reasonable inference of pretext, summary judgment should be denied…. To say that an employer's justification is a pretext means to say that it is 'a lie, specifically a phony reason for some action.' …  Evidence of pretext does not require but does permit an inference of unlawful motive, meaning that *summary judgment should be denied and the ultimate question of motive given to the trier of fact to decide.*  [emphasis added; internal citations omitted].

As is true in most employment discrimination cases, the key issue in this case is

Defendants' motives for taking adverse actions against Plaintiff.  In support of its motions for

summary judgment, DPI argued that it made all of the adverse decisions in this case based on

Plaintiff's alleged bad behavior during six specific monthly RSN and RPIC meetings, and both

Defendants argued that they took the adverse actions at issue because Plaintiff's job performance

was poor.  (ECF 101:34-39; ECF 99:7-8).  The reasons articulated by both Defendants are demonstrably false and pretextual.

### (i)  DPI's claims regarding Plaintiff's bad behavior during six monthly meetings are false.

Plaintiff's Interrogatory No. 5 asked DPI to identify Plaintiff's bad behavior during the monthly RSN and RPIC meetings upon which DPI claims to have relied to exclude Plaintiff from future meetings.  DPI identified six such meetings – the May, June, July, August, and September 2021 RSN meeting and September 2021 RPIC meeting.  After being compelled by the Court to fully respond, (ECF 47), DPI provided more than 20 pages of highly-detailed-but-false representations about what happened in those six meetings.  (ECF 83-6:4-26).  DPI repeated those falsehoods in the proposed facts filed in support of its motion for summary judgment.  See ECF 118:36, 46, 56, 60, 64-65, 75, 80-81, 97, 98, 104-106.

Fortunately for Plaintiff, almost all of the relevant portions of the six meetings were video recorded and portions of five of those meetings have now been transcribed by a certified court reporter.  (ECF 116:2-6; ECF 116-1 through 116-5).  That recorded evidence effectively negates nearly every one of DPI's dishonest claims about what actually happened in those six meetings.  Like the police dashboard video in *Scott v. Harris,* 550 U.S. 372, 379 (2007),[8] the

---

[8] *Scott v. Harris*, 550 U.S. 372 (2007) concerned a plaintiff who led police on a high speed chase and suffered injuries when he crashed his car at the end of that chase.  The plaintiff brought a Section 1983 action against a county deputy alleging that the deputy had used excessive force.  *Scott, supra*, 550 U.S. at 375-76.  In response to the deputy's motion for summary judgment, the plaintiff asserted that, "during the chase, there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and [the plaintiff] remained in control of his vehicle."  *Scott, supra*, 550 U.S. at 378-79.  The defendant refuted the plaintiff's claims about his driving by submitting the officer's dashboard video of the chase, but the District Court and the Eleventh Circuit were not swayed.  Those Courts viewed the facts in the light most favorable to the nonmovant-plaintiff and concluded that - as the Supreme Court subsequently and wryly noted - the plaintiff drove his vehicle, not as one who was fleeing from police, but rather as one who "was attempting to pass his driving test."  (Id.)  In spite of the plaintiff's own claims about his driving, the Supreme Court noted that "the videotape tells quite a different story."  (Id.)  The Court found that the video showed that the plaintiff raced down narrow roads in the dead of night at high speeds, swerved around more than a dozen other vehicles, ran multiple red-lights, and so on.  *Scott,*

actual video recordings and transcripts of those six meetings "tell quite a different story" than the story told by DPI in support of its motion for summary judgment.  In fact - as discussed in detail in Plaintiff's responses to DPI's proposed facts, (ECF 118:36, 46, 56, 60, 64-65, 75, 80-81, 97, 98, 104-106), the videos and transcripts demonstrate that almost all of DPI's claims about Plaintiff's behavior in those meetings are flatly false.

The first meeting that Plaintiff allegedly disrupted was the May 18, 2021 RSN meeting. (ECF 118:27-39).  DPI claims that, "Spengler took up the time allotted for all three groups to discuss her personal views and experiences from the July 2019 meeting in Ashland, Wisconsin, [and, as a result], the agenda then had to be readjusted."  (ECF 118:30).  These allegations are not just wrong - they are false.  The meeting agenda devoted 45 minutes to the topic at issue, and DPI - *not Plaintiff* - used the first 35 minutes of that agenda item *before Plaintiff ever said even one word*.  Then, after being invited to speak, Plaintiff spoke for only 2 minutes and 44 seconds regarding the Ashland incident.  (See ECF 118:30; ECF 118-1).

The second meeting that Plaintiff allegedly disrupted was the June 9, 2021 RSN meeting. (ECF 118:40-49).  According to Faasuamalie, instead of focusing on the issue designated by the meeting agenda, "[Spengler] continually brought up trust as a barrier to moving forward with the work while actively working against solutions and failing to offer any solutions."  (ECF 118:46). Faasuamalie's accusations regarding Plaintiff's behavior are not just wrong – they are false. First, Plaintiff was neither the first nor the only RSN that day to raise the issue of "trust." Second, the video makes clear that Faasuamalie and a number of other RSNs enthusiastically participated in the discussion regarding "trust."  Third, although Faasuamalie blames Plaintiff,

---

*supra*, 550 U.S. at 379-80.  The Court concluded that, in light of the video tape and despite the plaintiff's own testimony regarding his mild-mannered driving, a rationale trier of fact could not believe the plaintiff, and there was therefore no genuine issue for trial.  (Id.)

the truth is that Faasuamalie - *not Plaintiff* – made the decision to "put the kibosh" on the agenda item for that meeting and indicated that - in the near future - the entire group would engage in reevaluating and rewriting the group's community agreements.  (Id.)

The third meeting that Plaintiff allegedly disrupted was the July 19, 2021 RSN meeting. (ECF 118:50-60.)  In this litigation, DPI now describes some of the comments made by Plaintiff during that meeting as disruptive, (ECF 118:56), but in July of 2021, DPI had a different view. In fact, shortly after the meeting, Faasuamalie's boss, Lynne Winn (who had moderated the relevant portion of the July 19, 2021 meeting) – plainly stated that Plaintiff's comments during the meeting were not only appropriate but *should be emulated* by the other RSNs.  (See ECF 118:56.  Winn: "[Becky Spengler] expressed an 'ouch' and did so respectfully, modeling the very bravery we're seeking.")

The fourth meeting that Plaintiff allegedly disrupted was the August 11, 2021 RSN meeting.  (ECF 118:61-70).  The only comment made by Plaintiff during the August 11, 2021 RSN meeting that DPI suggests was disruptive was Plaintiff's brief reference to the CCPP document.  (ECF 118:63).  Plaintiff had indicated that some of the language regarding race proffered by DPI in various publications made her "uncomfortable."  Faasuamalie then asked Plaintiff to provide an example of that language, and Plaintiff cited the CCPP. (ECF 118:64). Faasuamalie then stated that she was unfamiliar with the CCPP and could not elaborate on the CCPP.  (ECF 118:64).  And that was it.  After Faasuamalie indicated that she could not comment on the CCPP, no further discussion regarding the CCPP occurred.  (ECF 118:64-65).  There was no "conversation" or debate regarding the CCPP, and the exchange between Plaintiff and Faasuamalie regarding the CCPP lasted less than 90 seconds.  (Id.)

The fifth meeting that Plaintiff allegedly disrupted was the September 8, 2021 RPIC meeting. (ECF 118:71-86). DPI claims that Fregien "tried five times to pivot the discussion back to the agenda" by moving the large group to breakout groups, but she was unable to do so because Plaintiff refused to follow Fregien's lead. (ECF 118:81). This allegation too is blatantly false. The truth is that, during her exchange with Plaintiff, Fregien told Plaintiff *four different times* that the time to discuss Plaintiff's concerns was "now" or words to that effect. (See ECF 118:75; ECF 118-3) At the time of those four statements, the full RPIC group was still in session, and Fregien made no mention of going to breakout groups. Thus, according to DPI, when – four different times – Fregien told Plaintiff that "now" was the time to discuss the issue, *she didn't really mean "*now*,"* but she instead meant, "*later*, after we move to breakout groups." (ECF 118:81) DPI offers no explanation for why Plaintiff should have construed the word "now" to mean "not now," or why Fregien failed to simply say what she allegedly meant. It was only on Fregien's claimed fifth "attempt" to "pivot the discussion" that she finally said, "I want to open the groups, the breakout rooms, so that we have time to have these conversations." (ECF 118:81). At that, the conversation promptly ended and the group adjourned to the breakout groups. Thus, contrary to DPI's claims, there was actually only one – not five –attempts by Fregien to "pivot the discussion," and that single attempt was immediately successful. DPI's claims to contrary are false.

The sixth meeting that Plaintiff allegedly disrupted was the September 15, 2021 RSN meeting. (ECF 118:87-108). DPI cites two initial comments made by Plaintiff in the chat function of the meeting. (ECF 118:93-94). DPI claims that Ms. Faasuamalie "attempted to bring the discussion back to the original purpose of the agenda item - self reflection based on the article," (ECF 118:97), suggesting that the meeting had gone off topic, that somehow Plaintiff

- 54 -

was responsible for taking the meeting off topic, and that Faasuamalie needed to expend substantial effort to "attempt" to bring the meeting back to topic. None of those three suggestions are true. The agenda described the topic as "Discussion/reflection regarding August article," (not just "reflection"), and plainly, the discussion was not "off topic" because it concerned the article and the assumptions and ideas expressed in the article. (ECF 118:97). Also, because the discussion was not "off topic," it follows that Plaintiff did not take the discussion off topic. Further, Faasuamalie did not need to take any dramatic measures to "attempt" to bring the meeting back to topic. Even if the discussion were off topic, she was the meeting moderator, and she had the power to bring the meeting back to topic by simply saying, "We're off topic; let's get back on topic." The record demonstrates that she made no such comment but instead engaged with Plaintiff and others in the discussion. (ECF 118:97). In short, these claims about Plaintiff's conduct during the September 15, 2021 RSN meeting being "disruptive" are false.[9]

The District Court acknowledged that DPI's claims about Plaintiff's behavior in the monthly meetings were false. "The record supports Plaintiff's claim that she 'never raised her voice, spoke disrespectfully, used profanity or sarcasm, ignored requests or directions of DPI, or otherwise behaved unprofessionally toward DPI or any of her colleagues." (Appen.:11). However, the Court erred by failing to apply the facts to the controlling law. In fact, on June 26, 2025 – thirteen days after the June 13, 2025 hearing on Defendants' motions – Plaintiff provided

---

[9] Although DPI also claims that Plaintiff "disrupted" the September 15, 2021 meeting by sending a Chat which referenced DPI's "antiracism BS," that fact – even if true – does not change the essential point that DPI was dishonest about Plaintiff's behavior in the other five meetings and a portion of the September 15 meeting. Moreover, as noted above at D.2.a.(ii), pp. 45-46, the Chat constituted protected opposition to behavior made illegal by Title VII. 42 U.S.C. §2000e-3(a). As such, the statute protected Plaintiff against retaliation from Defendants based on the Chat.

the District Court with written notice of this Court's decision in *Murphy*, *supra*, a case which

was decided six days after the June 13 hearing.  (ECF 134).

