No. 25-2532

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

BECKY SPENGLER,

      Plaintiff-Appellant,

    v.

COOPERATIVE EDUCATIONAL
SERVICE AGENCY 7, et al.,

       Defendants-Appellees.

ON APPEAL FROM A JUDGMENT ENTERED IN THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN, THE
HONORABLE WILLIAM C. GRIESBACH, PRESIDING

## BRIEF OF DEFENDANT-APPELLEE WISCONSIN DEPARTMENT OF PUBLIC INSTRUCTION

JOSHUA L. KAUL
Attorney General of Wisconsin

RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

Attorneys for Defendant-Appellee
Wisconsin Department of Public
Instruction

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188
(608) 294-2907 (Fax)
rachel.bachhuber@wisdoj.gov

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..................................................................1

INTRODUCTION ........................................................................................2

STATEMENT OF THE ISSUES PRESENTED ..................................................3

STATEMENT OF THE CASE ........................................................................3

I.    Statement of facts. ...........................................................................3

    A.    The Department of Public Instruction and the Special
        Education Team. ......................................................................3

    B.    CESA 7 and Becky Spengler's employment. ...............................5

    C.    Spengler's performance in the two projects on behalf
        of CESA 7. ..............................................................................6

        1.    The May 2021 Special Education Network
            meeting. ..........................................................................8

        2.    The June 2021 Special Education Network
            meeting. ..........................................................................9

        3.    The July 2021 Special Education Network
            meeting. ..........................................................................9

        4.    The August 2021 Special Education Network
            meeting. ........................................................................ 10

        5.    The September 2021 Research to Practice
            project meeting................................................................ 11

        6.    The September 2021 Special Education
            Network meeting. ........................................................... 12

        7.    Spengler's September 16 call with Fregien. ...................... 14

    D.    The Department and CESA 7 meet about Spengler's
        performance and Spengler's reassignment. ............................... 15

    E.    Spengler's EEOC charges against the Department..................... 17

II.     Procedural history. ............................................................................. 18

STANDARD OF REVIEW ........................................................................... 19

SUMMARY OF THE ARGUMENT ................................................... 20

ARGUMENT ................................................................................. 22

I.      The district court correctly granted summary judgment to
        the Department on Spengler's Title VII race discrimination
        claim. .............................................................................................. 22

        A.     Title VII requires proof of discrimination based on
               race, among other protected classes. ........................................... 22

        B.     Spengler failed to present evidence that the
               Department discriminated against her because she is
               white. .......................................................................................... 24

               1.     Spengler's first component is unsupported by
                      the record .......................................................................... 25

               2.     Spengler's second component fails because
                      there is no evidence to support it. ..................................... 29

               3.     Spengler's third component fails because the
                      Department did not impose race-differentiated
                      demands or make race a term or condition of
                      employment. ...................................................................... 32

II.     The district court granted summary judgment to the
        Department on Spengler's Title VII retaliation claim. .......................... 36

        A.     Title VII prohibits employer retaliation based on an
               employee's opposition to an unlawful employment
               practice and formal filing of a complaint. .................................... 36

        B.     Spengler did not engage in protected activity through
               "opposition" to an illegal employment practice under
               Title VII. ..................................................................................... 37

ii

1.     Spengler's cited statements of opposition fail the objective reasonableness standard. .............................. 38

     a.    Spengler's statements expressing ideological disagreement are not protected activity under Title VII. ........................... 39

     b.    Spengler's conclusory assertions of "discrimination" without supporting facts are insufficient to establish a protected activity. ...................................... 40

     c.    The September 15 group-chat message was not protected activity under Title VII. ......................................................... 41

     d.    Spengler's misrepresentation of the record cannot show a protected activity. ................. 43

     e.    Internal discussions and third-party conversations are not protected activity by Spengler. ............................................... 44

2.     Spengler did not, by her own admission, subjectively believe she was complaining about how illegal practices under Title VII. ................................ 45

C.    Spengler cannot establish causation because she never opposed an unlawful employment practice before the Department's alleged adverse actions. ...................... 46

D.    This Court need not reach the pretext analysis because Spengler failed to establish her prima facie case of retaliation. ....................................................... 49

III.   Regardless, the Department cannot be liable to Spengler under Title VII because no employer-employee relationship existed. ............................................................................. 52

A.    To establish Title VII, liability Spengler must prove the existence of an employer-employee relationship. .................. 52

B.    The undisputed facts weigh against treating the Department as Spengler's employer. ............................................. 53

    1.    CESA 7, not the Department, was Spengler's district employer. ............................................... 53

    2.    The Department was not Spengler's indirect employer. .......................................................... 53

        a.    The Department did not control or supervise Spengler. ....................................... 54

        b.    The Department did not pay Spengler, provide her any benefits, or otherwise cover her costs. ........................................... 59

        c.    Spengler brought significant training and experience to the Department's two projects and operated under term-limited contracts. ................................................... 60

CONCLUSION ............................................................................. 62

## TABLE OF AUTHORITIES

### Cases

*Alexander v. Rush North Shore Med. Ctr.*,
   101 F.3d 487 (7th Cir. 1996) ....................................................... 59

*Ames v. Ohio Dep't of Youth Services*,
   605 U.S. 303 (2025) ................................................................. 22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................. 19

*Board of Regents of Univ. of Wis. System v. Southworth*,
   529 U.S. 217 (2000) ................................................................. 27

*Bostock v. Clayton Cnty., Georgia,*
590 U.S. 644 (2020) ................................................................ 33, 34

*Bowman v. City of Chi. Bd. of Educ.,* Case No. 24-2938,
2025 WL 2759539 (7th Cir. Sept. 29, 2025) ................................. 23

*Castaneda v. Partida,*
430 U.S. 482 (1977) ...................................................................... 35

*Collins v. Am. Red Cross,*
715 F.3d 994 (7th Cir. 2013) ......................................................... 50

*Cuenca v. Univ. of Kansas,*
101 Fed. Appx. 782 (10th Cir. 2004) ............................................. 42

*Diemert v. City of Seattle,*
776 F.Supp.3d 922 (W.D. Wash. 2025) .......................................... 39

*Drake v. Minn. Mining & Mfg. Co.,*
134 F.3d 878 (7th Cir. 1998) ......................................................... 41

*EEOC v. Ill.,*
69 F.3d 167 (7th Cir. 1995) ........................................................... 55

*Ennin v. CNH Indus. Am., LLC,*
878 F.3d 590 (7th Cir. 2017) ......................................................... 34

*Erickson v. Wisconsin Dep't of Corr.,*
469 F.3d 600 (7th Cir. 2006) ......................................................... 39

*Giese v. City of Kankakee,*
71 F.4th 582 (7th Cir. 2023) ..................................................... 46, 47

*Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.,*
224 F.3d 701 (7th Cir. 2000) ......................................................... 39

*Harris v. Allen Cty. Bd. Of Comm'rs,*
890 F.3d 680 (7th Cir. 2018) ......................................................... 57

*Hojnacki v. Klein-Acosta,*
285 F.3d 544 (7th Cir. 2002) ......................................................... 60

*Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation,*
988 F.3d 948 (7th Cir. 2021) ..................................................... 23, 37

*Johnson v. Rimmer,*
   936 F.3d 695 (7th Cir. 2019) ........................................................ 19

*Knight v. United Farm Bureau Mut. Ins. Co.,*
   950 F.2d 377 (7th Cir. 1991) .................................................. 53, 61

*Logan v. City of Chicago,*
   4 F.4th 529 (7th Cir. 2021) ........................................... 37, 38, 45

*Love v. JP Cullen & Sons, Inc.,*
   779 F.3d 697 (7th Cir. 2015) ........................................52, *passim*

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.,*
   994 F.3d 869 (7th Cir. 2021) ........................................................ 19

*Markel v. Bd. of Regents of the Univ. of Wis. Sys.,*
   276 F.3d 906 (7th Cir. 2002) ........................................................ 19

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973) ...................................................................... 22

*Millbrook v. IBP, Inc.,*
   280 F.3d 1169 (7th Cir. 2002) ..................................................... 49

*Mozee v. Jeffboat, Inc.,*
   746 F.2d 365 (7th Cir. 1984) ....................................................... 42

*Muldrow v. City of St. Louis,*
   601 U.S. 346 (2024) ...................................................................... 23

*Murphy v. Caterpillar,*
   140 F.4th 900 (7th Cir. 2025) ................................................ 49, 50

*Nagle v. Vill. of Calumet Park,*
   554 F.3d 1106 (7th Cir. 2009) ................................................ 46–47

*Nischan v. Stratosphere Quality, LLC,*
   865 F.3d 922 (7th Cir. 2017) ........................................... 55, 56–57

*Northington v. H & M Int'l,*
   712 F.3d 1062 (7th Cir. 2013) ..................................................... 37

*Oncale v. Sundowner Offshore Servs., Inc.,*
   523 U.S. 75 (1998) ........................................................................ 35

vi

*Ortiz v. Werner Enterprises, Inc.*,
 834 F.3d 760 (7th Cir. 2016) ...................................................................... 22

*Pagel v. TIN Inc.*,
 695 F.3d 622 (7th Cir. 2012) ...................................................................... 19

*Parker v. Brooks Life Sci., Inc.*,
 39 F.4th 931 (7th Cir. 2022) ................................................................. 49, 51

*Pleasant Grove City, Utah v. Summum*,
 555 U.S. 460 (2009) ..................................................................................... 27

*Poullard v. McDonald*,
 829 F.3d 844 (7th Cir. 2016) ...................................................................... 19

*Reives v. Ill. State Police*,
 29 F.4th 887 (7th Cir. 2022) ....................................................................... 23

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
 515 U.S. 819 (1995) ..................................................................................... 27

*Runkel v. City of Springfield*,
 51 F.4th 736 (7th Cir. 2022) ....................................................................... 22

*Rust v. Sullivan*,
 500 U.S. 173 (1991) ..................................................................................... 27

*Scott v. Harris*,
 550 U.S. 372 (2007) ..................................................................................... 50

*Skiba v. Ill. Central Railroad Co.*,
 884 F.3d 708 (7th Cir. 2018) ...................................................................... 37

*Smith v. Ill. Dep't of Trans.*,
 936 F.3d 554 (7th Cir. 2019) ................................................................. 41, 49

*Thomas v. JBS Green Bay, Inc.*,
 120 F.4th 1335 (7th Cir. 2024) ................................................................... 23

*Tomanovich v. City of Indianapolis*,
 457 F.3d 656 (7th Cir. 2006) ...................................................................... 38

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
 570 U.S. 338 (2013) ..................................................................................... 37

## Statutes

20 U.S.C. § 1400(d)(1)(A) ........................................................................... 6

20 U.S.C. § 1418(d) ................................................................................... 40

20 U.S.C. §§ 1411–1419 ............................................................................. 6

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

29 U.S.C. § 2615 ........................................................................................ 1

29 U.S.C. § 2617 ........................................................................................ 1

42 U.S.C. § 1983 ........................................................................................ 1

42 U.S.C. § 2000d ...................................................................................... 1

42 U.S.C. § 2000e-2 ............................................................................. 40, 44

42 U.S.C. § 2000e-2(a) ......................................................................... 1, 45

42 U.S.C. § 2000e-2(a)(1) ................................................................... 22, 24

42 U.S.C. § 2000e-3(a) ................................................................... 1, 37, 45

Wis. Stat. § 116.01 ............................................................................... 5, 53

Wis. Stat. § 116.015 ................................................................................. 53

Wis. Stat. § 116.03(11) ............................................................................. 59

Wis. Stat. § 116.045 ........................................................................... 53, 57

## Rules

Fed. R. Civ. P. 56(a) ................................................................................ 19

## Regulations

Wis. Admin. Code PI § 34.065 .................................................................. 61

Wis. Admin. Code PI § 34.069 .................................................................. 61

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Becky Spengler's jurisdictional statement is not complete and correct. Defendant-Appellee Wisconsin Department of Public Instruction provides the following jurisdictional summary.