Because DPI's claims about Plaintiff's behavior in the six meetings were - in nearly

every respect - demonstrably false,[10] and because evidence of an employer's dishonesty about its

reasons for taking adverse actions against an employee dictates that summary judgment be

denied, *Murphy, supra*, 140 F.4th at 911-15, DPI's motion for summary judgment should have

been denied.

### (ii)  Defendants' claims regarding Plaintiff's poor job performance are false.

DPI and CESA 7 both falsely claim that they took adverse action against Plaintiff

because her job performance was poor.  (ECF 101:9-10, 39; ECF 99:7-8).  Plaintiff's job

performance was not poor, and Defendants' claims to the contrary are false and pretextual.

First, in her role as Integration Director, Plaintiff understood that her job duties required

her to support school based coaches in accordance with DPI's chosen ideology.  To that end, and

despite her personal disagreements with DPI on matters of race, Plaintiff still did the job of

Integration Director as DPI demanded, and she did it well.  (ECF 119:12; ECF 119-1).  Plaintiff

faithfully shared and applied DPI's beliefs regarding race with the school districts in CESA 7's

territory, and - to this day - no DPI witness has ever credibly claimed that Plaintiff undermined

or failed to properly share DPI's views in those districts.  (Id.)  To the contrary, Plaintiff was

praised for her performance by both DPI and CESA 7, she was given an unusually-large raise,

---

[10] In the District Court, Plaintiff also produced substantial evidence which demonstrated that DPI also made untruthful and pretextual claims that it took adverse action against Plaintiff because she "failed to meet contract deliverables," (ECF 117:22-24), failed to conduct CCR IEP training, (ECF 117:24-25), failed to meet attendance requirements, (ECF 117:25-26), and excluded herself from the monthly RSN and RPIC meetings.  (ECF 117:26-27).  Although the evidence of DPI's dishonesty regarding the six meetings is adequate evidence of pretext to deny its motion for summary judgment, this additional evidence reinforces that conclusion.

she was given positive job reviews, and she was lauded by the school-based coaches in CESA 7's territory. (ECF 119:12; ECF 119-1).

Furthermore, the record evidence cited by Plaintiff plainly demonstrates that, up to the time of her removal as Integration Director in mid-2022, her performance was repeatedly commended by the school districts and school-based coaches supported by Plaintiff, by Dickert, by the Board of Directors of CESA 7 (who approved a large raise to Plaintiff), and by DPI (who gave her positive performance reviews) – all at the same time when, according to Defendants *in this litigation*, Plaintiff's performance was so bad that it warranted her isolation from colleagues and monthly meetings, and the permanent removal from her position. (Compare ECF 101:9-10 with ECF 117:22-26 and compare ECF 99:7-8 with ECF 113:22-23, ECF 119:12, and ECF 119-1).

A reasonable jury could rely on the evidence to conclude or infer that Plaintiff's job performance was not poor, and that Defendants' claims to have taken adverse action against Plaintiff because of her fictional poor performance were false and a pretext for race discrimination and retaliation. The District Court should have denied both Defendants' motions for summary judgment. *Murphy, supra*, 140 F.4th at 911-15.

### 3. The District Court erroneously dismissed Plaintiff's Equal Protection claims.

With regard to Plaintiff's Equal Protection claims against CESA 7, the rationale offered by CESA 7 in support of its motion for summary judgment and the rationale adopted by the Court for dismissing Plaintiff's Equal Protection claims were very similar and very simple. CESA 7 and District Court both relied on the same case (*Williams v. Seniff*, 342 F.3d 774, 788, n. 13 (7th Cir. 2003)) for the proposition that the standard which applies to proving a Section 1983 Equal Protection claim is the same as the standard which applies to proving a Title VII claim,

and because Plaintiff's Title VII claims failed, it must follow that Plaintiff's Equal Protection claims also fail. (ECF 99:24-25; Appen.:32). No other rationale was offered by CESA 7 and no other basis for its decision was provided by the Court.

Plaintiff simply notes that, because both CESA 7 and the Court were mistaken about the validity of Plaintiff's Title VII claims, and because neither the Court nor CESA 7 offered any other rationale whatsoever, it follows that Plaintiff's Section 1983 Equal Protection Claims must survive summary judgment just as her Title VII discrimination and retaliation claims must survive.

### 4. The District Court erroneously dismissed Plaintiff's First Amendment claims.

The District Court gave very short shrift to Plaintiff's claims that CESA 7 violated her First Amendment rights by retaliating against her because of (i) what she believed, and (ii) what she declined to believe. The Court quoted four paragraphs from Plaintiff's Complaint and concluded that those paragraphs "do not provide CESA 7 with notice of Plaintiff's claim that it retaliated against her because of … what she believed, and what she declined to believe." (Appen.:36-37). The Court offered no other rationale for dismissing those two claims.

In *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005), this Court considered the adequacy of a plaintiff's complaint under Fed.R.Civ.P. 8, and held,

> Pleadings in federal court need not allege facts corresponding to each 'element' of a statute. Plaintiffs need not plead facts; they need not plead law; they plead claims for relief. Usually, they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of…. Any district judge (for that matter, any defendant) tempted to write 'this complaint is deficient because it does not contain …' should stop and think: What rule of law requires a complaint to contain that allegation?.... Complaints initiate the litigation but need not cover everything necessary for the plaintiff to win; factual details and legal arguments come later.[11]

---

[11] Although *Doe, supra*, preceded *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), courts in this Circuit have continued to cite *Doe*. See e.g., *Burke v. Heuerman*, 2025 WL 1643020 (C.D.Ill., June 9, 2025); *Cox v. Froedtert*, 2018 WL 8624494 (E.D.Wis., Sept. 28, 2018); *Global Imaging Acquisitions Group v. Rubenstein*, 2015 WL 5618803 (E.D.Wis., Sept. 24, 2015).

Further, in *Bravo v. Midland Credit Mgmt.*, 812 F.3d 599, 601-02 (7th Cir. 2016), this Court found that Rule 8 "is satisfied if the complaint (1) describes the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and (2) plausibly suggests that the plaintiff has a right to relief above a speculative level."

In this case, Plaintiff's Complaint contains at least five paragraphs (including two paragraphs – 37.h. and 41.b.—that the District Court quoted in its decision at Appen.:36-37) which plainly allege that CESA 7 violated Plaintiff's First Amendment rights to personally believe and refrain from believing what she wished about race. Plaintiff's Complaint (ECF 33; emphasis added) includes the following allegations:

- ¶37.b. – "Defendants repeatedly told Plaintiff … that Plaintiff could not 'do the work' assigned to her under the RSN and RPIC programs unless … Plaintiff **'believed' and agreed with** all of the tenets of those programs (including the racist ideals described above), and Plaintiff otherwise stated and demonstrated that she had an 'equity mindset.'"
- ¶37.e. – "Defendants warned Plaintiff that, if she remained in the Director of Integrated Services role, she would need to **fully embrace DPI's racist philosophy**, actions and agenda…."
- ¶37.g. – "Because Plaintiff **declined to accept DPI's beliefs** and to 'demonstrate' that **she embraced and agreed** with DPI's racist philosophy … Defendants removed her from her role as Director of Integrated Services."
- ¶37.h. – "Defendants' insistence that Plaintiff … **'demonstrate' her agreement** with Defendants' racist philosophy … violated Plaintiff's constitutional rights…."
- ¶41.b. – "Defendants repeatedly informed Plaintiff that she could not properly perform the Director of Integrated Services job **unless she believed and otherwise agreed with and embraced DPI's racist philosophy**, programs, and actions. Defendants' conduct violated Plaintiff's constitutional rights including, but not limited to, her rights to speak and to refrain from speaking."

Plaintiff's complaint describes Plaintiff's First Amendment claims in sufficient detail to give CESA 7 fair notice of what those claims are and the grounds upon which those claims rest.

---

In *Cox, supra*, 2018 WL at *1, the Court noted that, while it is true that *Doe* predates *Iqbal* and *Twombly*, "more recent cases make clear that *Iqbal* and *Twombly* did not reinstate code pleadings and do not require plaintiffs to plead legal theories or recite all the elements of a claim for relief."

*Bravo, supra*, 812 F.3d at 601-02.  The Complaint also plausibly suggests that Plaintiff has a right to relief beyond a speculative level.  (Id.)

Furthermore, through discovery, CESA 7 had ample, clear notice that Plaintiff is complaining about Defendants' efforts to compel her to abandon her own personal beliefs about race and to embrace DPI's beliefs.  For example, CESA 7's Interrogatories 16, 19 and 20 asked Plaintiff to identify the factual basis of the claims raised in paragraphs 37.b., 37.e., and 41.b. of Plaintiff's Complaint.  (ECF 85-12:2-7, 18-22).  In Plaintiff's meticulous and detailed responses to those three interrogatories (which cover 10 pages – ECF 85-12:2-7, 18-22), Plaintiff pointed to numerous facts which demonstrate first that, as a condition of keeping the role of Integration Director, DPI insisted that, "in addition to doing the work, Plaintiff must share DPI's beliefs and assumptions about race; must agree in her heart and mind with DPI's beliefs and assumptions about race." (ECF 85-12:3).  Plaintiff then set forth substantial evidence (i) that CESA 7 knew that, as a condition of keeping her role, DPI was demanding that Plaintiff abandon her beliefs on race and embrace DPI's beliefs, (ii) that CESA 7 refused to permit Plaintiff to remain in her role unless she abandoned her beliefs on race and wholly embraced DPI's beliefs, and (iii) that because Plaintiff refused to abandon her beliefs and embrace DPI's beliefs on race, CESA 7 made the decision to remove Plaintiff from the Integration Director role.  (ECF 85-12:4-6, 18-22).

Plaintiff's Complaint and the record evidence demonstrate that CESA 7 had notice and knowledge of Plaintiff's claim that CESA 7 violated her First Amendment rights by retaliating against her based on what she believed and what she refused to believe.  The District Court erred by concluding that CESA 7 did not have such notice and dismissing Plaintiff's First Amendment "belief" claims.

- 60 -

## IX.  CONCLUSION

For the reasons set forth herein, the District Court's order and judgment (Appen.:1, 36) dismissing Plaintiff's Title VII race discrimination and retaliation claims, her Equal Protection claims, and her First Amendment "belief" claims should be reversed, and this matter should be remanded to the District Court for further proceedings.

Dated this 19th day of December, 2025.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:    /s/ Ross W. Townsend
       Ross W. Townsend, Bar No. 1011622
       George Burnett, Bar No. 1005964
       231 S. Adams Street/PO Box 23200
       Green Bay, WI 54305-3200
       (920) 437-0476
       rwt@lcojlaw.com

*5608771_7*

## X.  CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Cir. Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 16,721 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 12-point Times New Roman font.

Dated this 19th day of December, 2025.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:    /s/ Ross W. Townsend
        Ross W. Townsend, Bar No. 1011622
        George Burnett, Bar No. 1005964
        231 S. Adams Street/PO Box 23200
        Green Bay, WI 54305-3200
        (920) 437-0476
        rwt@lcojlaw.com

## XI.  CIRCUIT RULE 25(a) CERTIFICATION

I hereby certify that, pursuant to Cir. Rule 25(a), I have electronically filed Plaintiff's

brief, Plaintiff's Required Short Appendix, and Plaintiff's Separate Appendix.