The district court had jurisdiction under 28 U.S.C. § 1331. Spengler filed a second amended complaint alleging claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), against Defendants-Appellees Wisconsin Department of Public Instruction (the Department) and Cooperative Educational Service Agency 7 (CESA 7). (Dkt. 33 ¶¶ 7, 60.) She also alleged claims against CESA 7 under the Family Medical Leave Act, 29 U.S.C. §§ 2615 and 2617; and under the Equal Protection Clause of the Fourteenth Amendment and the First Amendment, via 42 U.S.C. § 1983. (Dkt. 33 ¶¶ 7, 60.)

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered a decision and order granting the Department's and CESA 7's motions for summary judgment on August 4, 2025. (Dkt. 135.) The district court entered a final judgment that same day. (Dkt. 136.) Spengler did not file a motion for a new trial or alteration of the judgment, or any other motion claimed to toll the time within which to appeal. Spengler filed a timely notice of appeal on August 29, 2025. (Dkt. 149.)

**INTRODUCTION**

The district court's judgment should be affirmed because Title VII does not reach the conduct Spengler challenges. Spengler, a white woman, was employed by CESA 7 and assigned to work on two Department-supported projects that addressed concepts related to educational equity, including racial equity. Spengler disagreed with those concepts and now recasts that disagreement as race discrimination. But Title VII does not prohibit employers from engaging employees in difficult conversations about race; it prohibits adverse employment actions taken because of an individual's race or in retaliation for opposing an unlawful employment practice.

The record shows that the Department sought Spengler's reassignment from two projects for nondiscriminatory reasons tied to project integrity and group trust—most notably after Spengler broadcast to the entire project group that their work was "antiracism BS" and that colleagues had "incriminated themselves big time"—not because she is white. Nor can Spengler salvage her retaliation claim. Spengler cannot prove that she engaged in statutorily protected activity under Title VII because her cited "opposition" did not reasonably identify an unlawful employment practice. Spengler also failed to establish causation because the Department lacked notice of any protected activity before the challenged actions. And in all events, the Department was not even Spengler's employer. Wisconsin law makes CESA 7 her sole employer,

2

and the economic-realities factors confirm the Department had no employer-like control.

## STATEMENT OF THE ISSUES PRESENTED

Spengler's brief lists four issues, but the Department presents only the following pertinent three.[1]

1. Did the district court properly grant summary judgment to the Department on Spengler's Title VII race discrimination claim?

2. Did the district court properly grant summary judgment to the Department on Spengler's Title VII retaliation claim?

3. Notwithstanding the merits of Spengler's discrimination and retaliation claims, is the Department subject to Title VII liability when it was not her direct or indirect employer?

## STATEMENT OF THE CASE

**I.    Statement of facts.**

**A.    The Department of Public Instruction and the Special Education Team.**

The Department is a state agency led by the state superintendent of public instruction. Through its Division for Learning Support, the Department oversees the Special Education Team, which provides leadership to improve

---

[1] Issues and claims that Spengler has raised solely against CESA 7 will not be addressed in the Department's brief. (7th Dkt. 20:8.)

outcomes for students with disabilities under the federal Individuals with Disabilities Education Act (IDEA). At the relevant times, Julia Hartwig served as Director of Special Education and supervised Assistant Director Lynn Winn, who in turn supervised education consultants Erin Faasuamalie and Rachel Fregien. (Dkt. 97 ¶¶ 9–11, 48–51.)

Two Special Education Team initiatives are relevant here: the Regional Special Education Network ("RSN" or the "Special Education Network") and the Research to Practice–Inclusive Communities ("Research to Practice") projects. The Special Education Network supports special education leadership and collaboration among local educational agencies, particularly directors of special education. (Dkt. 118 ¶ 2.) The Research to Practice project provided evidence-based professional development to school districts aimed at improving outcomes for students with disabilities; participation was voluntary. Faasuamalie oversaw the Special Education Network, and Fregien oversaw the Research to Practice project. (Dkt. 97 ¶¶ 10–11.)

The Department funded and supported the projects through interagency agreements with Wisconsin's Cooperative Educational Service Agencies (CESAs), which are statutorily created entities that serve as regional intermediaries between school districts and the State. Wis. Stat. § 116.01.

4

**B.    CESA 7 and Becky Spengler's employment.**

CESA 7 is one of twelve Cooperative Educational Service Agencies in Wisconsin. Jeff Dickert served as the Agency's Administrator and was Spengler's direct supervisor. (Dkt. 97 ¶¶ 6, 15.)

CESA 7 hired Spengler in 2018 as its Integration Director. At the time of her hire, Spengler held Director of Special Education and Director of Pupil Services certifications. (Dkt. 84-8:1.)

As Integration Director, Spengler was responsible for carrying out certain initiatives under a contract between the Department and CESA 7, including the two projects. (Dkt. 97 ¶¶ 2–5, 68; 118 ¶¶ 7–8.) She served as CESA 7's participant in the Special Education Network and as a coach in the Research to Practice project. As part of the Special Education Network, she supported directors of special education in CESA 7's 38 school districts. (Dkt. 97 ¶ 16; 61.) As a coach in the Research to Practice project, she provided job-embedded professional learning to support implementation of educational practices following training. (Dkt. 97 ¶ 16; 135:4.) Spengler was one of ten coaches statewide; all were white. (Dkt. 118 ¶ 14.)

In addition to her project responsibilities, Spengler's primary duties for CESA 7 included directing pupil services, overseeing the administrator and teacher development center, attending and delivering professional development workshops, providing technical assistance, and serving as a

5

resource to school districts and community organizations. (Dkt. 118 ¶¶ 7–8; 57-17:1.) She supervised between seven and ten CESA 7 employees and completed their performance evaluations. (Dkt. 97 ¶¶ 73–74.) Dickert evaluated Spengler's performance. (Dkt. 97 ¶ 75.) Under her employment contract, CESA 7 set Spengler's salary, provided her benefits and work equipment, and had sole authority to hire or fire her. (Dkt. 97 ¶¶ 14, 69–70; 118 ¶¶ 6, 132, 140.)

## C. Spengler's performance in the two projects on behalf of CESA 7.

The two projects to which Spengler were assigned were federally funded under the IDEA. *See* 20 U.S.C. §§ 1411–1419; (Dkt. 118 ¶ 4.) The projects supported the Department's efforts to fulfill IDEA's mandate to ensure that students with disabilities receive a free appropriate public education designed to meet their unique needs and prepare them for future education, employment, and independent living. *See* 20 U.S.C. § 1400(d)(1)(A). Consistent with that purpose, the two projects were designed to improve outcomes for students with disabilities by supporting school and district leaders in identifying and addressing inequities in educational systems. (Dkt. 118 ¶¶ 1–3, 15; 77-1:3, 7–10, 19–20.) The Department defines educational equity as ensuring that "[e]very student has access to the resources and educational rigor they need at the right moment in their education, across race, gender,

6

ethnicity, language, ability, sexual orientation, family background, and/or family income." (Dkt. 74-4:4.)

Within the Research to Practice project, coaches support district leadership teams in strengthening systems and implementing inclusive learning communities. (Dkt. 118 ¶ 15.) As part of that work, Research to Practice participants learned and applied a coaching framework set out in the Coaching Competency Practice Profile ("Practice Profile"), which was developed by the Department and community stakeholders. (Dkt. 118 ¶ 16.) The practice profile defines coaching in a way intended to be teachable, learnable, and usable across educational settings and to promote consistency among practitioners. (Dkt. 118 ¶ 16.) It was not a performance-evaluation tool for individual coaches, but instead a framework for developing a system of coaching. (Dkt. 118 ¶¶ 17–18.)

Spengler disagreed with the Department's approach to educational equity, particularly as reflected in training materials discussed during the monthly project meetings between May and September 2021, which addressed topics such as systemic racism, bias, and privilege. Her pushback increased following the release of version 3.0 of the practice profile, which added a new equity competency containing language about privilege, bias, and the impact of white supremacy. (Dkt. 118 ¶¶ 62–70, 72, 74–85, 88–90, 93–103.)

7

### 1.     The May 2021 Special Education Network meeting.

In May 2021, Special Education Network participants were asked to read *From Safe Spaces to Brave Spaces: A New Way to Frame Dialogue Around Diversity and Social Justice*, which encouraged discussion of controversial views in social-justice settings. (Dkt. 115-1.) During the meeting, Spengler shared what she described as a "brave" response, recounting a July 2019 incident in which she declined to participate in a voluntary *White Fragility* book study and later overheard Special Education Network members— including Faasuamalie—make remarks about her political views. According to Spengler, those remarks suggested that supporters of Donald Trump or Scott Walker should study white privilege and that Trump voters hold racist beliefs. (Dkt. 126 ¶ 14.)

Spengler offered the example to explain her belief that the Special Education Network meetings were not always a safe forum for expressing her views. Faasuamalie responded by acknowledging the comments, describing them as "fair," and apologizing for not living up to the principles she advocated; Wall also apologized. (Dkt. 81-8:79–81, 84.) Participant feedback from the meeting reflected concerns about trust and about the use of "safe conversations" as a justification for negative or unproductive remarks. (Dkt. 118 ¶¶ 35, 37–39.) Spengler later described the discussion as "certainly tense." (Dkt. 118 ¶ 34.)

In the monthly meetings that followed, concerns continued to emerge that Spengler's contributions diverted discussions from their intended focus and undermined trust and collaboration among participants. (Dkt. 118 ¶¶ 35–39.)