Dated this 19th day of December, 2025.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:    /s/ Ross W. Townsend
         Ross W. Townsend, Bar No. 1011622
         George Burnett, Bar No. 1005964
         231 S. Adams Street/PO Box 23200
         Green Bay, WI 54305-3200
         (920) 437-0476
         rwt@lcojlaw.com

## XII.  CERTIFICATE OF SERVICE

I hereby certify that, on December 19, 2025, my assistant (acting at my direction) electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated this 19th day of December, 2025.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:     /s/ Ross W. Townsend
        Ross W. Townsend, Bar No. 1011622
        George Burnett, Bar No. 1005964
        231 S. Adams Street/PO Box 23200
        Green Bay, WI 54305-3200
        (920) 437-0476
        rwt@lcojlaw.com

**No. 25-2532**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

BECKY SPENGLER,

     Plaintiff-Appellant

v.

COOPERATIVE EDUCATIONAL SERVICE AGENCY 7, also
known as CESA 7, et al.,

     Defendants-Appellees.

---

**Appeal From The Eastern District of Wisconsin
District Court Case No. 22-CV-1199
The Honorable William C. Griesbach, Presiding**

---

**PLAINTIFF-APPELLANT'S REQUIRED SHORT APPENDIX**

---

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY S.C.
Ross W. Townsend
Attorneys for Plaintiff-Appellant

POST OFFICE ADDRESS:
231 South Adams Street
P.O. Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
State Bar No. 1011622
E-mail: rwt@lcojlaw.com

**Plaintiff-Appellant's Statement**

Pursuant to Circuit Rule 30(d), Plaintiff does hereby state that the materials required of

Circuit Rule 30(a) and 30(b) are included in "Plaintiff-Appellant's Required Short Appendix" and

"Plaintiff-Appellant's Separate Appendix".

Dated this 19th day of December, 2025.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:    /s/ Ross W. Townsend
        Ross W. Townsend, Bar No. 1011622
        George Burnett, Bar No. 1005964
        231 S. Adams Street/PO Box 23200
        Green Bay, WI 54305-3200
        (920) 437-0476
        rwt@lcojlaw.com

**<u>Required Short Appendix</u>**
**<u>Table of Contents</u>**

<u>Description</u>                                                <u>Page Nos.</u>

Decision and Order Granting Defendants'
Motions for Summary Judgment (Dkt 135) ..................................................... 1-40

Judgment (Dkt 136) ...................................................................................... 41

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BECKY SPENGLER,

        Plaintiff,

        v.                                Case No. 22-C-1199

COOPERATIVE EDUCATIONAL
SERVICE AGENCY 7, a/k/a CESA 7, and
WISCONSIN DEPARTMENT
OF PUBLIC INSTRUCTION,

        Defendants.

---

**DECISION AND ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

---

Plaintiff Becky Spengler filed this civil rights action against the Cooperative Educational Service Agency (CESA) that employed her, along with the Wisconsin Department of Public Instruction (DPI). Asserting claims under Title VII of the Civil Rights Act of 1964, Plaintiff, a white woman, alleges that she was subjected to adverse employment actions, including a hostile work environment, on account of her race and was retaliated against because of her opposition to the racist ideology that she claims DPI and CESA 7 adopted. Based on essentially the same allegations, Plaintiff claims that DPI and CESA 7, which receive federal financial assistance, also violated Title VI of the Civil Rights Act. Finally, she asserts claims against CESA 7 under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, and under 42 U.S.C. § 1983 for violations of her rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

The case is before the court on the defendants' motions for summary judgment. The court is required to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding such a motion, the court must view the evidence in the light most favorable to the opposing party. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). Because the parties offer starkly different versions of the evidence or, to be more precise, the inferences to be drawn from the evidence, it is worth emphasizing the court's limited role when considering a motion for summary judgment:

> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true. As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

With these principles in mind and based on the voluminous filings of the parties, the court provides the following summary of the parties' arguments and the facts in the light most favorable to Plaintiff.

## BACKGROUND

DPI is a state agency, headed by the state superintendent of public instruction, that advances public education in Wisconsin. It is divided into multiple divisions, one of which is the Division for Learning Support. The Division for Learning Support oversees the Special Education Team, which focuses on serving students with learning and emotional disabilities. The DPI Special Education Team's mission is to provide leadership to improve outcomes and ensure

2

appropriate free public education for students protected under the Individuals with Disabilities Education Act (IDEA).

Two of DPI's Special Education Team initiatives are directly relevant to this action: the Regional Special Education Network (RSN) program and the Research to Practice – Inclusive Communities (RPIC) project. The purpose of DPI's RSN project is to support Wisconsin local educational agencies (LEAs) in advancing educational equity for students with disabilities. The RSN project supports special education leadership throughout the State of Wisconsin, particularly directors of special education who serve students with Individualized Education Programs (IEPs). It provides coordinated technical assistance to LEAs to promote continuous systems improvement, foster collaboration, and develop educational leadership capacity. The purpose of the RPIC project is to provide high-quality evidence-based professional development to LEAs to positively impact educational outcomes of children with disabilities. School districts can voluntarily participate in the RPIC project.

DPI provided the funding and training for these initiatives under interagency agreements with the various Cooperative Educational Service Agencies (CESAs). CESAs are statutorily created agencies "designed to serve educational needs in all areas of Wisconsin by serving as a link both between school districts and between school districts and the state." Wis. Stat. § 116.01. CESAs "facilitate communication and cooperation among all public, private, and tribal schools, and all public and private agencies and organizations, that provide services to pupils." *Id.*

CESA 7 is one of 12 CESAs in Wisconsin, each of which covers a separate geographical area of the State. Plaintiff was hired as Integration Director by CESA 7 in 2018. At that time, Plaintiff had a Director of Special Education and Pupil Services certification. The job of the Integration Director is to "work in a myriad of service areas to insure integrated services of pupil

3

services and special education initiatives are blended within CESA 7 and its member districts." Dkt. No. 84-8 at 1.

Fulfillment of the RSN and RPIC duties are among the "Primary Functions or Responsibilities" of the Integration Director. *Id.* In her role as Integration Director, Plaintiff served as the RSN Director for CESA 7 and as a "coach" for the RPIC project. As RSN Director, Plaintiff was responsible for training and supporting the directors of special education within the 38 school districts in the CESA 7 region so that they could assist students with special needs to achieve better educational outcomes. The DPI website defines coaching as the "intentional, job-embedded professional learning designed to support teachers and staff in implementing practices with fidelity." *Coaching*, WIS. DEP'T OF PUB. INSTRUCTION, https://dpi.wi.gov/coaching (last visited Aug. 4, 2025). According to the website, "[c]oaching takes place after training and happens while practitioners are doing their work." *Id.* Plaintiff was one of ten coaches from various CESAs involved in the RPIC project. All of the coaches involved in the project were white.

In addition to her duties for the RSN and RPIC projects, Plaintiff had other responsibilities for CESA 7 related to pupil services, the Technical Assistance Network, and the Administrator and Teacher Development Center. Plaintiff supervised between seven and ten CESA 7 employees, including transitional coordinators, educational early childhood consultants, a CESA 7 project coordinator, and educational audiologists. She completed performance evaluations for the employees she supervised. Her job did not include direct contact with students.

Although the RSN and RPIC projects focused on special education services, DPI contends that "special education has a unique connection to race." Dkt. No. 101 at 6. In support of this contention, DPI cites several findings Congress made concerning equity and race in enacting or amending the IDEA. Congress found:

(A) Greater efforts are needed to prevent the intensification of problems connected with mislabeling and high dropout rates among minority children with disabilities.

(B) More minority children continue to be served in special education than would be expected from the percentage of minority students in the general school population.

(C) African-American children are identified as having intellectual disabilities and emotional disturbance at rates greater than their White counterparts.

(D) In the 1998-1999 school year, African-American children represented just 14.8 percent of the population aged 6 through 21, but comprised 20.2 percent of all children with disabilities.

(E) Studies have found that schools with predominately White students and teachers have placed disproportionately high numbers of their minority students into special education.

20 U.S.C. § 1400(c)(12)(A)–(E). DPI contends that the RSN and RPIC projects are "designed to improve outcomes for students with disabilities by equipping special education directors and school administrators with the tools and knowledge necessary to address inequities in the educational system." Dkt. No. 101 at 7. DPI's goal is to promote "educational equity," which it defines as "[e]very student [having] access to the resources and educational rigor they need at the right moment in their education, across race, gender, ethnicity, language, ability, sexual orientation, family background, and/or family income." Dkt. No. 74-4 at 4.

Plaintiff contends that the "tools and knowledge" DPI claims are necessary to address inequities in the special education system constitute a racist ideology and that she was subjected to adverse employment actions because of her disagreement with that ideology and her refusal to personally adopt it. She contends that at the time of her hiring and for the first year or two of her employment, the focus of her work in the RSN and RPIC initiatives was to train school-based coaches to assist students with disabilities who have Individual Educational Programs (IEPs) in

5

the 38 school districts within the geographic area of CESA 7.  After that time, however, she contends that DPI changed the focus of the RSN and RPIC programs to race.

Plaintiff contends that DPI adopted a "race-based agenda" with two primary components. Dkt. No. 113 at 4.  The first component is a "belief system and philosophy" adopted by DPI that categorizes all people by race into two groups: white people and people of color.  According to Plaintiff, DPI assigned negative attributes and behaviors to all white people as a group based solely on their race but drew no similar race-based conclusions about people of color.  *Id.* at 4–5.  The second component consists of DPI's demand that "Plaintiff and the other Integration Directors . . . not only teach and promote DPI's race-based agenda to the school-based coaches in the school districts in their respective territories but that they also demonstrate to DPI's satisfaction that they agreed with DPI and personally embraced the tenets of DPI's race-based agenda."  *Id.* at 5.

What Plaintiff refers to as DPI's racist ideology is the theory known as critical race theory, which holds that racial disparity in various areas of life, including income, employment, wealth, arrests, criminal prosecution, prison population, and, in this case, inclusion in special education, is evidence of racism.  Critical race theory views such disparity as the result of systemic racism, white privilege, and white supremacy, which the theory holds are endemic in American culture. "Critical race theory is more than a passing reference to race, racism, or even systemic racism.  It focuses on the ways that legal rules facilitate the social construction of race by using whiteness as a normative baseline for colorblind analysis."  Leah M. Watson, *The Anti-"Critical Race Theory" Campaign – Classroom Censorship and Racial Backlash by Another Name*, 58 HARV. C.R.-C.L. L. REV. 487, 499 (2023).

As evidence of the first component—that DPI adopted a racist ideology that categorized by race—Plaintiff points to excerpts from DPI's Coaching Competency Practice Profile (CCPP)

6

manual which DPI provides to RPIC coaches. The glossary of terms at the beginning of the manual includes the term "whiteness" which is defined as "[a] dominant cultural space with enormous political significance, with the purpose to keep others on the margin (Alberta, 2021)." Dkt. No. 74-4 at 5. The manual continues, "Whiteness itself refers to the specific dimensions of racism that serve to elevate white people over people of color." *Id.* "This definition," the Manual continues, "counters the dominant representation of racism in mainstream education as isolated in discrete behaviors that some individuals may or may not demonstrate, and goes beyond naming specific privileges (McIntosh, 1989)." *Id.* The glossary also contains the term "white supremacy" which is defined as "[a]n ideology, as a collection of ideas that encourage us to value whiteness (white norms, white culture and white people) more highly and above other cultures. (Unitarian Universalist College of Social Justice, 2021)." *Id.* Left unstated and unidentified are what the "white norms" and "the specific dimensions of racism that serve to elevate white people over people of color" may be.