### 2.     The June 2021 Special Education Network meeting.

At the June 9, 2021, Special Education Network meeting, participants discussed revising "Community Agreements" intended to support trust building and solution-oriented collaboration. (Dkt. 118 ¶ 41.) During the discussion, Spengler stated she was "hung up" on the lack of shared definitions and was not ready to proceed. (Dkt. 118 ¶ 42.)

Faasuamalie explained the planned process for gathering feedback, but Spengler continued to raise concerns about trust and inclusivity without engaging in the revision work or proposing solutions. (Dkt. 118 ¶¶ 43–46.) Faasuamalie understood Spengler's comments as resistance to the session's solution-focused purpose. (Dkt. 118 ¶ 46.)

### 3.     The July 2021 Special Education Network meeting.

At the July 21, 2021, Special Education Network meeting, Faasuamalie was absent, and Assistant Director Winn facilitated part of the discussion. (Dkt. 118 ¶ 50; 97 ¶ 63.) During the meeting, Spengler recorded a portion of the discussion without permission after Winn had asked for the recording to be turned off. (Dkt. 118 ¶¶ 51–52.) During her presentation, Winn emphasized

9

that no one was "wrong or bad," that "nobody is a bad person because they have racist tendencies," and explained that the Special Education Network work is not about being "right or wrong," it requires openness to learning and understanding others' perspectives. (Dkt. 118 ¶ 53.) Spengler later testified that she was not offended by Winn's remarks, and she never reported them to anyone at the Department. (Dkt. 118 ¶¶ 54–55.)

During the meeting, Spengler stated that she distrusted the group, said the meeting needed to be recorded to protect herself, revisited the July 2019 incident, criticized Faasuamalie in her absence, and stated, among other things, "I just don't trust you." (Dkt. 118 ¶ 56.) Spengler later testified that she did not state that she was opposing any unlawful employment practice. (Dkt. 118 ¶ 57.) After the meeting, multiple Special Education Network participants reported concerns to the Department about the tone of the discussion, discomfort with criticizing an absent colleague, and erosion of trust within the group. (Dkt. 118 ¶¶ 58–59.) Feedback from participant survey responses likewise reflected concern, frustration, and unease about the group's future work, which Faasuamalie understood as indicating a breakdown of trust within the group. (Dkt. 118 ¶¶ 59–60.)

> **4.      The August 2021 Special Education Network meeting.**

At the August 11, 2021, Special Education Network meeting, participants discussed an article as a self-reflection exercise on coaching for

equity. (Dkt. 118 ¶ 61.) Spengler stated that racial equity had become the primary "vehicle" of Special Education Network meetings, described that focus as "dangerous" and "scary" for teachers, and questioned what concrete actions should result. (Dkt. 118 ¶ 62.)

When asked what language concerned her, Spengler referenced draft language in the new Practice Profile version concerning equity and white supremacy. (Dkt. 81-33:63–61.) Faasuamalie responded that questions about the draft competencies should be directed to the Research to Practice group, noted she had not developed the document, and redirected the discussion to the agenda. (Dkt. 118 ¶¶ 64–65.)

### 5. The September 2021 Research to Practice project meeting.

The Research to Practice group met on September 8, 2021, for a session focused on "equity connections," designed to build capacity related to a component of the coaching competency practice profile through small-group coaching conversations. (Dkt. 118 ¶¶ 73–75.) Before breakout groups began, Spengler questioned how coaches should proceed if they disagreed with the equity assumptions in the Practice Profile, including whether systemic racism should be treated as fact and whether there was room for counter-perspectives. (Dkt. 118 ¶¶ 76–78.)

Fregien responded that the equity competency was part of a broader framework and encouraged Spengler to identify messaging consistent with the project's overarching goals. (Dkt. 118 ¶ 79.) She attempted multiple times to redirect the discussion to the agenda and proceed with the planned activity. (Dkt. 118 ¶¶ 81–82.) Fregien understood Spengler's persistence as heightening resistance to change and creating power struggles inconsistent with effective coaching. (Dkt. 118 ¶ 80.)

After the meeting, a Research to Practice coach reported that Spengler's comments made another coach uncomfortable and that the meeting felt less safe, particularly for newer participants. (Dkt. 118 ¶¶ 85–86.) Outside the meetings, Spengler raised concerns about the new Practice Profile during a call with Fregien on September 16. (Dkt. 118 ¶ 84.)

### 6. The September 2021 Special Education Network meeting.

The agenda for the September 15, 2021, Special Education Network meeting included six community agreements governing participation, including commitments to honest, productive, and respectful conversations; staying engaged; using a symptom–problem–cause–solution process; honoring timelines; maintaining safe conversations; and examining the use of privilege. (Dkt. 118 ¶ 87.)

During a facilitated discussion of *To Start Coaching for Equity, Start By Looking Within*, Spengler used the group chat—since this was a virtual meeting—to question whether the discussion assumed systemic racism as fact and whether the work could proceed if participants held a "counter belief." (Dkt. 118 ¶¶ 91–93.) Faasuamalie responded that historical evidence supported the concept and offered to continue the discussion outside the meeting. (Dkt. 118 ¶¶ 95–96.) Faasuamalie also suggested that additional conversations outside the scope of the meeting could be facilitated if Spengler wished to pursue them. (Dkt. 118 ¶ 96.)

During an afternoon agenda item focused on trust and relationship building, Spengler sent a message to the entire group chat referring to the Department's work as "antiracism BS," stating that they had "incriminated themselves," and indicating she planned to share a recording of the meeting:

> You will not believe the recording today. I got them to say I can't do this work if I don't believe in all this antiracism BS. I should have assumed it when I was hired. It shouldn't be a surprise to me. We need to take this conversation to another call with Lynn Winn. I'll share the recording later when I get it, but here's a snippet of a written comment I captured which lead into me pressing them to acknowledge what they are really saying. They incriminated themselves today, big time. ME: "This seems to assume that systemic racism is a fact, and not a theory, and that everyone has blind spots with regard to race. I'm curious about that and how someone does this work if they have a counter belief to that.

("the September 15 chat message") (Dkt. 118 ¶ 100.) Spengler later acknowledged that she had mistakenly shared a private message with the

group and was too upset to continue participating in the meeting. (Dkt. 118 ¶ 101.)

Following the meeting, Special Education Network survey responses and emails from multiple participants expressed concern that recordings were being shared externally, that trust within the group had eroded, and that the meetings no longer felt safe or productive. (Dkt. 118 ¶¶ 104–15.) Several Special Education Network participants reported feeling unsettled, exhausted, and offended by the characterization of equity work as "BS," and expressed concern that ongoing debate over the existence of systemic racism was disrupting the group's ability to do its work. (Dkt. 118 ¶ 109.) Those concerns were escalated to the Department leadership, and Hartwig concluded that trust within the Special Education Network had broken down and that participants felt vulnerable to having internal discussions recorded or used against them. (Dkt. 118 ¶¶ 112–14.) Based on this information, Hartwig initiated a meeting with Spengler's supervisor at CESA 7. (Dkt. 118 ¶ 115.)

### 7. Spengler's September 16 call with Fregien.

On September 16, 2021, Spengler spoke with Fregien about issues previously raised at the September 8 Research to Practice meeting and recorded the call without Fregien's consent. (Dkt. 118 ¶¶ 116–17.) Spengler later testified that she did not view the discussion—or her prior statements about the Practice Profile—as a "complaint," stating that a complaint, in her

14

view, involved having already made up one's mind, whereas questions or concerns reflected ongoing discussion. (Dkt. 118 ¶¶ 119–21.)

### D.    The Department and CESA 7 meet about Spengler's performance and Spengler's reassignment.

On September 16, 2021, Julia Hartwig contacted Jeff Dickert to request a meeting regarding repeated concerns raised about Spengler's conduct in the Special Education Network and Research to Practice projects. (Dkt. 118 ¶ 123.) At a meeting on September 21, Hartwig and Dickert discussed the negative impact of Spengler's behavior on group dynamics and the projects' work. (Dkt. 77 (Hartwig Dep. 137:9–139:18); 118 ¶¶ 123–29; 97 ¶ 19.) Dickert understood the Department's concern to be that Spengler was having a significant adverse effect on the culture of the meetings and that peers had complained about her conduct. (Dkt. 118 ¶ 128.)

On October 4, Hartwig emailed Dickert to express the Department's strong preference that Spengler no longer be assigned to the Special Education Network and Research to Practice projects, while acknowledging that Spengler was a CESA 7 employee and that reassignment might not be immediately feasible. (Dkt. 118 ¶ 132.) Hartwig requested that, if reassignment was not possible, Spengler not attend statewide meetings for those projects until a reparation process could occur. (Dkt. 118 ¶ 132.) Harwig stated the Department would not treat her absence as CESA 7's failure to meet project

15

requirements. (Dkt. 118 ¶ 132.) Dickert initially asked whether Spengler could attend with her camera and microphone off. (Dkt. 118 ¶ 133.) Shortly thereafter, Spengler suggested she instead review meeting recordings, and Dickert informed the Department that she would not attend Special Education Network or Research to Practice meetings for several months but would review recordings after each meeting. (Dkt. 118 ¶¶ 135, 138.)

The Department and CESA 7 representatives continued to meet about Spengler's role in the projects. At an October 11, 2021 meeting, Dickert relayed Spengler's reports that she felt bullied at prior Special Education Network meetings, including being labeled a Republican, conservative, or racist by unidentified individuals, sometimes outside formal meeting settings. (Dkt. 118 ¶ 136.) The Department representatives responded that they respected Spengler's differing viewpoints but viewed her delivery and conduct as the problem, explaining that her presence had become disruptive to the trainings and damaging to the group's work. (Dkt. 64 (Dickert Dep. 98:23–25, 187:25–188:10); 64-19:1; 118 ¶ 137.)

The Department and CESA 7 met again on December 10, 2021; February 23, 2022; March 23, 2022; and May 3, 2022. (Dkt. 118 ¶¶ 139–40; 97 ¶¶ 23–24.) Hartwig and Winn reported that the project meetings were more productive, collaborative, and collegial without Spengler's participation. (Dkt. 118 ¶ 141.) The Department also raised concerns about whether Spengler

16

was meeting CESA 7's contractual obligations, including communicating consistent with the Department's messaging, advancing equity-focused supports, and serving as an ambassador for the IDEA-funded work. (Dkt. 118 ¶ 130.) The Department emphasized that it was CESA 7's decision whether to assign Spengler to the Research to Practice and Special Education Network projects. (Dkt. 118 ¶¶ 148–49.) The Department never directed CESA 7 to terminate Spengler's employment or bar her from other roles. (Dkt. 118 ¶ 143.)

 In May 2022, the Department circulated a draft 2022–23 contract between the Department and the CESAs that included new staff-selection language requiring a demonstrated commitment to examining personal bias and dismantling racist and ableist educational systems by engaging in professional learning and educating others about those topics. (Dkt. 118 ¶¶ 146–47; 97 ¶ 28.)