The Manual goes on to list components of "Coaching Competencies," the expected and developmental use in practice of each component, and an unaccepted variation. *Id.* at 6. One of the listed components is "[e]xamines and challenges oppressive policies and practices within systems." *Id.* at 9. The "expected use in practice" of this component reads: "The coach surfaces the impact of white supremacy and the history of whiteness on systems, works to disrupt and dismantle its effects, and facilitates action planning to build a more equitable system of education in its place." *Id.* The "developmental use in practice" reads: "The coach recognizes the impact of white supremacy and the history of whiteness on systems and inconsistently works to disrupt and dismantle its effects." *Id.* According to the Manual, the "unacceptable variation" is when "[t]he coach does not recognize how the history of whiteness has impacted systems." *Id.*

Plaintiff also points to statements from a DPI document entitled "Equity Mindset Cards – A Coaching Tool" as further examples of the racist ideology that she claims DPI adopted. Among the statements she highlights are the following:

- Our educational system greatly disadvantages our students of color, students with IEPs, English language learners and students experiencing poverty. The Department of Public Education has made a commitment to address these unacceptable opportunity gaps at the systems level, knowing the inequities stem from the system, not from students and families who have been historically marginalized.

- Inequity is a result of systems and practices that benefit members of dominant groups and harm or provide little benefit to others. Students and families don't need to "fix" themselves to fit into an educational system that wasn't designed with their needs in mind.

Dkt. No. 116, ¶ 29.

Plaintiff has also submitted copies of various articles and documents DPI provided Integration Directors as part of their work on the RSN and RPIC initiatives: *Common Patterns of Racist Attitudes and Behaviors of Many Whites*; *ICS Equity Non-Negotiables*; *What if . . . White People Took Responsibility for Our Role in this Moment?*; *Nothing to Add: A Challenge to White Silence in Racial Discussions*; *To Coach for Equity, Start by Looking Within*; *White Supremacy Culture*; and *Leading for Equity: Our Mission Continues Despite CRT Turmoil*. Dkt. No. 129, ¶ 8.f. She also received a DPI handout entitled *Equity: Wisconsin's Model to Inform Culturally Responsive Practices*. Dkt. No. 115, ¶ 10; Dkt. Nos. 115-1–15-9.

Plaintiff contends that the implicit or explicit message of these and other instructional and training materials DPI provided is that "all White people (including Plaintiff) have various negative attributes and engage in various negative behaviors." Dkt. No. 113 at 6. She argues that the training and program materials that DPI provided reflect a racist ideology. In her view, to

8

define whiteness as "the specific dimensions of racism that serve to elevate white people over people of color" is itself racist. *Id.* at 5.

As for the second component of DPI's race-based agenda—the claim "that DPI would not permit Plaintiff to do the job of Integration Director unless she spread DPI's agenda in the 38 school districts in CESA 7's territory <u>and</u> she demonstrated – to DPI's satisfaction – her agreement with and commitment to the first component of DPI's race-based agenda"—Plaintiff points to the same materials and the monthly meetings DPI hosted for RSNs and RPIC coaches. *Id.* at 6. As evidence from the materials, she offers the following statements from the CCPP:

- "Developing one's knowledge of self and understanding of the historical context of who has benefited and who has not is essential for effective, transformative system change."

- A "component of the [equity mindset] competency" is that the coach "analyzes oppressive beliefs and feelings within oneself."

- The "expected use" of an "equity mindset" by coaches includes "the willingness and ability to see and speak how their power and privilege are at work to systematically advantage some while simultaneously disadvantage others."

- "The coach models self-awareness . . . when examining their social and personal identities. The coach intentionally disrupts the ways in which their social and personal identities uphold inequities."

- "Unacceptable variations" include: coaches who are "unwilling and/or unable to see and speak to how their power and privilege are at work to systematically advantage some while simultaneously disadvantage others."

- "'Unacceptable variations' also include the coach who rarely models self-awareness . . . . The coach does not recognize the ways in which their social and personal identities uphold inequities."

*Id.* (quoting CCPP, Dkt. No. 74-4 at 8). Plaintiff also cites other similar statements that appear in other publications and program materials provided by DPI. *Id.* at 6–7.

9

It was primarily in the course of the monthly meetings DPI hosted for RSNs and RPIC coaches that Plaintiff contends DPI and CESA 7 implemented the second component of the race-based agenda.  As an example, Plaintiff notes that during the July 25, 2019, RSN meeting, there was a discussion about an optional and voluntary book study where participants would read and discuss the book WHITE FRAGILITY – WHY IT'S SO HARD FOR WHITE PEOPLE TO TALK ABOUT RACISM.  Dkt. No. 118, ¶ 23.  Plaintiff declined to participate in the book study because she feared her views of the book's thesis would not be appreciated by the other members of the group.  DPI Special Education Team member Erin Faasuamalie replied that Plaintiff's political views were "the elephant in the room" and she was "not sure what to do with this now."  Dkt. No. 126, ¶ 14.

Plaintiff did not agree with the views expressed in the materials or those of her colleagues on topics such as systemic racism, white privilege, and bias, and she initially tried to keep her views to herself.  This changed over time, however, as the meeting participants were encouraged to read an article entitled *From Safe Spaces to Brave Spaces: A New Way to Frame Dialogue Around Diversity and Social Justice*.  Dkt. No. 115-1.  The point of the article was that the participants in groups addressing social justice issues (such as the RSN group) should eschew "safety" and should instead embrace "bravery" by sharing their views even if those views are controversial and are deemed "unsafe" by others.

Given this invitation, Plaintiff offered as an example of a "brave" verses "safe" response what she experienced after she declined to participate in the study of the book WHITE FRAGILITY in July of 2019.  She described how she overhead several members of the RSN group—including Faasuamalie, who led most of the meetings, and Deb Wall, CESA 8 RSN and statewide RSN coordinator—making derogatory remarks about her because of her views on so-called "white fragility" and racism which differed considerably from views of DPI leadership and the views of

10

the other RSNs in the group. Among the statements made, Plaintiff states she heard Faasuamalie say, "As someone who would support Donald Trump or Scott Walker, Becky is the one person who needs to participate in a book study about white privilege," and "Anyone who voted for Donald Trump support[s] racist beliefs." Dkt. No. 126, ¶ 14. Plaintiff's point in recounting the incident, but without naming the participants, was that she did not believe their meetings were always a safe place for her to honestly share her views. Not only did Faasuamalie not criticize Plaintiff for recounting the incident, but she noted Plaintiff's comments were "fair" and then apologized for her comments, noting she had been guilty of not practicing what she preached. Wall likewise apologized. Dkt. No. 81-8 at 79–81, 84.

Perhaps encouraged by this response, over the following months, Plaintiff "openly – but respectfully and professionally – questioned, challenged and opposed" what she viewed as "DPI's increasingly-radical views on race and systemic racism." Dkt. No. 117 at 7. The record supports Plaintiff's claim that she "<u>never</u> raised her voice, spoke disrespectfully, used profanity or sarcasm, ignored requests or directions of DPI, or otherwise behaved unprofessionally toward DPI or any of her colleagues." *Id.* at 8.

The conflict in views came to the fore, however, during the RSN meeting on September 15, 2021, when Plaintiff inadvertently sent the entire group a message intended only for her husband. The message read:

> You will not believe this recording today. I got them to say I can't do this work if I don't believe in all this antiracism BS. I should have assumed it when I was hired. It should [not] be a surprise to me. We need to take this conversation to another call with Lynn Winn [DPI's Assistant Director of Special Education]. I'll share the recording later when I get it, but here's a snippet of a written comment I captured which lead [sic] me into pressing them to acknowledge what they are really saying. They incriminated themselves today, big time. Me: "This seems to assume that systemic racism is a fact, and not a theory, and that everyone has blind spots with regard to race. I'm curious about that and how someone does this work if they have a counter belief to that."

11

Dkt. No. 118, ¶ 100. Realizing her mistake, Plaintiff immediately sent the following message to the group:

> Maybe it was my subconscious at work there, you know that I made that mistake and shared a private Facebook message that I had sent my husband, but it is what it is, I did it. And I don't regret sharing it with my husband, because I have to have somebody to talk to you about, but I need you all to hear this today that my opinion matters too and those of you who have reached out to me even privately and personally over the lunch break to tell me that you would like to hear a different perspective, I need the group to hear that too that other people want that, and I have it, but you're not listening so I'm going to be here, but I'm going to be here today at the rest of the meeting, more as just observing and taking it in because I'm just frankly too upset to even move on as a participant.

*Id.*, ¶ 101.

On September 16, 2021, Julia Hartwig, DPI's Director of Special Education, emailed Jeff Dickert, CESA 7's Agency Administrator, to request a meeting to address "repeated concerns" that had been brought to DPI's attention regarding Plaintiff and the RPIC and RSN projects. A meeting was set up for the following week. Dkt. No. 114, ¶ 14. Around the same time, Plaintiff spoke with Dickert about DPI's "race-based agenda." *Id.*, ¶ 15. On September 20, 2021, Plaintiff thanked Dickert for meeting with her and sent him a copy of the updated CCPP. *Id.*, ¶ 16. Also, on September 20 and on September 21, 2021, Dickert received a screenshot of the chat messages that Plaintiff inadvertently sent to the group chat during the September RSN meeting. *Id.*, ¶ 18. Dickert was "troubled by" Plaintiff's message. *Id.*, ¶ 19.

On October 4, 2021, Hartwig emailed Dickert stating that she had discussed the matter with Lynn Winn and wanted to "be clear on our preference, and at the same time respecting your organizational structure and supervision of Becky." Dkt. No. 118, ¶ 132. Hartwig wrote that "our strong preference is that Becky no longer be assigned to the RSN and RPIC projects," but that they understood that she was under contract with CESA 7 and that other assignments might not be

12

readily available within CESA 7. *Id.* If Dickert was unable to reassign her for the remainder of the contract year, Hartwig noted that DPI requested that Plaintiff "not attend statewide meetings for either of these projects until a reparation process can take place due to the significant negative impact she continues to have on individuals and group dynamics of the projects." *Id.* Hartwig assured Dickert that DPI would not consider her lack of attendance at these meetings as not meeting the requirements of the project because it is at DPI's request. *Id.*

Despite her personal disagreements with what she regarded as DPI's race-based agenda, Plaintiff contends that she still did the job of Integration Director and did it well. Dkt. No. 117 at 6. Plaintiff contends she faithfully spread DPI's messaging to the 38 school districts in CESA 7's territory. Her performance reviews by Dickert were uniformly positive, she received a significant salary increase, and she was praised by the school-based coaches in CESA 7's territory with whom she worked. Dkt. No. 119-1.