On June 7, 2022, Spengler accepted a different position at CESA 7 and signed a new employment contract. (Dkt. 97 ¶ 30.) Another CESA 7 employee, a white female, assumed responsibility for the two projects effective July 1, 2022. (Dkt. 97 ¶ 31; 76 ¶¶ 23–25; 76-4.)

### E.    Spengler's EEOC charges against the Department.

Spengler filed an EEOC charge against the Department on June 14, 2022. (Dkt. 118 ¶ 150.)

17

## II.    Procedural history.

Spengler commenced this federal action on October 7, 2022. (Dkt. 1.) On September 22, 2023, Spengler filed a second amended complaint asserting claims that the Department and CESA 7 discriminated and retaliated against her in violation of Titles VI and VII of the Civil Rights Act. (Dkt. 33.)

On December 16, 2024, the Department and CESA 7 filed motions for summary judgment, along with supporting briefs, proposed findings of fact, and stipulations to which all parties agreed. (Dkt. 96–102.) On February 27, 2025, Spengler responded to the motions. (Dkt. 113–14; 117–19.) The district court heard oral arguments on the defendants' motions on June 13, 2025. (Dkt. 158.)

On August 4, 2025, the district court granted summary judgment to the Department and CESA 7 on all claims. (Dkt. 135.) As relevant to the Department, the court held that Spengler failed to present evidence from which a reasonable jury could find race discrimination or retaliation under Title VII, concluding that the Department's actions were based on her conduct at the project meetings, particularly the September 15 Special Education Network meeting, rather than because of her race or opposition to an illegal employment practice. (Dkt. 135:18–32.)

18

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Pagel v. TIN Inc.*, 695 F.3d 622, 624 (7th Cir. 2012). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute defeats summary judgment only if it is both genuine and material—meaning the fact could affect the outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Courts view the evidence and draw reasonable inferences in favor of the nonmoving party. *Poullard v. McDonald*, 829 F.3d 844, 852 (7th Cir. 2016). But not all inferences are reasonable. Inferences contradicted by the record, or based on speculation rather than evidence, do not create a genuine issue of material fact. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021); *Johnson v. Rimmer*, 936 F.3d 695, 705–06 (7th Cir. 2019).

"In the employment discrimination context, summary judgment is warranted where 'the evidence, interpreted favorably to the plaintiff, could [not] persuade a reasonable jury that the employer had discriminated against the plaintiff.'" *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002) (citation omitted).

## SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment to the Department on Spengler's Title VII race discrimination and retaliation claims—the only claims she appeals.

On her race discrimination claim, Spengler did not produce evidence from which a reasonable jury could find that the Department treated her worse in any identifiable term or condition of employment because she is white, as Title VII requires. Instead, the Department's actions were tied to Spengler's conduct at meetings and its impact on trust and collaboration in the two projects, not to Spengler's race. Spengler's theory attempts to reframe professional training materials and equity-related discussions into a supposed demand that she confess personal responsibility for racial inequities—an interpretation not supported by the text of the materials or the record. And because Spengler cannot identify a similarly situated comparator outside her protected class—or otherwise show that race caused the Department's actions—her discrimination claim failed as a matter of law.

The district court correctly granted summary judgment to the Department on Spengler's Title VII retaliation claim. To prove a retaliation claim, a plaintiff must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. Spengler failed satisfy the first and third elements

20

of her claim. On the first element, Spengler cannot satisfy either the objective or subjective components to establish a statutorily protected activity under Title VII because her alleged "opposition" did not involve unlawful employment discrimination, nor did she subjectively believe she was making a complaint about illegal conduct. Further, Spengler cannot establish causation because the Department lacked notice that Spengler had engaged in any "protected activity" under Title VII, or that she believed she was subjected to race-based discrimination, *before* it sought her reassignment from the projects. As a result, this Court need not reach her pretext arguments, but regardless, the record does not support an inference that the Department's reasons for seeking her reassignment were dishonest rather than a good-faith assessment of Spengler's disruptive conduct and negative group impact.

Finally, summary judgment can be affirmed on an independent ground not addressed by the district court—that the Department was not Spengler's employer under Title VII. Wisconsin law provides that a CESA is the sole employer of its personnel. Also, the Department did not hire, fire, supervise, pay, or provide benefits to Spengler and made no job commitments to her. the Department's year-to-year contract with CESA 7 and its preference that CESA 7 assign different personnel to fulfill contract work are ordinary features of a service-provider relationship—not an employment relationship between the Department and Spengler. Because Spengler cannot establish the requisite

21

employer-employee relationship, both her Title VII claims fail on that basis as well.

## ARGUMENT

**I.    The district court correctly granted summary judgment to the Department on Spengler's Title VII race discrimination claim.**

The district court correctly held that Spengler failed to present admissible evidence that the Department treated her differently in the terms and conditions of her employment because she is white.

### A.    Title VII requires proof of discrimination based on race, among other protected classes.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). At summary judgment, the question is whether the evidence would permit a reasonable factfinder to conclude that discrimination caused the challenged action. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Although plaintiffs may rely on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework to establish discrimination through circumstantial evidence, *see Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022), *overruled on other grounds by Ames v. Ohio Dep't of Youth Services*, 605 U.S. 303, 305–06 (2025), that path is

unavailable to Spengler. She has not identified any similarly situated individual outside her protected class who was treated more favorably by the Department, a necessary element of her *prima facie* case. *See Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022); (Dkt. 118 ¶ 114.)

The dispositive question, therefore, is whether the record contains evidence from which a reasonable factfinder could conclude that Spengler's race—the fact that she is white—caused the Department to take any adverse action against her. *See Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021). An adverse employment action requires "some harm" affecting an identifiable term or condition of employment that leaves the plaintiff worse off. *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1336–37 (7th Cir. 2024); *Bowman v. City of Chicago Bd. of Educ.*, Case No. 24-2938, 2025 WL 2759539, at *2 (7th Cir. Sept. 29, 2025) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024)). While the harm need not be substantial, it must still be traceable to discrimination based on a protected characteristic. *See Thomas*, 120 F.4th at 1337. Examples of "some harm" include an employer's delaying training, denying vacation times, transferring shifts, and considering family circumstances when assigning shifts in a racially discriminatory way. *Id.*

23

**B.    Spengler failed to present evidence that the Department discriminated against her because she is white.**

Spengler claims the Department discriminated against her because she is white by requiring her to personally accept racial bias and responsibility for racial inequities—and by excluding her from meetings and seeking her reassignment when she refused. (7th Dkt. 20:18.) The district court correctly rejected that theory because Title VII does not prohibit adverse action based on disagreement with an employer's ideology; it prohibits discrimination because of race. 42 U.S.C. § 2000e-2(a)(1). The Department acted for a legitimate, nondiscriminatory reason: Spengler's September 15 group-chat message and the documented harm her conduct caused to the Special Education Network and Research to Practice projects' group dynamics, as reported by multiple participants. (Dkt. 118 ¶¶ 35, 37, 38, 58, 100, 109–15.)

On appeal, Spengler's theory of race discrimination proceeds in three components: (1) the Department holds the belief that all white people, but not people of color, possess racial bias and culpability for racial inequity; (2) the Department required her to personally agree with and affirm those beliefs; and (3) because she is white, the Department's demand necessarily required her, unlike employees of color, to personally admit she is racist and accept racial blame as a term and condition of employment in violation of Title VII. (7th Dkt. 20:19–25.) Spengler's theory is based on various training materials

24

discussed at group meetings, particularly the Practice Profile and other articles addressing culturally responsive practices. (7th Dkt. 20:19–25.) She essentially asks this Court to transform professional discussions of equity into a personal declaration of racial guilt imposed because she is white. The record does not support that leap. As the district court held and shown below, the Department imposed no race-differentiated demands, never required Spengler to adopt any personal belief, and acted for nondiscriminatory reasons.

### 1.    Spengler's first component is unsupported by the record.

Spengler's first component rests on an unsupported factual premise: that the Department "believes that all White people" are racially biased or culpable for racial inequity while making no similar observations about people of color. Nothing she cites says that. (Dkt. 116-30; 74-4; 61-9; 116-28; 115-7; 115-4.) The cited publications, training frameworks, and articles that the Department assigned do not attribute bias, culpability, or moral fault to individuals because they are white. Instead, they discuss systems, structures, and professional practices, and they encourage reflection on how historical and institutional factors affect educational outcomes. Spengler's argument repeatedly converts system-level descriptions into individual-level accusations, a leap unsupported by the text of the documents and the discussions at the monthly project meetings.

25

Nor do the materials purport to declare immutable traits or negative character flaws inherent in white people. For example, in *Equity: Wisconsin's Model to Inform Culturally Responsive Practices*, (Dkt. 116-30), the references to "dominant culture," "privilege," or "bias" are framed as concepts relevant to understanding educational inequities—not as assertions that every white individual holds biased beliefs or engages in discriminatory conduct. Spengler's disagreement with that framing does not transform it into a race-based classification or animus.

The Practice Profile and related materials define concepts such as "Whiteness" and "White Supremacy" in sociological and academic terms, describing a perspective on how systems operate and how norms can influence institutions. They do not assign intent, purpose, or blame to individual employees:

> **Whiteness**: A dominant cultural space with enormous political significance, with the purpose to keep others on the margin (Alberta, 2021). Whiteness itself refers to the specific dimensions of racism that serve to elevate white people over people of color. This definition counters the dominant representation of racism in mainstream education as isolated in discrete behaviors that some individuals may or may not demonstrate, and goes beyond naming specific privileges (McIntosh, 1989).

> **White Supremacy**: An ideology, as a collection of ideas that encourage us to value whiteness (white norms, white culture, and white people) more highly and above other cultures. (Unitarian Universalist College of Social Justice, 2021).

26

(Dkt. 74-4:5.)

As the district court recognized, this is a viewpoint about the effects of systems, and it is not the same as imputing malevolent purpose to individuals based on race. (Dkt. 135:25.) Relevant here, "[a] government entity has the right to speak for itself." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68 (2009) (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000)). "[I]t is entitled to say what it wishes and to select the views that it wants to express." *Id.* (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)) (internal quotations omitted)).

Spengler's argument that the Practice Profile identify categories of behaviors including expected, developmental, or unacceptable behaviors that apply only to "white coaches" is unsupported by the document itself. (*See* Dkt. 74-4.) As Spengler concedes, the Practice Profile does "not specifically use the adjective 'White' to describe 'coaches.'" (7th Dkt. 20:20 n.5; *see also,* Dkt. 74-4:8–9.) The Practice Profile refers to "coaches," not to any race, and is designed to examine all forms of identity-marked bias, conscious or unconscious, meaning all the characteristics, aspects, histories, background, and knowledge that make each individual unique. (Dkt. 74-4:4.) Her attempt to infer that the Department is racially targeting her, as a white person, is not grounded in the text of the materials or anywhere else in the record.