Dickert met with Plaintiff on October 5, 2021. Dkt. No. 114, ¶ 29. In the course of their meeting, Plaintiff told Dickert that during meetings and discussions and in the hallways, she was being excluded from the group. She indicated that she felt bullied because she did not believe in systemic racism. Plaintiff stated that she could do her job, even though she did not believe that the system was racist, but that Winn told her she could not do this job if she did not believe in the work. *Id.* In response to Plaintiff's complaints, Dickert sent Hartwig the following email:

> I think we would like to investigate a different path on this than your suggestion.
>
> I need to look at more evidence as my employee is the one feeling bullied for having a different mindset than the DPI on this lead into the coaching work.
>
> She claims to have numerous examples of being called out at the meetings as a Republican, conservative, and even racist. As you stated, this is supposed to be a safe zone for discussion, and dissenting opinions. I have a feeling that more needs to be done, then just eliminating this employee from the work. This employee does

13

the work that needs to be done, and is highly respected in our Region. I am confident that she will do Justice to the RSN work and the RPIC.

Dkt. No. 118, ¶ 133. Dickert further noted that he had previously advised Hartwig that "this may be a rabbit hole you are heading towards as an organization – leading coaching with a breakdown of one's whiteness" and apparently referenced a recent recall election for school board members in the Mequon-Thiensville School District in which critical race theory was a central issue. *Id.* In the meantime, Dickert suggested that Plaintiff would observe the upcoming RPIC and RSN video meetings but remain on mute so as to "give DPI and CESA 7 time to work through this issue." *Id.*

Hartwig responded to Dickert's email the same day, agreeing to have a follow up conversation and to allow Plaintiff to listen to recordings of the RSN and RPIC meetings. *Id.*, ¶ 134. On October 6, 2021, Plaintiff emailed Dickert during the RPIC meeting. She advised that she could get the same benefits from watching the recorded meetings and suggested that Dickert ask that she have access to the recordings the day after each RSN and RPIC meeting occurs. *Id.*, ¶ 135.

Dickert met with Hartwig, Winn, and Paul Manriquez, the Assistant State Superintendent of the Division for Learning Support, on October 11, 2021. *Id.*, ¶ 136. During the meeting, Dickert shared several examples of instances in which Plaintiff believed she was bullied at RSN meetings, including being called a Republican, a conservative, and a racist. She claimed she was told she did not understand the materials as presented and also complained of being isolated by the group. Dkt. No. 114, ¶ 32. The DPI representatives told Dickert that DPI "respects" Plaintiff's "different viewpoint" and that "much of the work is about equity." *Id.*, ¶ 34. They also told Dickert that Plaintiff's presence at the meetings was a "problem" and that DPI had hired an external facilitator to help with meetings. *Id.* On October 12, 2021, Dickert emailed Hartwig advising that Plaintiff

14

would not attend the RSN or RPIC meetings and would watch the recordings the next day. Dkt. No. 118, ¶ 138.

On December 10, 2021, Dickert, Winn, and Hartwig met to discuss the contract year 2022–2023. *Id.*, ¶ 139. Winn and Hartwig expressed that they would like to see Plaintiff spend less time in the RSN and RPIC projects. *Id.* Dickert, Winn, and Hartwig met again on February 23, 2022, to discuss whether Plaintiff would continue in the position for the 2022–2023 contract year. *Id.*, ¶ 140. During the meeting, the DPI representatives indicated that they did not want Plaintiff in the position. *Id.* Winn and Hartwig reported to Dickert that, without Plaintiff attending the meetings, they were more cordial and team-like. *Id.*, ¶ 141.

Dickert subsequently met with Plaintiff on February 23, 2022, and told Plaintiff that Hartwig and Winn informed him that they would be taking away the RPIC coach position and would not fund Plaintiff in the RSN position. Dkt. No. 114, ¶ 41. Hartwig emailed Dickert on February 24, 2022, stating: "Per your request, I am sending this email to let you know that it is our preference that Becky Spengler not be assigned to the RPIC and RSN Projects for the 2022-2023 contract as we have concerns about how she has been carrying out the terms of the contract. I appreciate your responsiveness and partnership as we've worked through this." *Id.*, ¶ 42. Dickert forwarded the email to Plaintiff on March 3, 2022. *Id.*

Dickert met with Plaintiff on March 4, 2022, and asked Plaintiff for evidence or examples of discriminatory actions by DPI so he could do his due diligence and investigate Plaintiff's complaints. *Id.*, ¶ 43. At the meeting, Dickert understood that Plaintiff believed she was being discriminated against for not believing in systemic racism and because of her viewpoints on DPI's messaging about equity and her political stance. *Id.*, ¶¶ 44–45.

On March 9, 2022, Dickert emailed Winn and Hartwig requesting another in-person meeting. He listed four items for discussion: (1) Dickert heard from a CESA 7 school district that CESA 7 would not be receiving RPIC funds, (2) clarification on what DPI meant by its "preference" that Plaintiff not be in the RPIC and RSN roles or whether DPI would not fund her in those roles, (3) evidence of DPI bullying Plaintiff, who has a philosophical belief in contrast to DPI's belief in "privilege" and "bias," and (4) Dickert's personal concern regarding the "white privilege" or "privilege" material. *Id.*, ¶ 46; Dkt. No. 64-23 at 2. Although DPI stated it simply "preferred" that Plaintiff not be in the RPIC and RSN roles, Dickert understood that, if Plaintiff was in the RPIC position, DPI would cut off funding for the position for 2022–2023 year, but if she did not occupy the RPIC position, CESA 7 would receive funding from DPI for that position. Dkt. No. 114, ¶ 47. Dickert was subsequently informed that DPI believed that Plaintiff was creating a hostile environment for other people. *Id.*, ¶ 49.

Plaintiff emailed Dickert on March 19, 2022, stating: "These are just a few, but significant, examples of how I believe DPI has discriminated against me for my political views and for questioning the work around white privilege, etc. There are more, but for now, these give you an idea." *Id.*, ¶ 50. Plaintiff attached a five-page document to her email, in which she recounts in July 2019 overhearing comments being made by various individuals, including members of the DPI Special Education Team, about "'people who voted for Donald Trump' or 'anyone who supported Scott Walker'" and realized "that the majority of the group leaned Left and did not support any Conservative thinking." Dkt. No. 84-25 at 1. Plaintiff also describes a conversation with Lynn Winn in which Winn stated that "if we don't believe in this, then perhaps this work isn't for us." *Id.* at 4. Plaintiff then recounts her requests at an August 2021 meeting for "actionable steps" the participants could take to address the "systemic racism" DPI insisted they needed to

16

address.  *Id.* at 5.  She states no specifics were provided.  *Id.*  After reviewing the document, Dickert indicated he could understand how Plaintiff could interpret some of the behavior as bullying, but he did not see the behavior as bullying or any evidence of a hostile work environment. Dkt. No. 114, ¶ 54.

Dickert met with DPI representatives on May 3, 2022.  After the meeting, he realized that CESA 7 would not receive funding and Plaintiff would not be able to attend the DPI trainings if she continued in her RSN and RPIC roles.  *Id.*, ¶ 59.  Dickert also met with Plaintiff and Colleen Timm, the Learning Services Director for CESA 7, on May 3, 2022.  Dickert and Timm shared with Plaintiff their takeaways from the meeting with DPI and their concerns that if they placed her in the RSN and RPIC roles, she would be monitored by DPI and DPI could pull the funding, which would result in a lapse of service for CESA 7's districts and region.  *Id.*, ¶ 63.  Timm relayed to Plaintiff that DPI had expressed that certain points in the Integrated Contract regarding an equity mindset were non-negotiable and that CESA 7 could keep Plaintiff in the Integration Director role if Plaintiff could commit to the role without pushback or questioning.  *Id.*, ¶ 61.

Plaintiff stated in response that she believed that DPI had an equity focus and required an equity mindset as an RSN and RPIC coach.  *Id.*, ¶ 62.  She also reiterated that she believed her performance reviews and pay raise demonstrated that she was doing the work and could continue to do the work but that she could not surrender her personal freedom or feelings "as it relates to what DPI was asking [her] to do."  *Id.*  Plaintiff emailed Dickert and Timm on May 12, 2022.  She wrote:

> Thank you for meeting with me yesterday to discuss DPI's demands with regard to my position as an RSN and RPIC coach.  I sincerely appreciate the support provided by both of you and your acknowledgement that I am fully able to effectively perform the actual work of an RSN and RPIC coach.  Although you didn't say it, I also understand that your hands are tied, that DPI completely controls and dictates the "what" and "how" of this work, that DPI also controls the purse strings for this work,

17

and that DPI will ultimately decide whether or not I am allowed to keep my job. As you know, I have successfully performed this work – including the anti-racist work that DPI is now emphasizing – for several years with great success and without complaint regarding my performance from any District, CESA 7, or DPI. I am committed to continue to perform the work just as I have in the past. In that regard, I will also commit to continue to behave as I always have in a professional and respectful manner in all my dealings with DPI, CESA 7, the Districts, and anyone else. However, I will continue to maintain my own personal views and opinions regarding matters of race, and I will not agree to waive my right to express those views in the same respectful manner as any other employee of DPI and/or CESA 7 might express their views. I am not a racist nor do I harbor bias toward any person based on race, and I will not confess to sins that I have not committed. Neither will I continue to consent to be the only employee who is excluded from meetings because of my race, nor will I agree to submit to special, unique and racially-discriminatory DPI monitoring of my work where such monitoring applies to me and me alone. Although I will continue to effectively carry out DPI's direction with regard to the RSN and RPIC work within the Districts, I will not agree to keep silent regarding DPI's racist philosophy, policies, and plan of action. Instead, I will retain my right to continue to oppose racial discrimination in the workplace. I hope that DPI will do the right thing. In any case, I look forward to their decision.

*Id.*, ¶ 64. Plaintiff met with Dickert and Timm on May 17, 2022, and told them that she felt DPI was retaliating against her for her views and behaviors. *Id.*, ¶ 69. Plaintiff did not continue in the Integration Director position for the 2022–2023 contract year. But she remained employed by CESA 7 in a different position until her employment was terminated in August of 2024, almost two years after the action was commenced. Additional facts, including those related to Plaintiff's FMLA claim, will be set forth as necessary in the analysis below.

## ANALYSIS

### A. Title VI, Title VII, and Equal Protection Claims

The landmark legislation known as the Civil Rights Act of 1964 was intended to end racial discrimination in voting, public accommodations, public education, federally assisted programs, and employment. Plaintiff alleges that she was subjected to adverse employment actions in violation of Titles VI and VII of the Act, 42 U.S.C. § 2000e-2, including demotion and a hostile work environment on account of her race and was retaliated against, in violation of 42 U.S.C.

18

§ 2000e-3, because of her opposition to the racist ideology that she claims DPI and CESA 7 adopted. CESA 7 contends it cannot be liable to Spengler under Title VI because she was its employee, and DPI contends that it cannot be liable to Plaintiff under Title VII because it was not her employer. To this argument, Plaintiff counters that DPI was her indirect employer and thus does have liability under Title VII. Plaintiff also contends that she was a beneficiary or participant under a program provided by DPI, an agency that receives federal funds and, thus, DPI could also be liable under Title VI of the Civil Rights Act, which prohibits subjecting any person to discrimination on the ground of race, color, or national origin, under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. She contends that the defendants are liable under both Title VI and Title VII. It is undisputed that DPI and CESA 7 receive federal financial assistance for its programs. Dkt. No. 97, ¶ 56.