27

As to the articles she cites, the district court correctly noted that the articles do not convey the belief that all white people are "inherently racist." (Dkt. 135:27–28.) Spengler cites, *What if . . . White People Took Responsibility for Our Role in this Moment* by Kathleen Osta, Managing Director of the National Equity Project, and claims it means "[the Department] indicates that all White people have racial bias and culpability for racial inequity." (7th Dkt. 20:22–23.) But the district court rightly pointed out that one may disagree with the author's "view of what a racist is, but she is not claiming that all white people are inherently racist. If that were the case, why call on them to become anti-racists?" (Dkt. 135:28.) On appeal, Spengler cites *To Coach for Equity, Start by Looking Within* by Sharon Helmke, and argues it means that the Department believes "all White people are guilty of 'active participation' in spreading racial bias." (7th Dkt. 20:22; Dkt. 115-7.) But the author of that article is recounting her *own* journey as an educator and coach. (Dkt. 115–7.)

At bottom, Spengler's argument conflates her disagreement with concepts reflected in the Department training materials with race-based discrimination against her as an individual. Title VII does not prohibit employers from discussing race, literature, or encouraging reflective practice.

### 2. Spengler's second component fails because there is no evidence to support it.

As proof of her second component—that as a condition of keeping her position the Department demanded that she agree with the Department and admit that she is racist and culpable for racial inequity—Spengler cites many of the same materials addressed directly above, along with discovery responses and the 2022–23 contract that she never worked under. (7th Dkt. 20:23–27.) But none show that, because she is white, the Department required her to personally adopt any particular belief about race as a condition of continued participation in the two projects.

Spengler relies on selective quotations from the Department's discovery responses to argue that it required her to believe she is racist and personally responsible for racial inequity. (7th Dkt. 20:25–26.) The record does not support that claim. She first cites the Department's response to Interrogatory 15, which asked the Department to identify concerns with how she was carrying out the contract. (7th Dkt. 20:25–26; Dkt. 83-1:16–17.) But she omits that the Department's response expressly referenced her September 15 group-chat message, explained that the message violated the Special Education Network's community norms, and noted that the governing 2021–22 contract required CESA staff to communicate in a manner consistent with the Department messaging and to demonstrate competence tied to specific

29

deliverables. (Dkt. 83-1:16–17.) Spengler instead isolates the Department's additional statement that she was not demonstrating the competencies of a competent coach and recasts it as a demand that she personally believe she is racist. (7th Dkt. 20:26.) That inference does not follow.

The same flaw undermines Spengler's reliance on the Department's responses to Interrogatories 16 and 26. (7th Dkt. 20:26.) Interrogatory 16 asked the Department to explain what it meant when it expressed uncertainty that Spengler had an "equity mindset." (Dkt. 83-1:17.) The Department explained that employees had reason to question whether she had an equity mindset based on the competency criteria. (Dkt. 83-1:17–18.) Nothing in that response shows the Department required Spengler to admit personal racism or culpability for inequity. Interrogatory 26 asked the Department to identify performance shortcomings. (Dkt. 83-4:2.) In a partial response concerning the Research to Practice project, Fregien noted that Spengler missed the August meeting and when she returned in September, she began "pushing back on the equity mindset idea." (Dkt. 83-4:3.) That observation was cited as an example of how Spengler disrupted the flow of Research to Practice meetings, not as an assertion that she failed to confess to her own racism. Spengler's effort to transform performance-based concerns into a demand for a personal confession of racism mischaracterizes the discovery responses and the record as a whole.

30

As for her reference to the 2022–23 contract, it was not in effect at any time that Spengler participated in the Department projects. (Dkt. 97 ¶¶ 14, 30–31, 68.) Spengler began her new job with CESA 7 as a school-based coach the very day that contract took effect, so its terms *never* applied to her. (Dkt. 97 ¶¶ 14, 30–31, 68.) When the 2022–23 contract took effect, a different CESA 7 employee—another white woman—took over CESA 7's obligations related to the projects. (Dkt. 97 ¶ 31; 76 ¶ 25.) Regardless, nothing in that contract required anyone to personally confess she is racist and responsible for racial inequity. (Dkt. 61-9.) The Department agreed that Spengler was entitled to her own viewpoint, (Dkt. 64 (Dickert Dep 98:23–25, 187:25–188:10); 64-19:1; 64-45:1), but that did not absolve her from consequences when she sent a group-chat message claiming the work is BS and that everyone "incriminated themselves today, big time." (Dkt. 118 ¶ 100; 57-12:6.)

In short, Spengler again recasts performance-based concerns into an ideological litmus test the record does not support. Nothing in the Department's discovery responses, the governing contract, or the Department's actions required her to, because she is white, personally adopt any particular belief about race as a condition of continued participation in the projects.

### 3. Spengler's third component fails because the Department did not impose race-differentiated demands or make race a term or condition of employment.

Spengler's third component addresses causation and relies on her unsupported claim that the Department imposed different and more onerous demands on her because she is white. The record does not support that claim. Nothing in the Department's policies, training materials, contracts, or communications required any participant of any race to make a personal confession of racial bias or culpability for racial inequity. The Department expected all project participants to engage professionally with the project materials, communicate consistently with the Department messaging, and adhere to meeting norms and community agreements including productive and respectful conversations within collaborative spaces. (Dkt. 118 ¶ 87; 57-1:3, 9; 83-1:21.) Those expectations applied equally to everyone, regardless of race.

Spengler's effort to reframe those expectations as race-segregated ideological demands mischaracterizes the record. The Department did not regulate Spengler's private beliefs or require her to adopt any personal view about herself as a condition of employment. (Dkt. 62 (Faasuamalie Dep. 118:3–7); 65 (Winn Dep. 39:14–40:13); 78 (Wall Dep. 150:18–151:4).) Instead, the Department responded to Spengler's disruption of meetings, accusations that colleagues had "incriminated themselves," and external

32

sharing of recorded internal discussion—conduct that multiple participants reported as undermining trust and the work of the groups. (Dkt. 118 ¶¶ 35, 37, 38, 58, 100, 109, 110, 111, 112, 113, 114, 115.) That the Department addressed those behaviors does not transform performance-based concerns into racially disparate treatment.

Nor does *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 658 (2020), support Spengler's theory. *Bostock* did not relax Title VII's causation requirement or authorize courts to use a hypothetical comparator, as she claims. (7th Dkt. 20:28–29.) The Court reaffirmed that Title VII requires but-for causation and held that the focus of Title VII liability should be on individuals, not groups. *Bostock,* 590 U.S. at 658. The Court then analyzed the facts not by comparing men as a group and women as a group, but by comparing the individual plaintiffs and members of the opposite sex. *Id.* at 665. That standard was satisfied in *Bostock* because the employers conceded they fired the plaintiffs for being homosexual or transgender—a status so "inextricably bound up with sex" that changing the employee's sex necessarily changes the outcome. *Id.* at 653–54, 660–61. As the Court explained, if an employer fires a male employee for being attracted to men but would not fire a female employee for the same conduct, sex is a but-for cause of the decision. *Id.* at 660–61.

33

Not only is *Bostock* a Title VII sex discrimination case, nothing comparable exists here under a race discrimination analogy. The Department did not rely on race in making its decision, nor did its concerns require race to enter the analysis at all. The record shows that the Department's actions flowed from Spengler's disruption of project meetings, erosion of trust among participants, and concerns with how Spengler was carrying out the Department's messaging and objectives. (Dkt. 118 ¶¶ 35, 37, 38, 58, 100, 109–15.) Those concerns apply identically regardless of race. Unlike in *Bostock*, changing Spengler's race while holding her conduct constant does not alter the Department's rationale or its response. Spengler's conduct was not inextricably bound to her race such that changing her race necessarily changed the outcome. *Cf. Bostock*, 590 U.S. at 661–62. Spengler's use of *Bostock* is simply inapt.

Spengler asks this Court to speculate about how the Department might have reacted had she been a person of color. Title VII does not permit plaintiffs to establish causation through speculation about hypothetical comparators; it requires evidence that the protected characteristic actually made a difference in the challenged decision. *Bostock,* 590 U.S. at 660–61; *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 597 (7th Cir. 2017) ("Without any appropriate comparators or any other indicators of racial bias, [plaintiff] is left with mere conjecture and speculation to support his race and national origin

34

discrimination claims. That is not enough to survive summary judgment.") Because race is separable from the Department's stated reasons for seeking Spengler's reassignment, and because the same actions would have followed from the same conduct regardless of race, Spengler's hypothetical comparator analysis should be rejected.

The same is true for Spengler's *Muldrow* analysis. (7th Dkt. 20:29.) Spengler's argument that she was subject to "more onerous and repugnant" conditions of employment fails because nowhere in the Department's contracts with CESA 7 did it require project participants to admit privilege or bias *because they are white*. (Dkt. 64-32; 61-9.) At most, Spengler could claim that *any* participant in the two projects in 2022–23 would be required to "examin[e] their personal biases in the areas of race and ability." (Dkt. 61-9:3.) To view this as targeting only white participants is contrary to the text of the contract but also to longstanding Supreme Court precedent recognizing that members of any group can discriminate or have racial or sex-based bias against members of their own group or any other group. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78–79 (1998); *Castaneda v. Partida*, 430 U.S. 482, 499 (1977). So even assuming that the Department required Spengler to admit racial bias—which it did not—there is no evidence that the Department would not have required a participant of any race to examine their personal racial biases in the same way.

35

Spengler's third component collapses because it depends on an invented race-segregated burden that is not supported by the record. The Department applied the same expectations to all participants, evaluated conduct rather than identity, and acted for nondiscriminatory reasons. (*See* Dkt. 118 ¶¶ 35, 37, 38, 58, 100, 109, 110, 111, 112, 113, 114, 115.)

This Court should affirm judgment in favor of The Department on Spengler's race discrimination claim.[2]

## II. The district court granted summary judgment to the Department on Spengler's Title VII retaliation claim.

This Court should affirm dismissal of Spengler's retaliation claim because she cannot establish that she engaged in any Title VII protected activity until she filed her EEOC complaint. Nor can Spengler establish causation because at the time she filed her EEOC complaint, the adverse actions she cites had already occurred.

### A. Title VII prohibits employer retaliation based on an employee's opposition to an unlawful employment practice and formal filing of a complaint.

Under Title VII, it is unlawful for an employer to retaliate against an employee for (1) opposing an unlawful employment practice under Title VII or

---

[2] Spengler spends several pages rearguing facts she contends the district court wrongly considered or did not consider. Because this Court's review is *de novo*, the Department's response to those arguments have been incorporated into Section I of this brief.