Instead of addressing which Title of the Civil Rights Act of 1964, if any, may apply to which defendant, however, it is first worth asking whether Plaintiff has presented evidence from which a reasonable jury could conclude that DPI and/or CESA 7 discriminated against her on the basis of her race or retaliated against her because she complained of or objected to such discrimination. Plaintiff, who is white, does not claim that she was subjected to discrimination by DPI or CESA 7 because she is white. In fact, at the time Plaintiff was involved in the RPIC project, all ten of the coaches involved in the project were white, as was the director of CESA 7 and the DPI personnel who were involved. Dkt. No. 118, ¶ 14. Plaintiff's claim, instead, is that she was discriminated against because of her opposition and refusal to submit to what she characterizes as the racist ideology imposed by DPI and in which CESA 7 acquiesced.

Plaintiff's claim is predicated on a narrow legal question: Does the adoption and promotion of the tenets of critical race theory by DPI and CESA 7 constitute a violation of Title VI or Title

19

VII of the Civil Rights Act.  Unless the answer to this question is "yes," Plaintiff's claim fails at the outset as a matter of law.  Neither Plaintiff nor the defendants have cited any case that addresses this precise issue, and the answer is not readily apparent from the text of the particular provisions at issue.  Title VII provides:

(a) Employer practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.  In regard to retaliation, Title VII provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Title VI likewise prohibits exclusion from participation in, denial of benefits, or subjecting to discrimination under any program or activity receiving federal financial assistance on the basis of race.  42 U.S.C. § 2000d.

To establish a prima facie case of racial discrimination under Title VII or Title VI, a plaintiff must present evidence that her employer subjected her to an adverse employment action because of her race.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("That legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other

20

adverse employment action."). Being demoted for objecting to an employer's opinion or ideology is not the same as being fired because of one's race. As the court pointed out at the hearing on the defendants' motions, presumably, a black employee who shared Plaintiff's views on critical race theory, a Thomas Sowell, for example, or most other black conservatives, would be subject to the same treatment. If, as Plaintiff contends, DPI and CESA 7 demoted her because she did not share DPI's views on critical race theory and systemic racism, and thus in their view she could not perform the work required under her contract, it would seem to follow that a "person of color" who did not share those views would be likewise unable to perform the work DPI and CESA 7 required. Yet, such a person would be hard-pressed to claim that he was demoted because of his race.

This is not to say that Plaintiff's claim that critical race theory is a racist ideology is unreasonable. Plaintiff is not alone in viewing critical race theory as a racist ideology. In April 2022, Florida Governor Ron DeSantis signed into the law of that State the Individual Freedom Act, also called the Stop W.O.K.E. Act. *See* Ch. 2022-72, Laws of Fla. Governor DeSantis described the Act as "a stand against the state-sanctioned racism that is critical race theory." *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations*, News Release (Dec. 15, 2021), https://perma.cc/9VV7-7YCE. The Act "prohibits Florida's public schools from 'subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such [individual] to believe' any of eight concepts descended from critical race theory." *Pernell v. Fla. Bd. of Governors of State Univ.*, 84 F.4th 1339, 1341 (11th Cir. 2023) (citing Fla. Stat. § 1000.05(4)(a)). For example, the Act stops schools from teaching that "[m]embers of one race, color, national origin, or sex are morally superior to members of another;" that "[a] person, by virtue of his or her

race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;" or that "[a] person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion." *Id.* (quoting § 1000.05(4)(a)(1), (2), (6)). Other states have enacted similar laws. According to one source, "[t]he vast majority of states have introduced anti-Critical Race Theory measures, and at least eighteen states have banned Critical Race Theory." Lia Epperson, *Truth-Telling in Legal and Political Movements for Equality: Debunking Critical Race Theory Myths*, 68 HOW. L.J. 53, 62 (2024). Neither the State of Wisconsin nor the federal government has enacted a similar law, however, and so the question presented in this case is whether Plaintiff has submitted evidence from which a jury could determine that the adoption of critical race theory by DPI and CESA 7 violated her rights under Titles VI and VII.

Critical race theory differs significantly from the understanding that led to the passage of the Civil Rights Act of 1964. The civil rights movement that led to the passage of the Civil Rights Act of 1964 had as its goal the elimination of racial discrimination so as to bring to fulfillment the promise of human equality set forth in the Declaration of Independence as envisioned by the Equal Protection Clause of the Fourteenth Amendment. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) ("The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States."). The end was a colorblind society where individuals would be free to rise or fall on their own effort and ability without regard to the color of their skin. Critical race theory rejects the goal of a colorblind society. Watson, *supra* at 495–96 ("Ignoring race altogether has a negative impact. Colorblindness is associated with a greater level of prejudice, both unconscious/implicit

22

and conscious/explicit, and is often used as a justification for inequality." (internal quotation marks and citation omitted)).

In place of the colorblind society with equal opportunity for all, critical race theory seeks the elimination of racial disparity. Under this theory, all or most disparities between "whites" and "people of color" in material wealth and social standing are due to white racism that is traced back in history to the time of slavery and segregation but continues to this very day in the form of what is called "systemic racism." Under this view, disparate impact is deemed conclusive evidence of racial discrimination. Thus, the congressional finding that "African-American children are identified as having intellectual disabilities and emotional disturbance at rates greater than their White counterparts," 20 U.S.C. § 1400(c)(12)(C), is viewed by DPI as a consequence of the "systemic racism" that its RSN and RPIC initiatives were intended to address in an effort to achieve "educational equity" and close the gap in educational achievement that exists between white students and students of color.

Many people, not just Plaintiff, strongly disagree with disparate impact theory. In the words of Judge Ho of the Fifth Circuit, "[t]here's a big difference between prohibiting racial discrimination and endorsing disparate impact theory." *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 648 (5th Cir. 2021) (Ho, J., concurring) (citing WILLIAM N. ESKRIDGE, JR., DYNAMIC STATUTORY INTERPRETATION 78 (1994) (disparate impact is "a significant leap away from" intentional racial discrimination)). Judge Ho continued:

> It's the difference between securing equality of opportunity regardless of race and guaranteeing equality of outcome based on race. It's the difference between color blindness and critical race theory. *Compare* Martin Luther King, Jr., I Have A Dream: Address to the March on Washington for Jobs and Freedom (Aug. 28, 1963) ("I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."), *with* IBRAM X. KENDI, HOW TO BE AN ANTI-RACIST 18 (2019) ("A racist policy is any measure that produces or sustains racial inequity between racial groups."); *see*

23

*also 'When I See Racial Disparities, I See Racism.' Discussing Race, Gender and Mobility*, N.Y. TIMES (Mar. 27, 2018), *available at* https://www.nytimes.com/interactive/2018/03/27/upshot/readerquestions-about-race-gender-and-mobility.html?smid=tw-share.

*Id.*   Moreover, in Judge Ho's view, disparate impact theory leads directly to the very racist practices that laws prohibiting racial discrimination are intended to prevent:

> Prohibiting racial discrimination means we must be blind to race. Disparate impact theory requires the opposite: It forces us to look at race—to check for racial imbalance and then decide what steps must be taken to advance some people at the expense of others based on their race.

*Id.*; *see also Students for Fair Admissions*, 600 U.S. at 218 ("The race-based admissions systems that respondents employ also fail to comply with the twin commands of the Equal Protection Clause that race may never be used as a 'negative' and that it may not operate as a stereotype.").

But while disparate impact theory may be a simplistic theory of human behavior or an unwarranted sociological assumption, even one that can be used to justify racially discriminatory practices, it is not itself a violation of either Title VI or Title VII of the Civil Rights Act. It is not even clear that it can properly be considered a "racist ideology," at least as the term racism is commonly understood. Racism is defined as "a belief that race is the primary determinant of human traits and capacities and that racial differences produce an inherent superiority of a particular race." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 962 (10th ed.). Neither critical race nor disparate impact theory falls within this definition. To the contrary, disparate impact theory assumes that people of all races are equally qualified for and/or interested in all occupations and pursuits, and thus, the only explanation for the under-representation of "people of color" in at least some of the more lucrative occupations or pursuits must be racial discrimination. It likewise views all racial disparity in criminal prosecution, prison populations, and, in the context of this case, inclusion in special education, as evidence of racial discrimination. Under this theory, all

24

races and cultures are equal, meaning the same, and thus, absent white racism, all racial groups should be equally represented in all areas of civic life. Critical race theory is viewed as a response to the alleged white superiority that its proponents claim still exists in society. On the other hand, critical race theory appears racist to many since it seems to consider people primarily as members of a particular race, not as individual members of the human race.

But regardless of whether critical race theory is considered racist or not, DPI's embrace of it does not, by itself, constitute a violation of Title VI or Title VII of the Civil Rights Act of 1964. Ultimately, it is not the role of the judiciary to dictate to the States what theory accounts for the racial disparity that exists in various areas of life. The role of the judiciary is to apply the law as it has been enacted by Congress and, as enacted, Titles VI and VII of the Civil Rights Act of 1964 prohibit discrimination on the basis of race, not ideology. Plaintiff's racial discrimination claims against both DPI and CESA 7 fail because Plaintiff has not presented a prima facie case that she was discriminated against by either DPI or CESA 7 on account of her race. Viewing the evidence in the light most favorably to Plaintiff, it was her opposition to DPI's agenda, not her skin color, that led to her demotion. The fatal flaw in Plaintiff's theory of liability is that the Civil Rights Act proscribes racially discriminatory actions; it does not prescribe theories or ideas that can lead to racially discriminatory actions. Presumably, this is why those seeking to ban critical race theory have turned to their state legislatures instead of to the courts.

In an effort to show that adoption of critical race theory as a factual matter amounts to discrimination against her because of her race, Plaintiff argues that DPI required, as a condition of her employment, that she confess that she herself, as a white person, was a racist. Of course, this is no small matter. Racists are despised by the vast majority of people, and racism is properly viewed in this country as a serious moral and intellectual failing. A black person who was fired

because he refused to confess to having such a flaw, Plaintiff contends, would properly be viewed as suffering discrimination on account of his race.  And if it would amount to a violation of Title VII to condition a black employee's employment on such a condition, it would likewise constitute a violation of Title VII to impose a similar condition on white employees, since the standard for establishing discrimination under Title VII is the same regardless of whether the plaintiff is black or white.  *See Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1546 (2025) ("Our case law thus makes clear that the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group.").

Plaintiff's argument fails, however, because she has not submitted evidence from which a reasonable jury could conclude that she was required to personally admit to being a racist as a condition of her maintaining her position.  Careful review of the evidence does not support her claim.  To be sure, some of the program and instructional materials provided by DPI do state that many, even most, white people have racist attitudes and engage in racist behaviors.  For example, Exhibit B to the declaration Plaintiff submitted in opposition to the defendants' motions for summary judgment is a copy of a handout she and other Integration Directors received from DPI as part of their training on the RSN and RPIC initiatives entitled *Common Patterns of Racist Attitudes and Behaviors of Many Whites*.  Dkt. No. 115-2.  The document lists 41 examples of such attitudes and behaviors, such as:

 1. Believe they have "earned" what they have, rather than acknowledge the extensive white privilege and unearned advantages they receive; believe that if people of color just worked harder. . . ;

2. Not notice the daily indignities that people of color experience; deny them and rationalize them away with PLEs (perfectly logical explanations);

3. Work to maintain the status quo and protect the advantages and privileges they receive;

26

4. Believe that white cultural norms, practices and values are superior and better;

5. Internalize the negative stereotypes about people of color and believe that whites are smarter and superior to people of color;

6. Want people of color to conform and assimilate to white cultural norms and practices.

*Id.* at 1 (cleaned up).