(2) because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. *See* 42 U.S.C. § 2000e-3(a); *see also Igasaki*, 988 F.3d at 959.

To overcome a summary judgment motion on a retaliation claim, a plaintiff must present evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *See Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (quoting *Skiba v. Ill. Central Railroad Co.*, 884 F.3d 708, 718 (7th Cir. 2018)). Title VII retaliation requires a plaintiff to prove "but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

## B.     Spengler did not engage in protected activity through "opposition" to an illegal employment practice under Title VII.

For the first element of a retaliation claim, a plaintiff must show that she engaged in statutorily protected activity. A plaintiff may do so in one of two ways: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice. *See Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). Because

37

Spengler's EEOC charge postdated the challenged actions, any protected activity must arise, if at all, under the opposition prong.

A plaintiff relying on the opposition prong must show not only that she subjectively believed she opposed unlawful conduct, but also that her belief was objectively reasonable—that is, that the conduct she opposed involved discrimination prohibited by Title VII. *Logan*, 4 F.4th at 538–39. Spengler argues that she engaged in protected activity by identifying a long list of statements that she characterizes as opposition to race discrimination. (7th Dkt. 20:39–44 (Items A–S).) But when measured against the subjective and objective standards, none of the statements Spengler identifies qualifies as opposition to an unlawful employment practice.

### 1. Spengler's cited statements of opposition fail the objective reasonableness standard.

To satisfy the objectively reasonable belief requirement, Spengler must show that she opposed conduct that falls within Title VII's prohibition on discriminatory employment practices. *See Logan*, 4 F.4th at 538–39. General complaints, ideological disagreements, or objections untethered to workplace discrimination based on a protected characteristic. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663–64 (7th Cir. 2006) (collecting cases); *see also, Logan*, 4 F.4th at 538–39. Title VII protects opposition only to an employer's unlawful employment practices; opposition to conduct outside that scope—

38

however sincerely held—cannot support a retaliation claim. *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000).

### a. Spengler's statements expressing ideological disagreement are not protected activity under Title VII.

Most of Spengler's cited statements, particularly those made during project meetings in August and September 2021, reflect her disagreement with the Department's views on systemic racism, equity, and "antiracism." (7th Dkt. 20:39–42 (Items C– F, H).) In those statements, Spengler questioned whether systemic racism exists, whether it should be treated as fact rather than theory, and whether she personally agreed with equity-related concepts. But disagreement with training materials on educational equity or antidiscrimination is not opposition to an unlawful employment practice. Indeed, this Court has recognized that "proactive steps such as . . . training employees about . . . harassment risks and what can be done to ameliorate them" are consistent with Title VII's "primary objective" which is "to avoid harm." *See Erickson v. Wisconsin Dep't of Corr.*, 469 F.3d 600, 605–06 (7th Cir. 2006); *see also, Diemert v. City of Seattle*, 776 F.Supp.3d 922, 939–40 (W.D. Wash. 2025) (collecting cases).

Relevant here, Wisconsin has a persistent achievement gap between white students and black students in its schools. (Dkt. 77 (Hartwig Dep. 130:16–131:14).) The Department is also required by the IDEA to collect

39

data and determine whether significant racial disproportionality exists in special education identification in Wisconsin schools, meaning that students from certain racial groups are identified for special education at significantly higher rates than others. (Dkt. 74 ¶¶ 17–21); 20 U.S.C. § 1418(d). To address these challenges, the Research to Practice project was designed to support school districts that had been flagged under federal law as needing additional support to improve how they serve students. (Dkt. 74 ¶¶ 17–21.) Participating school districts engaged in professional learning and a continuous improvement process to identify and address issues contributing to disparities, including racial or ethnic disproportionality in special education identification. (Dkt. 74 ¶¶ 17–21.)

Spengler's ideological disagreement with the Department's approach to addressing racial achievement gaps and disproportionate identification in special education services cannot reasonably be characterized as protected opposition to unlawful employment practices that violate Title VII. *See* 42 U.S.C. § 2000e-2.

> **b.** **Spengler's conclusory assertions of "discrimination" without supporting facts are insufficient to establish a protected activity.**

Spengler also relies on after-the-fact testimony and conclusory assertions that she "opposed. . . discrimination." (7th Dkt. 20:39 (Items A–B).) But conclusory characterizations—untethered to concrete facts describing who

40

allegedly discriminated against whom, how, and because of what protected characteristic—do not establish protected activity. *See Smith v. Ill. Dep't of Trans.*, 936 F.3d 554, 559 (7th Cir. 2019) (holding no abuse of discretion when district court excluded testimony that witness observed plaintiff being discriminated against on many different occasions, without identifying "who discriminated, what they did, and when they did it[.]") "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (citation omitted). Here, for instance, Spengler's declaration describing a June 17, 2021, conversation with Winn and Faasuamalie where she allegedly "reported various workplace incidents of illegal race discrimination and harassment" provides no specific facts identifying an unlawful employment practice and therefore cannot support the opposition element as a matter of law on summary judgment. *See Id.*; (Dkt. 115 ¶ 34.)

<blockquote>

**c.    The September 15 group-chat message was not protected activity under Title VII.**

</blockquote>

Spengler places particular emphasis on her September 15, 2021, group-chat message sent to all Special Education Network participants, referring to the Department's work as "antiracism BS," stating that they had "incriminated

41

themselves," and indicating she planned to share a recording of the meeting. (7th Dkt. 20:40–41 (Item G).) That message, however, did not allege race discrimination, reference an illegal employment action, or connect any conduct to discriminatory treatment based on race. (Dkt. 118 ¶ 100.) At most, the message expressed Spengler's frustration with the Department's beliefs about systemic racism—not opposition to an unlawful employment practice.

Even assuming the message could be construed as opposition—which it cannot—it would still fall outside Title VII's protection. The antiretaliation provision "do[es] not confer a license to present grievances in an arrogant and uncivil manner," *Cuenca v. Univ. of Kansas*, 101 Fed. Appx. 782, 790 (10th Cir. 2004), nor does it shield conduct that is "excessively disloyal or hostile or disruptive and damaging to the employer's business," *Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 374 (7th Cir. 1984) (citation omitted). Spengler's group-chat message—broadcast to all participants during a training session—violated established community norms and undermined trust and collaboration. This was not a case of an employee lacking a channel for raising concerns. Spengler testified at her deposition that the appropriate course was to raise issues through her supervisor, Jeff Dickert, who would then take them further "to the appropriate people[.]" (Dkt. 58 (Spengler Dep. 167:24–168:6).)

Further, Spengler herself acknowledged that she understood her message did not align with the community agreements of "trust and

42

relationship building" and "honest, productive, and respectful conversations." (Dkt. 118 ¶¶ 107–108.) Title VII does not immunize disruptive conduct simply because an employee characterizes it as opposition.

### d. Spengler's misrepresentation of the record cannot show a protected activity.

Spengler cannot show she engaged in a protected activity by misrepresenting the evidentiary record. For listed items H and L, Spengler misquotes the cited material in a manner that changes its context. (7th Dkt. 20:41–42.)

As to item H, Spengler represents that she expressed concerns to Freigien about whether she could carry out the Department's work given her disagreement with the equity framework—particularly the equity mindset competency—and that Fregien responded by telling her she could not put her feelings aside and still do the job. (7th Dkt. 20:42.) But the transcript shows that Fregien was not declaring that Spengler was incapable of doing the job; she was asking Spengler how she intended to reconcile her stated concerns with the expectations of the coaching role. (Dkt. 83-7:29–30.) Read in context, Fregien's comment was part of a clarifying question during an ongoing discussion about implementation, not a demand that Spengler abandon her beliefs or an assertion that disagreement itself was disqualifying. And regardless, Spengler testified at her deposition that she did not view the

43

discussion—or her prior statements about the Practice Profile—as a "complaint," stating that a complaint, in her view, involved having already made up one's mind, whereas questions or concerns reflected ongoing discussion. (Dkt. 118 ¶¶ 116, 118; 57 (Spengler Dep. 16:1–20:10 (May 15, 2024)).)

For item L, Spengler misrepresents the October 5 email from Dickert to Hartwig, which did not say, she was "feeling bullied for disagreeing with [the Department] on this lead into coaching work," which is "a breakdown of one's whiteness." (7th Dkt. 20:42.) What Dickert actually wrote in this email was, "I need to look at more evidence as my employee is the one feeling bullied for having a different mindset than the [Department] on this lead into the coaching work. She claims to have numerous examples of being called out at the meetings as a Republican, conservative, and even racist." (Dkt. 64-11:1.)

Neither of Spengler's statements can properly be characterized as protected opposition to Department practices that violate Title VII. *See* 42 U.S.C. § 2000e-2.

> **e.     Internal     discussions     and     third-party conversations are not protected activity by Spengler.**

Spengler also points to later emails, notes, and summaries authored by her supervisor or the Department officials describing her "opposition to equity work" or disagreement with the Department's approach.

44

(7th Dkt. 20:42–44 (Items I–S).) Those references do not reflect protected activity *by Spengler* to the Department; instead, they reflect others' descriptions of her disagreement with the Department's framework. Recognition that the plaintiff employee is resistant to a particular initiative does not transform ideological disagreement into evidence of protected opposition by that plaintiff employee under Title VII.

*     *     *

There is simply no basis in the record to support a conclusion that Spengler had an objectively reasonable belief that she acted to oppose race discrimination violative of Title VII. As with Spengler's discrimination claims, evidence that Spengler opposed the Department's position on racial equity or systemic racism is wholly irrelevant because it falls outside the reach of the statute she is suing under. *See* 42 U.S.C. §§ 2000e-2(a), 2000e-3(a).

> **2.      Spengler did not, by her own admission, subjectively believe she was complaining about how illegal practices under Title VII.**

Spengler must also show that she subjectively believed she was opposing unlawful conduct under Title VII. *Logan*, 4 F.4th at 538–39. By her own admission, Spengler did not subjectively believe that she was opposing unlawful behavior during the project meetings, as she had not decided herself whether anything illegal had occurred. (Dkt. 118 ¶¶ 118–22.) Pressed at her deposition, the Spengler refused to characterize her behavior at the meetings

45

as "complaining," which she defined to mean "something you've already sort of made your mind up about and you are complaining about it." (Dkt. 118 ¶¶ 118–22.) Instead, Spengler stated that she "had questions," had "concerns," and "was looking for some answers[.]" (Dkt. 118 ¶¶ 118–22.) Spengler defined a question or concern as something one hasn't necessarily made up one's mind about yet. (Dkt. 118 ¶¶ 118–22.)

## C.    Spengler cannot establish causation because she never opposed an unlawful employment practice before the Department's alleged adverse actions.