These statements, like those in most of the DPI materials, are so vague and non-specific as to be almost meaningless. For example, what specifically is meant by the "extensive white privilege and unearned advantages" that accounts for individual achievement and what are the "daily indignities" that people of color face? What are the "white cultural norms and practices" that the supposed racists think are superior and better and that others should adopt? Given the generalities used to describe the various attitudes and behaviors, it is difficult to assess what the author is saying other than those who interact with students receiving special education services and their families should take care to avoid any biases, whether conscious or unconscious, they may have.

Moreover, it is clear from the title of the document that it does not convey the belief that white people are inherently racist. It speaks not of the behaviors and attitudes of all whites but of "many whites." The last section of the handout offers a list of "productive actions to shift racist dynamics." *Id.* at 3. These include:

42. Track patterns of differential treatment of people of color and intervene to stop inappropriate actions and educate others;

43. Continually learn more about the experiences of people of color and the dynamics of racism;

44. Recognize when people of color might be reacting out of cumulative impact, and offer space to talk about issues and their experience;

27

45. Analyze policies and practices with a Race lens to assess any negative differential impact on people of color and/or unearned privilege and access for whites; intervene to create change;

46. Constantly track daily organizational activities to ensure fairness, respect, and inclusion for all people with respect to group dynamics, communication, task assignments, hiring, promotions, professional development opportunities, decision-making, conflict management, mentoring, networking, etc.

*Id.* (cleaned up).  The fact that the handout offers steps to correct "racist dynamics" indicates that people are not inherently racist and that, to the extent one has expressed such attitudes or engaged in such behaviors in the past, he or she is able to overcome or correct such tendencies.

Another of the DPI handouts Plaintiff emphasizes is *What if . . . White People Took Responsibility for Our Role in this Moment* by Kathleen Osta, Managing Director of the National Equity Project.  Dkt. No. 115-4.  Osta cites Ibram X. Kendi for the proposition that "there is no such thing as a 'not-racist' — our actions are either racist or anti-racist.  If we are serious about justice, if we are serious about peace, we don't get to spend our time being 'neutral' white people — because there is no neutral."  *Id.* at 3.  Osta continues, "As white people committed to justice, it is our responsibility to move beyond the idea that we are 'not-racist' and therefore, not implicated in racism, to an understanding of ourselves as either racist, by virtue of our action or inaction, or anti-racist by virtue of what we are willing to interrupt, demand, and put on the line."  *Id.* at 4.  One may disagree with Osta's (and Kendi's) view of what a racist is, but she is not claiming that all white people are inherently racist.  If that were the case, why call on them to become anti-racists?  More importantly, Plaintiff has offered no evidence that her complete agreement with all of the positions set out in the handouts DPI provided was a condition of her employment.

Plaintiff seems to view her exchange with DPI Special Education Team member Faasuamalie during the September 15, 2021, RSN meeting as proof that she was required to confess to being a racist as a condition of her employment.  She believed that Faasuamalie, and

28

thus DPI, had "incriminated themselves . . . big time" during this exchange. Dkt. No. 118, ¶ 100. However, she overstates the import of the exchange. As noted above, Plaintiff wrote in the chat intended only for her husband but unintentionally sent to the entire group that "I got them to say I can't do this work if I don't believe in all this antiracism BS." *Id.* The transcript of the meeting and the contemporaneous chat, however, do not support her claim.

During the course of the meeting, Plaintiff brought up Martin Luther King's appeal to a colorblind society where people would be judged by the content of their character and not the color of their skin and asked why that no longer seemed to be the goal. Dkt. No. 81-40 at 100. Faasuamalie responded that if you are colorblind, you're not recognizing people, the culture that they come from, and the beliefs that may play a part in their lives. *Id.* at 100–01. She noted that "the focus of the work DPI was funding was around equity and advancing opportunities to eliminate race inability [sic] as predictors of success or failure, so that is the focus of the Agency and funded staff in the positions you hold." *Id.* at 101. Faasuamalie then suggested that if Plaintiff did not agree with the focus, she should continue to reflect and determine if she could do the work with "the full buy in and support that you would offer if you did agree with it." *Id.* Faasuamalie also suggested that she could bring in DPI's "in house equity person" to speak with Plaintiff as well. *Id.* at 102.

Plaintiff responded that she appreciated the clarification, but then stated her question is "how you would do the work, then, if you didn't believe that as a fact, but as a theory as one possible theory." *Id.* "It sounds like," she continued, "my avenue to explore that then is to reflect on it, and if I can't come to that conclusion then maybe I have to consider whether or not the work is right for me today." *Id.* Faasuamalie replied, "I think that would be accurate, you know, I think that it's just like any position in the world. So, let's say you go into teaching and decide that you

29

don't necessarily agree with the curriculum, you can decide to stay and teach, or you can move on to another position." *Id.* Faasuamalie added, "you know I'm not suggesting, Becky, that I want to lose you as an RSN, but I also am saying you know, this is the agency's effort or focus and of the work, and you know we are going to continue to engage in this work, and if you struggle with it, you know I'm not sure how I can best support you other than to continue to provide these opportunities for learning and growth, and you know I think if you want to engage in the conversation further we could certainly invite Lynn and have another conversation around that." *Id.* at 102–03.

Plaintiff suggested further reflection would not change anything and would not close race-based gaps. She then said, "I think it's interesting that it sounds like in order to do the work you have to agree with this, and this means being told how to feel and I don't know what to do with that, because you can't tell somebody how to feel." *Id.* at 103–04. Faasuamalie responded, "That's fair; I agree." *Id.* at 104. Plaintiff also made the point that she was having trouble conveying DPI's message to some of the school districts within her area because people did not agree with it and would become particularly heated when the subject came up. *Id.*

Plaintiff raised the issue again in a chat during a presentation after lunch. She wrote: "This seems to assume that systemic racism is a fact, and not a theory, and that everyone has blind spots with regard to race. I'm curious about that and how someone does this work if they have a counter belief to that." Dkt. No. 81-41 at 4. After several other participants offered their thoughts, Plaintiff added, "I would be curious to hear how DPI would answer that, but not sure who to ask, because I've asked it several times with no real answer." *Id.* at 5. Faasuamalie then responded: "While I don't have 'research' at my fingertips, I would argue that there is historical evidence of policies that demonstrate systemic racism. I would agree that everyone has blind spots with regard to race.

30

I wish I had an answer to Becky's question about how someone does this work if they have a counter belief to it. I would imagine that it makes the work challenging if you don't believe in it."

*Id.*

It was shortly after this exchange that Plaintiff inadvertently sent the message intended for her husband to the entire group. That message, once again, read:

> You will not believe this recording today. I got them to say I can't do this work if I don't believe in all this antiracism BS. I should have assumed it when I was hired. It should be a surprise to me. We need to take this conversation to another call with Lynn Winn. I'll share the recording later when I get it, but here's a snippet of a written comment I captured which lead [sic] me into pressing them to acknowledge what they are really saying. They incriminated themselves today, big time. Me: "This seems to assume that systemic racism is a fact, and not a theory, and that everyone has blind spots with regard to race. I'm curious about that and how someone does this work if they have a counter belief to that."

*Id.* at 6.

DPI describes this incident as "the tipping point" that ultimately led to DPI's request to CESA 7 that Plaintiff no longer be assigned to the RSN and RPIC projects. It notes that "multiple RSN group members . . . expressed to DPI their discomfort and frustration with [Plaintiff's] behavior, noting its negative impact on the group's morale and trust." Dkt. No. 101 at 8. Plaintiff, on the other hand, views DPI's reaction to her chat as a "smoking gun" clearly establishing her claims. She interprets DPI's reaction to her inadvertent group message as proof that a condition of her employment was the requirement that she admit being a racist and as retaliation for her refusal to do so.

But that is not what Faasuamalie said. She simply agreed with Plaintiff that it would be difficult for her to carry out her responsibilities under the RSN and RPIC initiatives if she did not believe in the message the projects were intended to convey. At no point did Faasuamalie, or any other DPI officer or employee, tell Plaintiff that she was required to admit that she, as a white

31

person, was a racist, as a condition of her employment as an Integration Director or her participation in the RSN and RPIC projects. No such admission was made by any of the other participants in the group meetings. Thus, Plaintiff has failed to offer evidence of the second component of her argument. What the transcript of the meeting and chats do reveal is that Plaintiff was trying to get Faasuamalie and DPI to say things that would incriminate themselves "big time." It was for this reason that DPI insisted that Plaintiff no longer participate in the RSN and RPIC meetings, not because of the color of her skin.

In short, Plaintiff has failed to offer evidence from which a reasonable jury could conclude that she suffered discrimination based on her race or retaliation because of her complaint about or opposition to an unlawful employment practice. And because the same standards apply for proving an equal protection claim under § 1983, *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003), Plaintiff's equal protection claim against CESA 7 fails as well. For this reason, the defendants are entitled to summary judgment on her Title VI and Title VII claims.

## B. Family Medical Leave Act Claim

Plaintiff asserts that CESA 7 interfered with her efforts to exercise her FMLA rights. The FMLA provides that an eligible employee may take up to twelve weeks of leave during any twelve-month period if she is unable to perform the functions of her position because of a serious health condition. 29 U.S.C. § 2612(a)(1)(D). An employer is prohibited from interfering with the exercise of or the attempt to exercise any right under the FMLA. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 780 (7th Cir. 2013) (citing 29 U.S.C. § 2615(a)(1)). "An employee claiming FMLA interference must show that: (1) he was eligible for FMLA protections; (2) his employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer 'interfered with, restrained, or denied FMLA

32

benefits to which he was entitled.'" *Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023) (quoting *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022)). An employer who violates § 2615 by interfering with, restraining, or denying an employee's exercise of FMLA rights is liable for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B).

"When an employee initially requests FMLA leave, the employer may take the employee at his word and grant the request, or 'may request certification by the employee's healthcare provider.'" *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 837 (7th Cir. 2014) (quoting *Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 886 (7th Cir. 2005)). The health care provider's certification for an employee who claims a serious health condition that renders her unable to perform the functions of her position "shall be sufficient" if it provides "the date on which the serious health condition commenced," "the probable duration of the condition," "the appropriate medical facts within the knowledge of the health care provider regarding the condition," and "a statement that the employee is unable to perform the functions of the position of the employee." 29 U.S.C. § 2613(b)(1)–(3), (4)(B).

The FMLA also "circumscribes the employer's right to challenge a physician's certification that is FMLA-qualifying." *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 313 (7th Cir. 1998) (citing 29 U.S.C. § 2613); *see also Hansen*, 763 F.3d at 837. The employer may require that the employee obtain a second opinion, at the employer's expense, when it has reason to doubt the validity of the certification provided by the employee's health care provider. 29 U.S.C. § 2613(c). If the second opinion differs from the opinion in the certification provided by

the employee, the employer may require that the employee obtain a third opinion, also at the employer's expense. § 2613(d)(1). "The opinion of the third health care provider concerning the information certified under subsection (b) shall be considered to be final and shall be binding on the employer and the employee." § 2613(d)(2).