As an additional reason to affirm judgment in favor of the Department on the retaliation claim, Spengler cannot establish the causation requirement. The Department had no notice that Spengler had engaged in any "protected activity" under Title VII or that she believed she was subjected to race-based discrimination *before* it sought her reassignment from the projects. This lack of notice is fatal to her retaliation claim against the Department.

For purposes of Title VII retaliation, it goes without saying that only actions taken by an employer that post-date an employee's "protected activity" are relevant, and that an employee must establish the relevant employer decisionmaker had actual knowledge of the protected activity. *See Giese v. City of Kankakee*, 71 F.4th 582, 591 (7th Cir. 2023) (observing it is "axiomatic that an employer cannot 'retaliate' against an employee for conduct in which the employee has not yet engaged"); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106,

46

1122 (7th Cir. 2009). This requirement relates to the causation element: If a defendant had no knowledge that the plaintiff engaged in a protected activity, any adverse action it took could not have been a response to protected activity. Such is the case here.

First, Spengler did not file an EEOC complaint until June 14, 2022, which was *after* Spengler had accepted a new position with CESA 7. (Dkt. 97 ¶¶ 30, 44–45.) The adverse actions Spengler complains of, such as the Department seeking to reassign her from the projects, (7th Dkt. 20:44–49), all predate this EEOC notice, so clearly Spengler's EEOC complaint could not have caused the Department to take any action. *See Giese*, 71 F.4th at 591.

Second, there is no evidence that the Department decisionmakers had actual knowledge that Spengler had, prior to filing the EEOC complaint, engaged in any conduct that could be considered a "protected activity." For all that anyone at the Department knew, Spengler had only ever expressed opposition to perceived "bullying" based on her political affiliation and/or her beliefs about racism. (Dkt. 118 ¶¶ 24, 31–34, 36, 49, 78–79, 93, 100, 133, 136.) And because those are not protected characteristics, the Department would not have knowledge of Spengler's opposing violations of Title VII. *See Giese*, 71 F.4th at 591 (holding that conversation with HR "cannot constitute protected activity" absent plaintiff making explicit "a link between the [defendant's] actions and the plaintiff's protected class").

47

Spengler, prior to filing her EEOC complaint, never lodged a complaint of race discrimination directly with the relevant decisionmakers at the Department, (Dkt. 118 ¶ 150; 57 (Spengler Dep. 258:6–22)), and Spengler's direct supervisor at CESA 7, Jeff Dickert, first learned Spengler "felt bullied" during the project meetings on October 5, 2021. (Dkt. 118 ¶ 133.) Notably, this conversation happened *after* the Department requested that Spengler not attend future project meetings pending a "reparation process." (*Compare* Dkt. 118 ¶ 132 *with* Dkt. 118 ¶ 133.) And, when Dickert told the Department the concerns Spengler raised with him, he referred only to bullying due to "having a different mindset than the [Department]" and examples of being singled out as "a Republican, conservative, and even racist." (Dkt. 118 ¶ 133.) In the months that followed, the Department was never informed that Spengler believed she was being discriminated against because she is white or that she had otherwise claimed to be opposing illegal race discrimination. (Dkt. 118 ¶¶ 133, 136–41, 148–49.) And to the extent Spengler voiced questions or disagreements during the project meetings, even if Department leadership had notice of those disagreements, Spengler herself refused to categorize those actions as "complaints." (Dkt. 118 ¶¶ 118–22.)

Given what the Department knew during the time when it was discussing its concerns with CESA 7 about Spengler's fulfillment of the contract requirements, there is no basis to conclude that its actions were

48

retaliatory, as it could not have had knowledge that Spengler had engaged in a protected activity. At most, the Department knew that Spengler had certain ideological disagreements and felt bullied for having expressed them.

The complete lack of causation, alone, is a basis to affirm the district court's judgment in favor of the Department on Spengler's retaliation claim.

**D.    This Court need not reach the pretext analysis because Spengler failed to establish her prima facie case of retaliation.**

Spengler spends several pages arguing that her performance was not poor and that the Department made false claims about her behavior at project meetings. (7th Dkt. 20:50–57.) This Court need not even reach those arguments for the reasons stated above in Section II.B–II.C. Regardless, those arguments fail because Spengler's opinion about her own performance is irrelevant to the pretext analysis. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002); *Smith*, 936 F.3d at 560.

Spengler's pretext argument is neither supported by the record nor governing legal standard. Evidence of pretext requires more than showing that the employer's characterization of events is debatable or that the employee disputes the employer's judgment; it requires evidence that the employer's stated reason for the action was a lie. *See Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937–38 (7th Cir. 2022). In support of her argument, Spengler cites *Murphy v. Caterpillar*, 140 F.4th 900, 911–12 (7th Cir. 2025), but she

49

misunderstands the language she quotes. (7th Dkt. 20:50.) *Murphy* does not stand for the proposition that a plaintiff need *only* show pretext. 140 F.4th at 911. Indeed, *Murphy* analyzed pretext in a discrimination claim, and reaffirmed that it is only after a plaintiff presents evidence to establish a *prima facie* case under the burden shifting method that pretext even enters the equation. *Id.*

Here, the Department consistently cited the same core concerns: Spengler's conduct during project meetings undermined the projects' purpose, disrupted collaborative work, eroded trust among participants, and violated agreed-upon norms governing professional engagement. That Spengler disputes the Department's interpretation of her conduct—or can point to moments where facilitators attempted to engage her—does not convert the Department's rationale into a lie. *See Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (citation omitted) ("[A]rguing 'about the accuracy of the employer's assessment' is a 'distraction' in the pretext context; the fact that a statement is inaccurate does not mean that it is a deliberate lie.").

Nor does the existence of the recordings and transcripts of meetings establish pretext. Unlike *Scott v. Harris*, 550 U.S. 372, 380 (2007), the recordings here do not "blatantly contradict" the Department's account or render it implausible as a matter of law. Spengler has never accounted for the fact that her behavior raised concerns not only for Faasuamalie and Fregien,

50

but also for several of her peers, who sent contemporaneous emails and survey responses to the Department documenting concerns that aligned with the Department's. Indeed, Spengler did not dispute her peers' concerns. (Dkt. 118 ¶¶ 35, 37, 38, 58, 109–15.) Nor did she dispute that the Department leadership—specifically Hartwig—reviewed Spengler's peers' concerns and acted on them by initiating a meeting with Spengler's supervisor at CESA 7, which led to the request for her reassignment from the projects. (Dkt. 118 ¶¶ 114–15, 123–24, 132.) Finally, Spengler, herself, acknowledged that meetings, such as the May 2021 Special Education Network meeting, cited by the Department were "certainly tense." (Dkt. 118 ¶ 34.)

That Department officials at times acknowledged professionalism or attempted to manage discussions does not negate their conclusion that Spengler's pattern of conduct had become incompatible with the projects' objectives. Pretext is not shown by pointing to selective praise, alternative interpretations of events, or disagreements about tone or emphasis. *See Parker*, 39 F.4th at 937–38. Because Spengler fails to identify contradictions or shifting explanations from which a reasonable jury could find dishonesty—rather than mere disagreement—her pretext theory cannot defeat summary judgment. *Id.*

**III.    Regardless, the Department cannot be liable to Spengler under Title VII because no employer-employee relationship existed.**

Setting aside the merits arguments above, a prerequisite for a plaintiff pursuing a Title VII claim is evidence that the entity being sued is plaintiff's employer. Spengler failed to make this basic, required showing, and that is an independent reason for this Court to affirm judgment in the Department's favor.

**A.    To establish Title VII, liability Spengler must prove the existence of an employer-employee relationship.**

By its terms, Title VII prohibits discrimination in employment, so a plaintiff pursuing a claim "must prove the existence of an employer-employee relationship." *Love v. JP Cullen & Sons, Inc.,* 779 F.3d 697, 701 (7th Cir. 2015). However, "under certain limited circumstances," a plaintiff can pursue a Title VII claim against a defendant "who is not [her] direct employer." *Id.* To establish an indirect employer relationship, a plaintiff must satisfy a multi-factor test—often referred to as the "*Knight* factors"—that examines the control a defendant exerts over a plaintiff and the "economic realities of their relationship." *Id.* at 702–03. The relevant factors under this multi-factor test are:

> (1) the extent of the employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment.

52

*Id.* at 702 (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991)). Of the five *Knight* factors, the first is the most important. *Id.* at 703.

### B. The undisputed facts weigh against treating the Department as Spengler's employer.

#### 1. CESA 7, not the Department, was Spengler's district employer.

CESA 7 was Spengler's direct and sole employer. This arrangement is specifically provided for in Wisconsin law. The Wisconsin legislature created the various CESAs to serve "as a link both between school districts and between school districts and the state" in order to "serve educational needs in all areas of Wisconsin." Wis. Stat. §§ 116.01–116.015. And in establishing the CESAs, the legislature made a deliberate choice regarding the status of CESA employees: "The [CESA] is the sole employer of the personnel it employes. A recipient of personnel services is not deemed an employer because of the exercise of supervision or control over any personnel services provided." Wis. Stat. § 116.045. It could not be more clear, under Wisconsin law, CESA 7, not the Department, was Spengler's direct and only employer.

#### 2. The Department was not Spengler's indirect employer.

Consistent with that legislative choice, the *Knight* factors weigh decisively against treating the Department as Spengler's indirect employer.

53

The Department did not hire, fire, supervise, or discipline Spengler and had no authority to do so. CESA 7—not the Department—paid Spengler's salary and benefits and bore the associated employment costs. The Department made no commitments to Spengler regarding the duration or terms of her employment, contracting instead with CESA 7 on a year-to-year basis. And when CESA 7 hired Spengler, she already possessed the specialized training and expertise required for her role. In short, the undisputed facts confirm that the Department was not Spengler's indirect employer under the *Knight* factors.

### a. The Department did not control or supervise Spengler.

The Department's relationship with Spengler did not involve control over the details of her employment or supervision of her work. Instead, the Department's role was limited to providing training and support to Spengler (and employees of other CESAs) so that she—as the person CESA 7 tasked with fulfilling certain requirements of CESA 7's contract with the Department—could fulfill the contract deliverables. There are three clear indications that the Department's relationship with Spengler does not satisfy the first *Knight* factor—control and supervision.

First, and most importantly, the Department did not have the ability to hire or fire Spengler. CESA 7 hired Spengler directly, entering into an employment contract with her in July 2020. (Dkt. 118 ¶ 6; 97 ¶ 14.) And, at the

54

critical moment in this case in September 2021, the Department could not, and did not, fire Spengler. Instead, it did what one would expect a party contracting with a service provider to do: it expressed a preference that CESA 7 assign someone else to fulfill the contract. (Dkt. 118 ¶¶ 132, 140.) The Department's actions in this case are simply not consistent with the type of control that establishes an indirect employer relationship. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 929 (7th Cir. 2017) (finding no indirect employer relationship where direct employer removed plaintiff from work assignment at the request of the purported indirect employer and noting "it is very common for service providers to adhere to their client's wishes on personnel decisions").