Plaintiff argues that CESA 7 interfered with her FMLA rights, forcing her to "jump through unnecessary hoops by requiring her to return to Wisconsin for the first [independent medical examination] IME and requiring her to submit to a second IME *seven weeks after* the need for any leave whatsoever had ended." Dkt. No. 113 at 37. She suggests that because the medical certification completed by APNP Leasum was legally sufficient, CESA 7 had no basis to ask for a second (or third) opinion. But the statute expressly authorizes the employer to request a second opinion when it has "reason to doubt the validity of the certification" provided by the employee's health care provider. 29 U.S.C. § 2613(c).

Neither the statute nor the related regulations, *see* 29 C.F.R. § 825.307, explain what qualifies as "reason to doubt the validity of the certification." Courts have found that requests for second opinions may be based on doubts as to the "sufficiency or veracity of the certification," *Nett v. Milwaukee County*, No. 04-C-534, 2006 WL 2517896, at *15 (E.D. Wis. Aug. 25, 2006), or based on an "honest suspicion that [the] application for FMLA leave was not legitimate," *Barnes v. LaPorte County*, No. 07-CV-297, 2008 WL 5263364, at *3 (N.D. Ind. Dec. 16, 2008). Specifically, as reasons to doubt the validity of the medical certification, Timm noted that Plaintiff would not be seeking medical treatment until the day after her leave ended; the certification sought leave for the exact time period when Plaintiff had been working remotely in Florida the two years prior; and the certification stated that Plaintiff could not "communicate effectively with clients and CESA 7 employees" or perform "all duties" because of her condition, yet Timm believed that

34

Plaintiff had been communicating effectively with clients and CESA 7 employees and performing all of her job duties since the onset date of the alleged condition. Dkt. No. 114, ¶ 79.

Plaintiff disputes that CESA 7 had a legitimate basis to doubt the validity of the medical certification she submitted. *Id.*, ¶¶ 78–79. She asserts that the fact that her condition began on October 12, 2021, but did not incapacitate Plaintiff or make her unable to effectively communicate with clients or CESA 7 employees until slightly more than a year later is neither remarkable nor cause for suspicion because some progressive medical conditions may commence long before the condition leads to substantial incapacitation. Plaintiff also argues that the fact that she might not need medical treatment while on medical leave is "precisely the sort of medical decision that FMLA properly leaves to the medical professionals – not the employee's layman supervisor." *Id.*, ¶ 79. Although Plaintiff disagrees with the reasons for Timm's doubts about the validity of the medical certification, the court finds that she had an "honest suspicion" to request a second opinion.

Plaintiff also contends that she was prejudiced because she was compelled to travel from Florida to Wisconsin and back to spend substantial parts of two days submitting to the examinations. But there is no dispute that Plaintiff never requested an alternate date, alternate provider, or alternate location for the second examination. *Id.*, ¶ 87. Though Plaintiff maintains that CESA 7 would not have considered any request she would have made, her assertion is based only on her speculation.

In this case, CESA 7 had reason to doubt the validity of the first medical certification, so it requested a second opinion. The second opinion conflicted with the first, so CESA 7 sought a third opinion. *See* 29 U.S.C. § 2613(d)(1). The third opinion concluded that Plaintiff was not able to perform one or more of her essential job functions, and CESA 7 accepted that opinion as

required by law.  CESA 7 had provisionally approved Plaintiff's FMLA leave while it was obtaining the second and third medical opinions, as required by 29 C.F.R. § 825.307(b)(1), and officially approved her FMLA leave.  In short, CESA 7 did not interfere with Plaintiff's efforts to exercise her FMLA rights, and CESA 7 is entitled to summary judgment on this claim.

## C.  First Amendment Retaliation Claim

Plaintiff asserts that CESA 7 violated her First Amendment rights by retaliating against her because of (1) her political beliefs, (2) what she said, (3) what she declined to say, (4) what she believed, and (5) what she declined to believe.  Generally speaking, a government employer may not retaliate against its employees for exercising their right to free speech.  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  To establish retaliation under the First Amendment, a plaintiff must show (1) she engaged in activity protected by the First Amendment, (2) she suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was "at least a motivating factor" in the defendant's decision to take the retaliatory action.  *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

Plaintiff asserts that CESA 7 retaliated against her not just because of what she said but because of her political beliefs—what she believed and what she declined to believe.  CESA 7 argues that Plaintiff never alleged these claims in her complaint, despite amending it twice.  Plaintiff cites to the following paragraphs in her Second Amended Complaint to support her argument that she brought claims that CESA 7 retaliated against her because of her political beliefs, what she believed, and what she declined to believe:

> Defendants' insistence that Plaintiff cease expressing her views and that she instead "demonstrate" her agreement with Defendants' racist philosophy, conduct and actions violated Plaintiff's constitutional rights including her right to speak and to refrain from speaking.

36

Despite her positive job performance and track record, Defendants repeatedly informed Plaintiff that she could not properly perform the Director of Integrated Services job unless she believed and otherwise agreed with and embraced DPI's racist philosophy, programs, and actions. Defendants' conduct violated Plaintiff's constitutional rights including, but not limited to, her rights to speak and to refrain from speaking.

The conduct of both Defendants violated Plaintiff's constitutional rights including her constitutional right to equal protection under law.

While acting under color of state law, CESA 7 subjected Plaintiff to a deprivation of her rights, privileges and immunities secured by federal law and the U.S. Constitution, including – but not limited to – Plaintiff's rights to equal protection under the law, her right to speak, and her right to refrain from engaging in speech. DPI exercised such coercive power and provided such overt and covert encouragement to CESA 7 that the decisions made by CESA 7 are properly attributable to DPI and vice-versa.

Dkt. No. 33, ¶¶ 37.h, 41.b, 57.b, 60.r. These allegations do not provide CESA 7 with notice of Plaintiff's claim that it retaliated against her because of her political beliefs, what she believed, and what she declined to believe. Because Plaintiff did not assert these claims in her complaint, the court will not consider them. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment. By then, [Defendant], relying on [Plaintiff's] second amended complaint, had not received the fair notice required by the federal pleading rules." (citations omitted)).

With respect to Plaintiff's assertion that CESA 7 retaliated against her based on what she said, Plaintiff lists seven statements she made that she contends constitute protected speech. Dkt. No. 113 at 42–46. In particular, at the July 21, 2021, RSN meeting, Plaintiff challenged DPI's practice of selectively choosing not to record "controversial" portions of the RSN and RPIC meetings. *Id.* at 42. At the August 11, 2021, and September 15, 2021, RSN meetings, Plaintiff warned DPI about the consequences of attempting to "foist its race-based agenda on school districts." *Id.* at 43–44. At the September 8, 2021, RPIC meeting, Plaintiff warned DPI that its

37

race-based agenda was "illegal and immoral." *Id.* at 44. During a September 16, 2021, telephone call with DPI Special Education Team member Rachel Fregien, Plaintiff advised that DPI's race-based agenda was "illegal and immoral" and criticized Fregien's "unjust and derogatory" statements about parents who opposed efforts by local Wisconsin school districts to implement critical race theory in their districts. *Id.* at 45. In a May 12, 2022, email to Dickert and Timm, Plaintiff advised that DPI was engaging in illegal activity. *Id.* at 46.

As an initial matter, CESA 7 argues that Plaintiff's September 8 and September 16, 2021, statements cannot form the basis of a valid First Amendment claim because Plaintiff's supervisor was not aware of those instances of speech until after Plaintiff filed her lawsuit. Plaintiff has not cited any evidence to show that her supervisor knew about these statements. This failure is fatal to her claim. *See Wackett v. City of Beaver Dam*, 642 F.3d 578, 582 (7th Cir. 2011) (defendants entitled to summary judgment where plaintiff failed to present any evidence that defendants knew about plaintiff's allegedly protected speech).

Next, CESA 7 argues that Plaintiff's remaining statements were not constitutionally protected speech. In order for a public employee to raise a successful claim under the First Amendment, she must have spoken in her capacity "as a private citizen and not as an employee." *See Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008). Indeed, a public employee's speech receives constitutional protection only if it "(1) was made as a private citizen; and (2) addressed a matter of public concern." *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

38

Plaintiff asserts that she made her statements as a private citizen because nothing about her "official duties" pertained to the secrecy of DPI meetings or obligated Plaintiff to warn DPI about its conduct. But Plaintiff's focus on her "'core' job functions is too narrow." *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007) (citing *Garcetti*, 547 U.S. at 423). "Whether speech is made 'pursuant to' official duties is broader than an employee's job description." *Fehlman v. Mankowski*, 74 F.4th 872, 875 (7th Cir. 2023). An employee's statements about misconduct involving her workplace is considered "official-capacity speech," even if the employee is not "ordinarily responsible for investigating misconduct." *Id.* (citing *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013)).

Based on the record, the court concludes that Plaintiff was speaking pursuant to her official duties when she spoke at the RSN and RPIC meetings. As CESA 7's Integration Director, Plaintiff was required to attend the RSN and RPIC meetings. Plaintiff did not speak as a citizen. Instead, she spoke in her capacity as a public employee contributing to the group discussions regarding DPI's messaging. Because Plaintiff's comments were made in her role as a public employee, they are not subject to First Amendment protection. *See Callahan v. Fermon*, 526 F.3d 1040, 1045 (7th Cir. 2008) ("[Plaintiff] did not speak as a citizen when he attended the meeting; he went to work and performed the tasks that he was paid to perform." (citing *Garcetti*, 547 U.S. at 422)).

Ultimately, Plaintiff's First Amendment claim seeks to elevate her own free speech rights above the government's right to determine policy. The First Amendment, however, does not prevent the government from adopting policies or expressing views with which its employees may disagree:

> When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. That must be true for government to work. Boston could not easily congratulate the Red Sox on a victory were the city powerless to decline to

39

simultaneously transmit the views of disappointed Yankees fans. The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks.

*Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 251–52 (2022) (citations omitted); *see also Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy."). This is even more true when the government seeks to implement its policies and transmit its views through the employees it hires for that very purpose.

Finally, Plaintiff raises a compelled speech claim. She asserts that Defendants compelled her to "share the tenets of DPI's race-based agenda within the school districts in her territory." Dkt. No. 113 at 48. "The First Amendment protects both the right to speak and 'the right to refrain from speaking.'" *Kilborn v. Amiridis*, 131 F.4th 550, 562 (7th Cir. 2025) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). Public employees receive certain protection "against compulsion by their employer to endorse messages they find objectionable." *Id.* CESA 7 argues that Plaintiff's compelled speech claim fails because she never engaged in any compelled speech. Plaintiff does not dispute that she never spoke any of the compelled speech. Therefore, her compelled speech claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment (Dkt. Nos. 96 & 100) are **GRANTED**. The clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 4th day of August, 2025.

William C. Griesbach
United States District Judge

40

# United States District Court
### EASTERN DISTRICT OF WISCONSIN

BECKY SPENGLER,

        Plaintiff,

    v.

COOPERATIVE EDUCATIONAL
SERVICE AGENCY 7, a/k/a CESA 7, and
WISCONSIN DEPARTMENT
OF PUBLIC INSTRUCTION,

        Defendants.

**JUDGMENT IN A CIVIL CASE**
Case No. 22-C-1199

☐    **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict

☒    **Decision by Court.**  This action came before the Court for consideration.

    **IT IS HEREBY ORDERED AND ADJUDGED** that the plaintiff takes nothing, and this case is DISMISSED.

    Dated:   August 4, 2025

                          LINDA M. KLEMM
                          Interim Clerk of Court

                          s/ Mara VandenHeuvel
                          (By) Deputy Clerk