This Court's decision in *Love* is also instructive. The plaintiff in *Love*, the employee of a subcontractor, had sued the general contractor, "Cullen," under Title VII as his "indirect employer" after Cullen dismissed him from the job site. 779 F.3d at 699. In analyzing the issue of "control," this Court observed that the power to fire was a key consideration. *Id.* at 703 (citing *EEOC v. Ill.*, 69 F.3d 167, 171 (7th Cir. 1995)). Cullen conceded that it had the ultimate authority "regarding the continued presence of any worker on the project site," and the plaintiff even contended that Cullen threatened to terminate the relevant contract with his direct employer if he was not removed from the site. *Id.* And, when the plaintiff *was* removed from the project site, he lost his employment as a result, because there were no other jobs his direct employer

55

could assign him to. *Id.* Nevertheless, the Court found control lacking under these circumstances, as there was no evidence "Cullen attempted to jeopardize [plaintiff's] continued employment" vis-à-vis his direct employer. *Id; see also Nischan*, 865 F.3d at 929 (finding fact that purported indirect employer "obtained [plaintiff's] removal from" job assignment did not amount to power to fire).

As in *Love*, the Department had no power to fire Spengler and did not take any action to jeopardize her employment with CESA 7. Instead, the Department expressed to CESA 7 a preference that Spengler no longer be assigned to two of the three projects she was assigned to under the contract. (Dkt. 118 ¶¶ 7, 132, 140.) The Department never told CESA 7 that it could not assign Spengler to a different job at CESA 7. (Dkt. 118 ¶ 143.) Indeed, and unlike in *Love*, Spengler remained on the projects until the completion of the 2021–22 contract year and remained employed with CESA 7 even after CESA 7 assigned someone else to the two projects. (Dkt. 97 ¶¶ 30, 31.)

Second, the Department was not Spengler's indirect employer because, at all relevant times, her direct supervisor was Jeff Dickert, CESA 7's director, and the day-today details of her employment were controlled by CESA 7. (Dkt. 97 ¶ 15.) There is no evidence that the Department dictated Spengler's work hours, set her primary work location, approved paid time off, or otherwise oversaw her day-to-day work. *See Nischan*, 865 F.3d at 929 (finding fact that

56

direct employer "regulated [plaintiff's] work days and hours and managed her day-to-day assignments" weighed against first *Knight* factor). As noted above, Wisconsin law dictates that CESA 7 was plaintiff's "sole employer." Wis. Stat. § 116.045; *see also Harris v. Allen Cty. Bd. Of Comm'rs*, 890 F.3d 680, 684 (7th Cir. 2018) (finding no indirect employer relationship where employment responsibilities were "statutorily delegated" to direct employer and collecting cases).

Indeed, the Department's actions show that it did not view Spengler as its employee. Specifically, in attempting to address concerns with Spengler's conduct and her fulfillment of the contract deliverables, the Department took those concerns to Spengler's supervisor, CESA 7 Administrator Dickert, so that CESA 7, as the party with whom the Department contracted, could take action. (Dkt. 97 ¶¶ 19, 21, 23–24, 26–27; 118 ¶¶ 114–15, 123–41, 143–44, 148–49.) This shows the Department understood it lacked the authority to direct Spengler as to the details of her job performance. *See Love*, 779 F.3d at 703 (finding fact that purported indirect employer communicated with plaintiff's direct employer when it "found [plaintiff's work] unsatisfactory . . . militate[s] against a finding of control").

Third, Spengler's responsibility for fulfilling CESA 7's obligations as to the two projects was only one part of her employment with CESA 7. According to her employment contracts, as CESA 7's Integration Director, Spengler was

57

also responsible for (among other things) directing pupil services, the Technical Assistance Network ("the TA Network"), and the Administrator & Teacher Development Center. (Dkt. 118 ¶¶ 6–8.) Spengler herself supervised several other CESA 7 employees, requiring here to evaluate their performance. (Dkt. 97 ¶¶ 73–74.) The Department did not have any involvement in these aspects of Spengler's work, and the project meetings took up relatively little of Spengler's work hours—approximately three days per month. (Dkt. 97 ¶¶ 63, 67, 75.) The Department's non-involvement in much of the work Spengler performed as a CESA 7 employee underscores that it lacked the powers of supervision and control that an employer normally exercises.

To the extent Spengler contends that (1) the Department's involvement in the project meetings and/or (2) its control over the substance of the deliverables it expected CESA 7 (through Spengler) to provide, are indicative of control in the *Knight* factor sense, that argument is misplaced. The Department had a contract with CESA 7 under which CESA 7 agreed to perform work in furtherance of the two projects. (Dkt. 97 ¶ 68; 118 ¶¶ 5, 130.) That the Department dictated the substance of those projects—the result it aimed to achieve through the contract—does not mean that the Department was exercising power to supervise and control Spengler as her employer. *See Love*, 779 F.3d at 703 (observing that "right to control and direct [individual's] work . . . as to the result to be achieved" does not equate to power to supervise

58

and control under first *Knight* factor (quoting *Alexander v. Rush North Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996))). The meetings and the materials the Department disseminated were a natural extension of the Department's right of control over the result to be achieved, not an exercise of control over individual CESA employees.

These three considerations weigh strongly in the Department's favor as the first, and most important, *Knight* factor.

### b.    The Department did not pay Spengler, provide her any benefits, or otherwise cover her costs.

The third and fourth *Knight* factors, which examine the employer's responsibility for the costs of operation and the method and form of payment and benefits, provide further confirmation that the Department was not Spengler's employer. As the court in *Love* explained, the *Knight* factors are designed, in part, to examine the "economic realities" of the relationship in question, including its "financial underpinnings." *Love*, 779 F.3d at 702. Nothing about the "economic realities" of the relationship among the parties in this case suggests that the Department should be viewed as Spengler's employer.

CESA 7, not the Department, paid Spengler and made decisions about adjustments to her pay rate. Wis. Stat. § 116.03(11); (Dkt. 97 ¶ 69; 118 ¶ 6.) CESA 7, not the Department, offered Spengler fringe benefits, according to the

59

by-laws and policies of the CESA 7 Board of Control. (Dkt. 118 ¶ 6.) CESA 7, not the Department, provided Spengler an office. CESA 7, not the Department, provided Spengler with supplies—for example, the work laptop and cell phone she used. (Dkt. 97 ¶ 70.) When it comes to the "economic realities" of this case, not a single factor suggests the Department was Spengler's employer.

### c. Spengler brought significant training and experience to the Department's two projects and operated under term-limited contracts.

The Department's contracts with CESA 7 related to the two projects—which lasted only a year—contemplated that CESA 7 would assign staff with significant training and experience in education. (Dkt. 97 ¶¶ 71–72.) Under the second *Knight* factor, which examines "the type of occupation and nature of the skills required," *Love*, 779 F.3d at 704, the fact that Spengler had extensive, specialized skills when CESA 7 assigned her to staff the two projects again shows that the Department was not her employer. (Dkt. 97 ¶¶ 71–72.)

Simply put, Spengler did not derive the fundamental skills and qualifications needed to staff the two projects through training provided by the Department. *See Hojnacki v. Klein-Acosta*, 285 F.3d 544, 550 (7th Cir. 2002) (noting for purposes of second factor that the plaintiff "did not derive" her skills from work for purported indirect employer). In fact, CESA 7 required that a person in Spengler's Integration Director position have or be working toward a Director of Special Education certification or Director of Pupil Services

60

certification. (Dkt. 97 ¶¶ 71–72.) The requirements for such certifications require extensive education, training, and hundreds of hours of classroom teaching experience. *See generally*, Wis. Admin. Code PI §§ 34.065, 34.069. Spengler had both certifications when she started working at CESA 7. (Dkt. 97 ¶ 72.)

To the extent Spengler claims she received specialized training from the Department in connection with the two projects, that is simply one aspect of the second *Knight* factor, and it is hardly dispositive. For one, the training Spengler received through involvement in the projects provided transferrable skills Spengler could apply in other jobs. *See Knight*, 950 F.2d at 379 (finding no indirect employer relationship where defendant trained plaintiff as insurance agent but "[plaintiff] was free to leave [defendant] at any time and use her skills to work for other [ ] companies"). The mere fact that the Department provided training to CESA staff related to implementation of the two projects does not, by itself, suggest that the Department had an employer-like relationship with the CESA staff. *See Love*, 779 F.3d at 704 (finding requirement to attend periodic trainings "d[id] not weigh in favor" of indirect employer relationship).

As to the fifth factor—the length of the job commitment—it is undisputed that the contracts between the Department and CESA 7 lasted only a year. (Dkt. 97 ¶ 68.) To the extent the Department made any commitment, it was to

61

CESA 7 (not to Spengler), it was only for one year and, as is common with many contracts, the Department could terminate that contract with 30 days' notice. (Dkt. 118 ¶ 5.) The employment relationship between CESA 7 and Spengler was itself defined by a two-year employment contract. (Dkt. 118 ¶ 6; 97 ¶ 14.) Under these circumstances, there would have been no expectation that Spengler's work on the two projects was akin to an indefinite or permanent job. This factor, too, weighs in favor of the Department not being Spengler's indirect employer.

Because the CESA 7, not the Department, was Spengler's direct employer, and because Spengler cannot establish that an indirect employee-employer relationship existed between her and the Department, all her Title VII claims against the Department fail and the district court's judgment can be affirmed on this separate basis.

## CONCLUSION

Defendant-Appellee Wisconsin Department of Public Instruction respectfully requests that this Court affirm the district court's judgment in full.

Dated this 27th day of January 2026.

                                        Respectfully submitted,

                                        JOSHUA L. KAUL
                                        Attorney General of Wisconsin

                                        Electronically signed by:

                                        s/ Rachel L. Bachhuber
                                        RACHEL L. BACHHUBER
                                        Assistant Attorney General
                                        State Bar #1052533

                                        Attorneys for Defendant-Appellee
                                        Wisconsin Department of Public
                                        Instruction

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188
(608) 294-2907 (Fax)
rachel.bachhuber@wisdoj.gov

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

This brief contains 13,812 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

Dated this 27th day of January 2026.

Electronically signed by:

s/ Rachel L. Bachhuber
RACHEL L. BACHHUBER
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on January 27, 2026, I electronically filed the foregoing *Brief of Defendant-Appellee Wisconsin Department of Public Instruction* with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 27th day of January 2026.

Electronically signed by:

s/ Rachel L. Bachhuber
RACHEL L. BACHHUBER
Assistant Attorney General