No. 25-2532

# In the United States Court of Appeals for the Seventh Circuit

BECKY SPENGLER,

*Plaintiff-Appellant,*

*v.*

COOPERATIVE EDUCATIONAL SERVICE AGENCY 7
AND
WISCONSIN DEPARTMENT OF PUBLIC INSTRUCTION,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
CASE NO. 22-CV-1199
THE HONORABLE WILLIAM C. GRIESBACH PRESIDING

## RESPONSE BRIEF OF DEFENDANT-APPELLEE
## COOPERATIVE EDUCATIONAL SERVICE AGENCY 7

Axley LLP
Attorneys for Defendant-Appellee
Cooperative Educational Service Agency 7
Lori M. Lubinsky (SBN 1027575)
Danielle Baudhuin Tierney (SBN 1096371)
2 E. Mifflin Street, Suite 200, Madison, WI 53703
(608) 257-5661

**RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court Case No. 25-2532

Short Caption: Becky Spengler v. Cooperative Educational Service Agency 7, also known as CESA 7, et al.

The full name of every party that the attorney represents in this case:

Cooperative Educational Service Agency 7

The names of all law firms whose partners or associates have appeared for the parties in this case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: Axley LLP

If the party or amicus is a corporation:

(i)     Identify all its parent corporations, if any; and

(ii)    List any publicly held company that owns 10% or more of the party's or amicus stock: N/A

Attorney's Signature: */s/ Danielle Baudhuin Tierney*

Date: January 27, 2026

Attorney's Printed Name: Danielle Baudhuin Tierney

Address: 2 E. Mifflin Street, Suite 200, Madison, Wisconsin 53703

## RULE 26.1 DISCLOSURE STATEMENT

Appellate Court Case No. 25-2532

Short Caption: Becky Spengler v. Cooperative Educational Service Agency 7, also known as CESA 7, et al.

The full name of every party that the attorney represents in this case:

Cooperative Educational Service Agency 7

The names of all law firms whose partners or associates have appeared for the parties in this case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:  Axley LLP

If the party or amicus is a corporation:

    (i)    Identify all its parent corporations, if any; and

    (ii)    List any publicly held company that owns 10% or more of the party's or amicus stock:  N/A

Attorney's Signature:  */s/ Lori M. Lubinsky*

Date: January 27, 2026

Attorney's Printed Name: Lori M. Lubinsky

Address: 2 E. Mifflin Street, Suite 200, Madison, Wisconsin 53703

**TABLE OF CONTENTS**

RULE 26.1 DISCLOSURE STATEMENT ............................................................ ii

RULE 26.1 DISCLOSURE STATEMENT ........................................................... iii

TABLE OF AUTHORITIES........................................................................... vi

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES ......................................................................2

STATEMENT OF THE CASE .........................................................................3

STANDARD OF REVIEW ............................................................................24

SUMMARY OF THE ARGUMENT.................................................................25

ARGUMENT..............................................................................................27

I.  Spengler is not permitted to raise new arguments on appeal. ............27

    a.  Spengler's three-part theory of racial discrimination was not raised in opposition to CESA 7's motion to summary judgment and should not be considered on appeal. ........................................ 27

    b.  Spengler's argument that she pled a First Amendment claim based upon what she believed and refused to believe against CESA 7 must be limited to what she presented to the District Court. .............................................................................. 30

II.  Spengler cannot establish a prima facie Title VII racial discrimination claim against CESA 7........................................................34

III. Spengler cannot establish a Title VII retaliation claim against CESA 7................................................................................................39

    a.  Spengler did not engage in protected activity. ............................... 39

    b.  Spengler did not identify an adverse employment action nor establish (or even argue) but-for causation..................................... 49

    c.  The Court need not even evaluate claims of pretext because Spengler cannot establish a prima facie claim; nevertheless, CESA 7 did not make any false claims about Spengler's performance..................................................................................... 51

iv

IV. The District Court correctly dismissed Spengler's Equal Protection Claim. ..................................................................................53

V. Spengler did not plead a First Amendment claim premised on her beliefs or refusal to believe. .......................................................53

CONCLUSION ............................................................................ 57

CERTIFICATE OF COMPLIANCE.................................................... 58

CERTIFICATE OF SERVICE............................................................ 59

v

# TABLE OF AUTHORITIES

## Cases

*Ames v. Ohio Department of Youth Services*,
605 U.S. 303, 145 S. Ct. 1540, 221 L. Ed. 2d 929 (2025) .................................. 29

*Andonissamy v. Hewlett–Packard Co.*,
547 F.3d 841 (7th Cir. 2008) ............................................................... 40

*Bridges v. Gilbert,*
557 F.3d 541 (7th Cir. 2009) ............................................................... 55

*Burlington Indus., Inc. v. Ellerth,*
524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) ................................ 36

*Colbert v. City of Chicago,*
851 F.3d 649 (7th Cir. 2017) ............................................................... 55

*Craig v. Wrought Washer Mfg., Inc.,*
108 F.4th 537 (7th Cir. 2024) ............................................................. 44

*Frazier-Hill v. Chicago Transit Auth.,*
75 F.4th 797 (7th Cir. 2023) ............................................................... 25

*Hague v. Thompson Distrib. Co.,*
436 F.3d 816 (7th Cir. 2006) ............................................................... 51

*Help At Home Inc. v. Med. Cap., L.L.C.,*
260 F.3d 748 (7th Cir. 2001) ............................................................... 27

*Hunt v. DaVita, Inc.,*
680 F.3d 775 (7th Cir. 2012) ..................................................... 42, 43, 44, 46

*Liberles v. Cook County,*
709 F.2d 1122 (7th Cir. 1983) ............................................................. 25

*Logan v. City of Chicago,*
4 F.4th 529 (7th Cir. 2021) ............................................................. 40, 41

vi

*Lord v. High Voltage Software, Inc.*,
  839 F.3d 556 (7th Cir. 2016) ...................................................................41

*Miller v. Polaris Lab'ys, LLC*,
  797 F.3d 486 (7th Cir. 2015) ...................................................................39

*Muldrow v. City of St. Louis*,
  601 U.S. 346, 144 S. Ct. 967, 218 L. Ed. 2d 322 (2024) ....................................36

*Northington v. H & M Int'l*,
  712 F.3d 1062 (7th Cir. 2013) ............................................................40, 47

*O'Neal v. City of Chicago*,
  588 F.3d 406 (7th Cir. 2009) ...........................................................28, 29, 33

*Ortiz v. Werner Enters., Inc.*,
  834 F.3d 760 (7th Cir. 2016) ...................................................................35

*Packer v. Trs. of Ind. Univ. Sch. of Med.*,
  800 F.3d 843 (7th Cir. 2015) ....................................................34, 42, 44, 46

*Phillips v. Baxter*,
  No. 23-1740, 2024 WL 1795859 (7th Cir. Apr. 25, 2024) ...............................36

*Reynolds v. Tangherlini*,
  737 F.3d 1093 (7th Cir. 2013) ..................................................................55

*Richards v. Combined Ins. Co. of Am.*,
  55 F.3d 247 (7th Cir. 1995) .....................................................................50

*Ross v. Fin. Asset Mgmt. Sys., Inc.*,
  74 F.4th 429 (7th Cir. 2023) ...............................................................25, 27

*Runkel v. City of Springfield*,
  51 F.4th 736 (7th Cir. 2022) ....................................................................35

*Salas v. Wis. Dep't of Corr.*,
  493 F.3d 913 (7th Cir. 2007) ...................................................................53

*Scheidler v. Indiana*,
  914 F.3d 535 (7th Cir. 2019) ...................................................................40

*Schmees v. HC1.COM, Inc.,*
  77 F.4th 483 (7th Cir. 2023) ..................................................................56, 57

*Smart v. Ball State Univ.,*
  89 F.3d 437 (7th Cir. 1996) ...........................................................................36

*Soo Line R.R. Co. v. Consol. Rail Corp.,*
  965 F.3d 596 (7th Cir. 2020) ...............................................................27, 28, 30

*Tomanovich v. City of Indianapolis,*
  457 F.3d 656 (7th Cir. 2006) ................................................................. passim

*United States v. Washburn,*
  383 F.3d 638 (7th Cir. 2004) ..........................................................................41

*Wheeler v. Hronopoulos,*
  891 F.3d 1072 (7th Cir. 2018) ...................................................................27, 28

*Williams v. Seniff,*
  342 F.3d 774 (7th Cir. 2003) ..........................................................................53

*Xiong v. Bd. of Regents of Univ. of Wis. Sys.,*
  62 F.4th 350 (7th Cir. 2023) .....................................................................39, 49

**Statutes**

28 U.S.C. § 1291.............................................................................................2

28 U.S.C. § 1331.............................................................................................1

28 U.S.C. § 1391(b)(2) ...................................................................................1

28 U.S.C. § 1983.............................................................................................1

29 U.S.C. § 2601, et seq. ...............................................................................1

42 U.S.C. § 2000d, et seq. .............................................................................1

42 U.S.C. § 2000e, et seq...............................................................................1

42 U.S.C. § 2000e-2(a)(1) ..........................................................................2

**Rules**

Fed. R. App. P. 4(a)(4)............................................................................ 2

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant's jurisdictional statement is not complete and correct.

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331, as Plaintiff-Appellant Becky Spengler asserted claims for violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.) in her original Complaint [Dkt. 1[1]]; claims for violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.) and the Family Medical Leave Act (29 U.S.C. § 2601, et seq.) in her Amended Complaint [Dkt. 18]; and claims for violations of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, et seq.); Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.); the Family Medical Leave Act (29 U.S.C. § 2601, et seq.), and the Equal Protection Clause and the First Amendment pursuant to 28 U.S.C. § 1983 in her Second Amended Complaint [Dkt. 33]. Spengler's claims arose within the geographic boundaries of the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391(b)(2).

---

[1] "Dkt." refers to the document number in the District Court proceedings. "Doc." shall refer to the document number in the Circuit Court proceedings. CESA 7 will utilize the ECF system page numbers for its record citations in District Court documents and the Appellant's pagination for citation to Appellant's Brief.

1

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. The District Court entered a Decision and Order on August 4, 2025, which granted the motions for summary judgment filed by Cooperative Educational Service Agency 7 ("CESA 7") and the Wisconsin Department of Public Instruction ("DPI"). [Dkt. 135.] Final judgment was entered that same day. [Dkt. 136.]

Spengler did not file any post-judgment motions that would have tolled the appeal deadline pursuant to Fed. R. App. P. 4(a)(4). Spengler filed a timely notice of appeal in the District Court on August 29, 2025. [Dkt. 149.] There are no related appellate proceedings.

## STATEMENT OF THE ISSUES

CESA 7 disagrees with Spengler's proposed Issues on Appeal and proposes the following:

1. Did Spengler establish a prima facie claim for racial discrimination in violation of Title VII (42 U.S.C. § 2000e-2(a)(1)) against CESA 7?

2. Did Spengler establish a prima facie claim for retaliation in violation of Title VII against CESA 7?

3. Did Spengler establish a prima facie claim for a violation of the Equal

Protection Clause against CESA 7?

4.  Did Spengler plead a First Amendment claim against CESA 7 premised on what she believed and refused in her Second Amended Complaint?

## STATEMENT OF THE CASE

CESA 7 is an entity located at 595 Baeten Road, Green Bay, WI 54304. [Dkt. 97, ¶ 1.] Jeff Dickert was the CESA 7 Agency Administrator for fourteen years before he retired on July 1, 2022. [Dkt. 97, ¶ 6.]

CESA 7 and DPI entered into at least four consecutive Integrated Improvement Supports Contracts ("the Integrated Contract(s)") spanning July 1, 2019 through June 30, 2020; July 1, 2020 through June 30, 2021; July 1, 2021 through June 30, 2022; and July 1, 2022 through June 30, 2023. [Dkt. 68.] The Integrated Contracts included deliverables by CESA 7 for the Regional Special Education Network ("RSN") and the Research to Practice – Inclusive Communities ("RPIC").[2] The 2021-2022 and 2022-2023 Integrated Improvement Support Contracts provided a termination provision whereby DPI

---

[2] In accordance with the Practitioner's Handbook for Appeals to the United State Court of Appeal for the Seventh Circuit, p. 159, CESA 7 incorporates by reference Section I.A.-I.C. of the Statement of the Case from co-Appellee DPI for further explanation of the RSN and

3

could terminate the agreement immediately as a result of the agency's breach of any provisions of terms of the agreement if the agency fails, after 30 days, to cure any such breach to DPI's reasonable satisfaction. [Dkt. 84-4 (CESA000070); Dkt. 84-5 (CESA000095).]

Becky Spengler, who is white, entered into an employment contract with CESA 7 for a two-year term (July 1, 2020 through June 30, 2022) as Integration Director. [Dkt. 97, ¶ 13.] The 2020-2022 contract between Spengler and CESA 7 stated Spengler "agrees to perform all of the acts and duties pertaining to [Spengler's] employment … during the school year, including, but not limited to all rules and policies of CESA 7, its administrators and performing all other assigned tasks." [Dkt. 84-7 (CESA000024).] CESA 7's Integration Director job description included a list of eight "primary functions or responsibilities," which included two references to CESA 7's contracted work with the DPI: "… (2) Fulfill Regional Services Network duties as assigned by the Department of Public Instruction via the Integrated Contract and the

RPIC programs, as well as the requirements of the individual who would be fulfilling those roles on behalf of CESA 7.

4

DPI job description for the Regional Services Network Director; and (3) Fulfill *Research to Practice Grant: Inclusive Communities Project* duties as assigned by the Department of Public Instruction." [Dkt. 84, ¶ 7; Dkt. 84-8 (CESA000658).] Accordingly, Spengler served as the RSN Director and as a "coach" for the RPIC project in her role as Integration Director for CESA 7, among other duties. [Dkt. 97, ¶ 16.] Dickert estimated that approximately 92% of Spengler's Integration Director contract was funded by the funding provided by DPI via the Integrated Contract. [Dkt. 64, p. 6 (15:18-17:10).]

On September 15, 2021, during an RSN Zoom meeting, Spengler sent the following chat to the participants: "You will not believe this recording today. I got them to say I can't do this work if I don't believe in all this anti-racism BS. I should have assumed it when I was hired. It shouldn't be a surprise to me. We need to take this conversation to another call with Lynn Winn. I'll share the recording later when I get it, but here's a snippet of a written comment I captured which lead [*sic*] into me pressing them to acknowledge what they are really saying. They incriminated themselves today, big time. ME: 'This seems to assume that systemic racism is a fact, and

5

not a theory, and that everyone has blind spots with regard to race. I'm curious about that and how someone does this work if they have a counter belief to that.'" [Dkt. 81, ¶ 69; Dkt. 81-41.]

Later that evening, Spengler sent an email that included much of this same text to Brett Healy, the President of the John K. MacIver Institute for Public Policy. [Dkt. 85-2 (P005732).] Spengler had been exchanging emails with Healy since August 2021 and, in her initial contact to him, said she "need[ed] guidance and help with what I believe is a discrimination suit against the state, who is creating a hostile work environment for me, as a conservative." [Dkt. 85-1 (P005725).]

On September 16, 2021, Julia Hartwig (the Director of Special Education at DPI) emailed Dickert to request a meeting to address "[r]epeated concerns" that had been brought to DPI's attention regarding Spengler and the RPIC and RSN projects; a meeting was set up for the following week. [Dkt. 76, ¶17; Dkt. 84, ¶ 8.]

Approximately around the time that Hartwig emailed Dickert, Spengler had spoken with Dickert about some of the training lead "stuff" that Spengler had to do with the new RPIC; specifically Spengler had identified things

6

like introducing yourself and starting a meeting by everybody admitting to their white bias and acknowledging that white bias was one of the reasons that special education students and students of color were not doing as well as other students in Wisconsin school systems. [Dkt. 64, p. 10 (33:12-23).] Also, sometime prior to September 20, 2021, Spengler had reported to Dickert that someone in a meeting either used Spengler as an example or called Spengler a racist. [Dkt. 84, ¶ 10.]

On September 20, 2021, Spengler sent an email to Dickert that stated, "Thanks for taking time to talk. I've attached the link to the updated coaching practice profile. You can read the department's narrative and click on the profile on the bottom to read it. The new language is the equity language in 1A, 1B, and 1C. I also attached the equity mindset cards for you to look at. Both of these tools are used across all FISSC groups." [Dkt. 84-9.] Dickert understood that Spengler's September 20, 2021 email was raising disagreement with some of DPI's messaging because she did not believe that it would be well-received by the school districts within the CESA 7 region. [Dkt. 84, ¶ 9.]

7

On September 20, 2021 and September 21, 2021, in response to his emails seeking information about what had occurred at the RSN meetings, Dickert received a screenshot of the chat messages that Spengler sent to the group chat at the September RSN group. [Dkt. 84, ¶ 10; Dkt. 84-10.] Dickert was troubled by Spengler's messages; he understood that Spengler's use of "antiracism BS" meant that the training materials had antiracism in them and that she was calling it baloney, and that was troubling to him. [Dkt. 64, p. 13 (42:14-18; 45:12-17).]

Dickert, Hartwig, and Lynn Winn (the Assistant Director of the Special Education Team in the Division of Learning Support) met on September 21, 2021. [Dkt. 97, ¶¶ 9, 19.] Winn and Hartwig reported to Dickert that they had received complaints that Spengler's mission was to create chaos, Spengler's behavior was disrupting the work, Spengler tried to hijack meetings, and that Spengler's behavior was unacceptable. [Dkt. 84, ¶ 11.] Dickert had been told that Spengler's behavior during meetings had slowed down the process of training because of the extended conversations that Spengler kept having, that training was taking longer because of Spengler, that training

8

that had been targeted to be completed in September had not been completed as projected, that Spengler was disruptive in meetings, that other people had brought forth concerns, and that there was a problem with how Spengler shared her viewpoints. [Dkt. 64, pp. 19-20 (69:22-71:2); p. 49 (187:14-188:10).] Dickert was concerned about what he understood Spengler's demeanor to have been at the meeting, and how Spengler was reportedly trying to get her views across in that she called the training "BS," raising her voice, and talking on the subject after being told to stop. [Dkt. 64, p. 17 (60:1-61:17).]

Spengler emailed Dickert on September 30, 2021, asking "Have you spoken with DPI yet? I'm curious about what they said, given what I shared with you about my concerns about the CRT language." [Dkt. 84-11.] (When Spengler said, "concerns about the CRT language," Dickert understood she was referring to her disagreement with some of the DPI messaging related to race and equity and how it would be received by the school districts within the CESA 7 region. [Dkt. 84, ¶ 12.])

On October 4, 2021, Hartwig emailed Dickert and stated, "Lynn and I had a chance to discuss this a bit more today, and I want to be sure to be

9

clear on our preference, and at the same time respecting your organizational structure and supervision of Becky. Our strong preference is that Becky no longer be assigned to the RSN and RPIC projects. However, we do understand that she is under contract, and that other assignments might not be readily available within your CESA. If it isn't possible for her to be reassigned during this contract year, we request she not attend statewide meetings for either of these projects until a reparation process can take place due to the significant negative impact she continues to have on individual and group dynamics of the projects. We will not consider her lack of attendance at these meetings as not meeting the requirements of the project because it is at our request. Please feel free to reach out to me at any time. I truly appreciate your partnership as we work through this difficult situation." [Dkt. 84-12.]

Dickert and Spengler met on October 5, 2021 and Spengler told Dickert that during meetings, discussions, and in the hallways, she was being excluded from the group and when she walked by people, they would stop talking or give her the impression that she was wrong; that that she felt bullied because of her stance (which was that she did not believe in systemic

racism and did not believe systemic racism was a leading topic to start meetings); that she could do her job, but that she did not believe that the system was racist; and that Winn told her she could not do this job if she did not believe in the work. [Dkt. 97, ¶ 20; Dkt. 64, p. 20 (73:11-20); p. 49 (188:17-189:1); p. 21 (74:7-10); p. 21 (77:15-18).]

Spengler emailed Dickert on October 5, 2021 after their meeting and stated, "Thank you for meeting earlier today and the support you offered. As requested, I will share the messages of support I have (I forwarded one from the last meeting and have to dig for the rest.) Additionally, would you please put in an email what DPI shared with you? Specifically, their concerns and their request to have me removed from my roles as RSN and RPIC? That will better allow me to offer evidence to you, to share with them, as a way of addressing their concerns. Some of the items I captured from our conversation were, they believe: 1. I am creating chaos. 2. My behavior is disruptive. 3. I hijack meetings. 4. I have created a hostile environment. 5. They don't feel I can regain their trust. 6. They do not believe I have an equity mindset. 7. They would like me removed from the work of RSN and RPIC. If I didn't capture those accurately, and where I missed any they

shared with you, please offer a correction for my misunderstanding and share the rest I missed. I'd also appreciate the email they sent to you about not wanting me to continue the work for those two grants." [Dkt. 84-13.]

Dickert emailed Hartwig after he met with Spengler and told Hartwig that Dickert would like to investigate an option different than what Hartwig suggested; that he needed to look at evidence because Spengler reportedly felt bullied for having a different mindset than the DPI on the lead into coaching work; that Spengler had told Dickert that Spengler had numerous examples of being called out at the meetings as a Republican, a conservative, and a racist; that he thought more needed to be done other than excluding Spengler from the meetings; and that they needed to speak soon and, while they were working to address Hartwig's concerns and investigate Spengler's complaints about being called out as a Republican, a conservative, and a racist, Dickert suggested that Spengler continue to attend the Zoom meetings but turn her camera off and keep her microphone off so she could still receive the training materials and information while DPI and CESA 7 worked through the issues. [Dkt. 84, ¶ 13.]

On October 6, 2021, Spengler emailed Dickert, stating, "I'm in my all day RPIC meeting now, just observing, but it's weird, because much of what we do is in breakout rooms in small groups. I'm staying out of them, but I could get the same benefit of just watching the recorded meetings. So, in your discussion with DPI, maybe you could just ask for me to be able to have access to the recordings the day after each meeting for RPIC and RSN? Of course, the coordinators would have to be told to record, and I could always send a request email, but this is strange for everyone, to sit here, without participating. I can certainly do it, but I think people are wondering why Becky isn't speaking when prompted. Food for thought." [Dkt. 84-14 (P001084).]

On October 11, 2021, Dickert met with Winn, Hartwig, and Paul Manriquez (Assistant State Superintendent) to talk about how he thought Spengler could do the work and then Dickert shared the four examples of bullying that Spengler had shared with him up to that point: that, in July and August of 2021, she was called a Republican, that she was called a racist, that she was called a conservative, and that she did not understand the materials as presented. [Dkt. 97, ¶ 51; Dkt. 64, pp. 53-54 (204:4-206:16); Dkt. 84, ¶ 17.] (Notably, Dickert had watched the recordings of the meetings from July and

13

August 2021 and did not see any bullying. [Dkt. 64, p. 54 (206:17-207:3).]) In response, they told Dickert that "much of the work is about equity," "the department respects [Spengler's] different viewpoint," that it was Spengler's "delivery that is the problem," that "over a couple of months, [Spengler] has been starting to become an aggressive problem, intentionally disrupting training" and that DPI had hired an external facilitator to help with meetings. [Dkt. 64, pp. 26-27 (97:17-21; 98:12-15; 98:23-99:1; 101:11-13;101:19-23).]

Dickert then met with Spengler on October 12, 2021. [Dkt. 97, ¶ 22.] After his meeting with Spengler, Dickert emailed Hartwig, Winn, and Manriquez and told them that Spengler would not attend the RSN or RPIC meetings for a couple of months, but that she would be taking the recordings from DPI to stay abreast of her work and the information presented in the meetings; asked that Spengler receive recordings of the Wednesday meetings by 7:30 a.m. the next day, as she had agreed to set that time aside for reviewing the recording; and stated that, after a few months, they would meet again and look at the possibility of some kind of restorative practice exercise that might allow Spengler to attend future meetings, told them that Spengler would

14

continue to fulfill the contract deliverables, and told them to reach out ASAP if they had any questions.  [Dkt. 84, ¶ 19.]

Dickert met with Hartwig and Winn on December 10, 2021, and Hartwig and Winn suggested to Dickert that another employee should fill the RSN and RPIC positions instead of Spengler. [Dkt. 84, ¶ 26.] Dickert again met with Hartwig and Winn on February 23, 2022, and Hartwig and Winn told Dickert they did not want Spengler in the RSN and RPIC positions for the 2022-2023 school year. [Dkt. 84, ¶ 27.]

Dickert subsequently spoke with Spengler on February 23, 2022 and told Spengler that Hartwig and Winn informed him they would be taking away the RPIC coach position and would not fund Spengler in the RSN position. [Dkt. 84, ¶ 28.] On March 3, 2022, Dickert forwarded an email that he received from Hartwig dated February 24, 2022, which said, "Per your request, I am sending this email to let you know that it is our preference that Becky Spengler not be assigned to the RPIC and RSN Projects for the 2022-2023 contract as we have concerns about how she has been carrying out the terms of the contract. I appreciate your responsiveness and partnership as we've worked through this." [Dkt. 84-21 (CESA000526).]

15

Dickert met with Spengler on March 4, 2022 and asked Spengler for evidence or examples of discriminatory actions by DPI so he could do his due diligence and investigate Spengler's complaints. [Dkt. 84, ¶ 30.] In that meeting, Dickert believed Spengler was saying she was being discriminated against for her not believing in systemic racism. [Dkt. 64, p. 60 (232:4-14).] As of the meeting on March 4, 2022, Dickert understood that Spengler believed she was being bullied (or, as Spengler put it, discriminated against) because of Spengler's viewpoints on the DPI messaging about equity and because of her political stance. [Dkt. 84, ¶ 30.]

On March 9, 2022, Dickert emailed Winn and Hartwig and told them he thought they needed to have another meeting with four items for discussion including (1) that Dickert heard from a CESA 7 school district that CESA 7 would not be receiving RPIC funds, (2) clarification on DPI meant by its "preference" that Spengler not be in the RPIC and RSN roles or whether DPI would not fund her in those roles, (3) Spengler's allegations that she was being bullied because of her different political and philosophical views, and (4) Dickert's own concerns about the community agreements. [Dkt. 84, ¶ 32.] (The concerns of bullying that Spengler had raised to Dickert were being

16

called a Republican, being called a conservative, being called a racist, being excluded from conversations in the hallways, and feeling cut off during discussions in July and August 2021. [Dkt. 64, p. 61 (236:22-237:24).])

Spengler emailed Dickert on March 19, 2022 and said, "These are just a few, but significant, examples of how I believe DPI has discriminated against me for my political views and for questioning the work around white privilege, etc. There are more, but for now, these give you an idea. In some of the meetings, others also question the work, but are not further shut out, as I have been. There are minute markers because the recordings are long, however, for context, large portions of the meetings are necessary to watch in order to understand. While DPI has the same recordings, I trust that this document is not shared with them at this point. We can talk further if you'd like clarification." [Dkt. 84-24 (CESA000541).] Spengler attached a five-page document to her March 19, 2022 email to Dickert, which included embedded links to documents and recordings. [Dkt. 84, ¶ 34; Dkt. 84-25 (CESA000336-340).] Dickert went through the five-page document, reviewed the specific items identified by Spengler, and – while he did not review the entirety of the videos embedded – he reviewed the specific video

17

portions identified by Spengler. [Dkt. 64, p. 63 (242:16-243:16).] After reviewing the five-page document, Dickert understood that Spengler believed she was being bullied for having different political beliefs, because she disagreed with the DPI messaging, and because she was unable to get DPI to see – what she perceived as – errors in DPI's work. [Dkt. 84, ¶ 34.] Dickert could understand how Spengler could interpret some of the behavior as bullying, but he did not see the behavior as bullying, nor did he see any evidence of a hostile working environment. [Dkt. 84, ¶ 34.]

On or about March 23, 2022, Dickert had an in-person meeting with Winn and Hartwig. [Dkt. 97, ¶ 26.] Dickert understood that, if Spengler was in the RPIC position, DPI would cut off funding for the 2022-2023 year for that position, but if she did not occupy the RPIC position, CESA 7 would receive funding from DPI for that position. [Dkt. 64, p. 35 (132:24-133:6).] Dickert did not believe it was ultimately CESA 7's decision whether to place Spengler in the RSN and RPIC roles; he understood that CESA 7 would not receive funding if she were in the roles, and CESA 7 needed funding for those roles. [Dkt. 64, p. 39 (147:1-6).]

18

On May 3, 2022, Colleen Timm (who later assumed the role of Agency Administrator at CESA 7 in July 2022 after Dickert retired), Dickert, Hartwig, Winn, Manriquez, and Thomas McCarthy (Executive Director in the Office of the State Superintendent) met. [Dkt. 97, ¶¶ 7; 27; 55.] At the meeting, Dickert was again of the impression that CESA 7 would not receive funding for the RSN and RPIC roles if they assigned Spengler to the position, but DPI asserted that it was ultimately CESA 7's decision whether to put her in those roles. [Dkt. 64, p. 39 (146:16-147:6).] When DPI had first approached Dickert regarding DPI's concerns in October, Dickert believed that he could work with Spengler and DPI to come to a mutual agreement to allow Spengler to continue in her position as RSN and RPIC, and he continued to be of the belief that he could work out the conflict between the parties to the benefit of CESA 7 until after the May 3, 2022 meeting when he completely understood that CESA 7 would not receive funding if Spengler continued in her role as RSN and RPIC, and that Spengler would not be able to attend the DPI trainings if she continued in her role as RSN and RPIC. [Dkt. 84, ¶ 56.] After attending the May 3, 2022 meeting, Dickert realized and rec-

19

ognized that CESA 7 could not put Spengler in the RSN and RPIC roles unless CESA 7 was prepared to lose tens of thousands of dollars in funding and was prepared to forego all training of the RSN and RPIC coach (which, in effect, meant the school districts within CESA 7 would not be receiving the same information that all other school districts would be receiving from DPI). [Dkt. 84, ¶ 56.] The decision not to put Spengler in the RSN and RPIC roles for the 2022-2023 school year was premised entirely on funding and training concerns, and was made after meeting with DPI on May 3, 2022. [Dkt. 84, ¶ 56.]

Spengler had a conversation with Timm on or about May 3, 2022 wherein Timm relayed to Spengler that DPI had expressed that the points in the Integrated Contract were non-negotiable, that CESA 7 could keep Spengler in the Integration Director role if Spengler could commit to the role without pushback or questioning, and that Timm was worried if Spengler remained in the role that funding would be pulled. [Dkt. 58, p. (131:22-134:7).]

On May 11, 2022, Dickert, Timm, and Spengler met. [Dkt. 97, ¶ 28.] During the May 11, 2022 meeting, Dickert and Timm shared with Spengler their takeaways from their May 3, 2022 meeting with DPI and their concerns that

20

if they placed her in the RSN and RPIC roles, she would be monitored by DPI and that DPI could pull the funding, which would result in a lapse of service for CESA 7's districts and region. [Dkt. 58, p. 36 (138:22-139:16).] They went point by point through the items that Spengler would be required to fulfill under the new Integrated Contract with DPI, and Spengler could not commit to one of the points. [Dkt. 64, pp. 65-66 (253:13-254:19); Dkt. 61, pp. 36-37 (135:11-138:3); Dkt. 58, pp. 35-36 (136:18-137:19); Dkt. 61-8, pp. 13-14.] Spengler also pointed out the new language in the contract specific to staff selection and how she thought there was much more of a focus with the new language that changed in terms of an equity focus and having an equity mindset as being a requirement for the RSN and RPIC coaches, reiterated that she believed her performance reviews and pay raise demonstrated that she was doing the work and could continue to do the work, but that she would not "sort of surrender [her] personal freedom, [her] personal feelings about -- as it relates to what DPI was asking [her] to do." [Dkt. 58, p. 36 (138:5-21).]

Spengler emailed Dickert and Timm on May 12, 2022 and wrote, "Thank you for meeting with me yesterday to discuss DPI's demands with regard

21

to my position as an RSN and RPIC coach. I sincerely appreciate the support provided by both of you and your acknowledgement that I am fully able to effectively perform the actual work of an RSN and RPIC coach. Although you didn't say it, I also understand that your hands are tied, that DPI completely controls and dictates the 'what' and 'how' of this work, that DPI also controls the purse strings for this work, and that DPI will ultimately decide whether or not I am allowed to keep my job. As you know, I have successfully performed this work – including the anti-racist work that DPI is now emphasizing – for several years with great success and without complaint regarding my performance from any District, CESA 7, or DPI. I am committed to continue to perform the work just as I have in the past. In that regard, I will also commit to continue to behave as I always have in a professional and respectful manner in all my dealings with DPI, CESA 7, the Districts, and anyone else. However, I will continue to maintain my own personal views and opinions regarding matters of race, and I will not agree to waive my right to express those views in the same respectful manner as any other employee of DPI and/or CESA 7 might express their views. I am not a racist nor do I harbor bias toward any person based on race, and I will not confess

22

to sins that I have not committed. Neither will I continue to consent to be the only employee who is excluded from meetings because of my race, nor will I agree to submit to special, unique and racially-discriminatory DPI monitoring of my work where such monitoring applies to me and me alone. Although I will continue to effectively carry out DPI's direction with regard to the RSN and RPIC work within the Districts, I will not agree to keep silent regarding DPI's racist philosophy, policies, and plan of action. Instead, I will retain my right to continue to oppose racial discrimination in the workplace. I hope that DPI will do the right thing. In any case, I look forward to their decision." [Dkt. 84-28 (CESA000585-586).]

The May 12, 2022 email from Spengler was the first time Spengler mentioned to Dickert that she believed she was being discriminated against because she was white and the first time that Spengler mentioned race discrimination or race discrimination in the workplace to Dickert. [Dkt. 64, p. 67 (259:16-260:9); Dkt. 84, ¶ 12.] As of May 12, 2022 when he received Spengler's email, Dickert had not seen any evidence that Spengler was being excluded from meetings because of her race or that she was being monitored by DPI because of her race, had not seen any evidence that Spengler had

23

been opposing race discrimination in the workplace, had not seen any evidence of racial discrimination in the workplace and had no idea what Spengler was referring to when she said she would continue to oppose race discrimination in the workplace. [Dkt. 84, ¶ 42.]

On June 7, 2022, Spengler signed a contract with CESA 7 for her role as a NEWYA School-Based Coach, which had a one-year term (July 1, 2022 to June 30, 2023). [Dkt. 97, ¶ 30.] Rachel Kaderabek, a white female, was hired as the Integration Coordinator for CESA 7 as of July 1, 2022. [Dkt. 97 ¶ 31.]

Spengler filed her Second Amended Complaint on September 22, 2023. [Dkt. 33.] The District Court entered a Decision and Order on August 4, 2025, which granted the motions for summary judgment filed by CESA 7 and DPI dismissing all of Spengler's claims. [Dkt. 135.] Final judgment was entered that same day. [Dkt. 136.]

## STANDARD OF REVIEW

This Court reviews a district court's decision on cross motions for summary judgment *de novo*, and construes facts in favor of the party "against whom the motion under review was made." *Frazier-Hill v. Chicago Transit*

24

*Auth.*, 75 F.4th 797, 801 (7th Cir. 2023) (citation omitted). The Court may affirm a summary judgment decision "on any ground that is supported in the record and adequately presented in the trial court." *Ross v. Fin. Asset Mgmt. Sys., Inc.*, 74 F.4th 429, 433 (7th Cir. 2023) (citation omitted). The Court should not consider new arguments on appeal. *Liberles v. Cook County*, 709 F.2d 1122, 1126 (7th Cir. 1983) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.") (citations omitted).

## SUMMARY OF THE ARGUMENT

The District Court's decision, which dismissed all of Spengler's claims (including, pertinent to this appeal, her Title VII racial discrimination claim, Title VII retaliation claim, and Equal Protection Claim) and concluded that she failed to plead a First Amendment claim premised upon what she believed and refused to believe, should be affirmed.

First, Spengler is not permitted to raise new arguments in this appeal. As

25

it pertains to her Title VII racial discrimination claim against CESA 7, Spengler is now attempting to advance an entirely new argument and new theory that was not presented to the District Court when she sought to withstand CESA 7's summary judgment motion. As it pertains to the dismissal of her First Amendment claim premised upon what she believed and refused to believe, Spengler is now attempting to advance her argument by citing to evidence that was not presented to the District Court, which is not permitted.

Second, Spengler has not established prima facie claims of racial discrimination, retaliation, or violations of the Equal Protection Clause for which she is claiming summary judgment was improperly granted to CESA 7. In her appeal, Spengler focuses on certain aspects of her arguments that she believes the District Court misunderstood or got wrong, but she did not address CESA 7's primary argument to the District Court: that Spengler cannot establish prima facie claims. Because this Court may affirm the dismissal on any basis previously presented to the District Court, and because CESA 7 presented numerous arguments in support of the motion, Spengler's failure

26

to explain how she believes she can establish prima facie cases[3] should be dispositive. *Ross*, 74 F. 4th at 433 (citation omitted).

For these reasons, as set forth herein, this Court should affirm the decision of the District Court.

## ARGUMENT

**I.     Spengler is not permitted to raise new arguments on appeal.**

> **a.     Spengler's three-part theory of racial discrimination was not raised in opposition to CESA 7's motion to summary judgment and should not be considered on appeal.**

This Court should summarily disregard and reject Spengler's new argument on appeal regarding her racial discrimination claim against CESA 7 because it was never presented to the District Court. [*See* Doc. 19, pp. 17-37.] It is well-established that by "failing to bring an argument to the district court," an appellant "waive[s] that argument on appeal." *Soo Line R.R. Co. v. Consol. Rail Corp.*, 965 F.3d 596, 601 (7th Cir. 2020) (internal quotation marks omitted; quoting *Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018)). Even though this Court's review is *de novo*, "parties cannot conjure

---

[3] Spengler cannot rectify this in her reply brief; she waived the arguments not set forth in her initial appellate brief. *Help At Home Inc. v. Med. Cap., L.L.C.*, 260 F.3d 748, 753 n.2 (7th Cir. 2001).

up brand new legal theories on appeal….” *Wheeler*, 891 F.3d at 1073. The appellant must have “present[ed] the specific argument urged on appeal” to the lower court in order to present it on appeal. *Soo Line R.R.,* 965 F.3d at 601.

In its motion for summary judgment, CESA 7 argued that Spengler could not establish a prima facie Title VII race discrimination claim and there was no merit to her argument that she suffered adverse employment actions because she was white. [Dkt. 99, pp. 4-9.] CESA 7 primarily relied upon the *McDonnell Douglas* framework to emphasize the baselessness of Spengler's claim, but fundamentally argued that Spengler simply had no evidence from which a reasonable jury could conclude that she suffered the two adverse employment actions at issue (non-renewal of her Integration Direction position and CESA 7's refusal to offer an interview for the Director of Special Education position[4]) because she was white [Dkt. 99, pp. 5-8.] CESA 7 also

---

[4] Spengler applied for the Director of Special Education position with CESA 7 on August 17, 2022. [Dkt. 82, ¶ 3.] However, applicants had been selected for interviews on August 10, 2022; no one reviewed the applicant portal thereafter until Spengler filed the present lawsuit in October 20222 and alleged therein that she had applied for the position. [Dkt. 82, ¶ 3.] Appropriately, Spengler does not argue in her appeal that the failure to offer her an interview was an adverse employment action. [*See* Doc. 19.] Accordingly, she has waived the argument. *See O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009).

argued there were legitimate, non-discriminatory reasons for the two adverse employment actions. [Dkt. 99, pp. 7-8.]

In response to CESA 7's motion for summary judgment, Spengler argued that (1) CESA 7 failed to protect Spengler from "DPI's unlawful race discrimination, harassment and retaliation,"[5] and (2) "CESA 7 engaged in its own acts of discrimination, harassment and retaliation." [Dkt. 113, p. 2.] The specifics of her second argument were limited; she argued (against CESA 7's *McDonnell Douglas* argument) that there were fishy circumstances present,[6] that she was meeting her employer's legitimate expectations, and that her lack of comparator was irrelevant. [Dkt. 113, pp. 20-23.] She presented no evidence from which a reasonable jury could conclude that CESA 7 took adverse employment actions because of her race and, notably, she made absolutely no arguments akin to what is being presented here on appeal.[7]

---

[5] Spengler has since waived this argument because she has not raised it on appeal. *O'Neal*, 588 F.3d at 409.

[6] The parties' summary judgment briefing took place prior to the Supreme Court issuing its decision in *Ames v. Ohio Department of Youth Services*, 605 U.S. 303, 145 S. Ct. 1540, 221 L. Ed. 2d 929 (2025).

[7] CESA 7 understands Spengler's new convoluted race discrimination argument to be: (1) DPI believes all White people (and only White people) have racial bias and are responsible for racial inequity; (2) DPI and CESA 7 demanded that Spengler affirmatively agree with these propositions in order to keep her position, which made Spengler's beliefs about race a condition of her employment; and (3) the demand by DPI and CESA 7 was equivalent

Spengler's new, contrived argument should be summarily disregarded because she never presented this argument to the District Court in support of her claim that CESA 7 discriminated against her on the basis of race. Spengler has not offered a "persuasive reason to address [her] new argument[s]" – in fact, she offered no argument whatsoever to attempt to justify her attempt to raise this new argument on appeal. *Soo Line R.R. Co.*, 965 F.3d at 601. While an appellate court "*may* address an issue that was forfeited in the district court" that "is not to say that it *must*." *Id.* (emphasis in original). This Court has recognized that it has forgiven waiver of legal issues "sparingly" and only in "rare instances" – but it should not do so here when the waiver was obvious and Spengler made no argument or explanation to justify her new argument. *Id.* For these reasons, Spengler's new racial discrimination argument should be rejected.

> **b. Spengler's argument that she pled a First Amendment claim based upon what she believed and refused to believe against CESA 7 must be limited to what she presented to the District Court.**

---

to demanding that Spengler personally confess to racial bias and culpability for racial inequity, that demand was not made to people of any other race, so it violated Title VII. [*See* Doc. 10, p. 10.] Notwithstanding the baselessness of her argument, this was not argued in Spengler's brief in opposition to CESA 7's motion for summary judgment. [*See* Dkt. 113.]

The District Court appropriately considered – and rejected – Spengler's argument that she purportedly raised additional First Amendment Claims against CESA 7. While Spengler may certainly challenge that ruling on appeal, she may not present new evidence or information in support of her arguments. Her argument on appeal must be limited to the information she cited at the District Court.

Spengler filed her original Complaint in October 2022, her Amended Complaint in March 2023, and she was granted leave to file her Second Amended Complaint in September 2023. [Dkt. 1; 18; 32.] Spengler's Second Amended Complaint was the first pleading to assert a First Amendment claim against CESA 7. [*See* Dkt. 1; 18; 32.] Her Second Amended Complaint explicitly alleged that CESA 7 violated Spengler's right to speak and refrain from speaking. [Dkt. 33, ¶ 60.r.]

When CESA 7 sought to dismiss her First Amendment claims at summary judgment, CESA 7 argued that Spengler could not establish a First Amendment retaliation claim because certain instances of alleged speech were not protected by the First Amendment and because CESA 7 did not retaliate against Spengler. [*See* Dkt. 99, pp. 33-46.] CESA 7 also argued that

31

Spengler could not maintain a First Amendment compelled speech claim because she never made any compelled speech, because the speech would not have been subject to First Amendment protections, and because she lacked standing. [*See* Dkt. 99, pp. 46-51.]

In response to the motion, Spengler argued that CESA 7 only addressed two of the "five categories of First Amendment claims" and that CESA 7 also violated her First Amendment rights by retaliating against Spengler because of her political beliefs, because of what she believed, and because of what she declined to believe. [Dkt. 113, p. 38.] In support of her assertion that these three additional claims were made, Spengler argued to the District Court that four paragraphs in her Second Amended Complaint identified her three additional claims: ¶¶ 37.h., 41.b., 57.b., and 60.r. [Dkt. 113, p. 38.] However, those paragraphs did not support her position; in those paragraphs, Spengler alleged that CESA 7 violated Spengler's First Amendment rights "to speak and to refrain from speaking," [Dkt. 33, ¶ 37.h.], "to speak and to refrain from speaking," [Dkt. 33, ¶ 41.b.], "to speak, and her right to refrain from engaging in speech" [Dkt. 33, ¶ 60.r.], and her right to equal protection under the law [Dkt. 33, ¶ 57.b.]. The District Court then

correctly noted in its decision that the "allegations do not provide CESA 7 with notice of Plaintiff's claim that it retaliated against her because of her political beliefs, what she believed, and what she declined to believe. Because Plaintiff did not assert these claims in her complaint, the court will not consider them." [Dkt. 135, p. 37.]

Perhaps acknowledging that the paragraphs she presented in her argument to the District Court were completely unhelpful, Spengler now cites to five paragraphs from her Second Amended Complaint – three of which she never previously identified – to support her argument: ¶¶ 37.b. (new), 37.e. (new), 37.g. (new), 37.h., and 41.b. [Doc. 19, p. 59.] She also now cites to her discovery responses to present additional "evidence" that was not previously presented to the District Court. [Doc. 19, p. 60.]

While Spengler is certainly entitled to argue[8] to this Court that she asserted a First Amendment claim based upon what she believed and refused to believe,[9] the evidence in support of her argument should be confined to what was presented to the District Court. *See Packer v. Trs. of Ind. Univ. Sch.*

---

[8] CESA 7 will address the substance of her argument in Section V, *infra*.

[9] Spengler does not argue on appeal that she brought a First Amendment claim based upon her political beliefs. As such, she has waived that argument. *O'Neal*, 588 F.3d at 409.

33

*of Med.*, 800 F.3d 843, 848-49 (7th Cir. 2015) ("[O]ur task, in reviewing the district court's decision to grant summary judgment in favor of the University, is to consider the reasons for that court's decision and in turn what was argued and presented to the district court by the parties. … We will not consider factual arguments that were not raised below nor shall we consider evidence that was not properly cited to the court below.").

## II. Spengler cannot establish a prima facie Title VII racial discrimination claim against CESA 7.

Notwithstanding the impropriety of Spengler's new argument[10] regarding her Title VII race discrimination claim, Spengler's claim was properly dismissed because it lacks merit. Spengler lacks any evidence that would

---

[10] In accordance with the Practitioner's Handbook for Appeals to the United State Court of Appeal for the Seventh Circuit, p. 159, CESA 7 incorporates by reference and adopts as if fully stated herein reference the entirety of Argument Section I of DPI's response brief in opposition to Spengler's new argument (Section VIII(D)(1)). In addition to the argument therein, it is important to note that Spengler's new argument repeatedly references things the "Defendants" purportedly did, but she cited no evidence in support of her argument as to CESA 7 specifically. For example, her "second" and "third components" argued that "*Defendants* demanded that Plaintiff agree with DPI on matters of race" and "personally accept and believe" certain things. [Doc. 19, p. 18 (emphasis added).] The evidence cited in support of her position was about DPI – there was no evidence cited to suggest CESA 7 made any demand that Spengler personally believe any of the information she was being trained on. [Doc. 19, pp. 23-27.] Accordingly, to the extent the Court even considers her new argument, it lacks not only a legal basis, but also a factual basis to support a claim against CESA 7.

34

suggest CESA 7 took an adverse employment action against Spengler because of her race.[11] Accordingly, this Court should affirm the dismissal.

"Title VII protects people of all races, including white people, from race discrimination." *Runkel v. City of Springfield*, 51 F.4th 736, 742–43 (7th Cir. 2022) (citation omitted). The legal standard for Title VII claims "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence process the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* To maintain a claim under the antidiscrimination provision of Title VII, a plaintiff must prove that their protected class status was, at the very least, a motivating factor in the employer's decision to take an adverse employment action. *Runkel*, 51 F.4th at 743.

---

[11] Spengler did not make a race discrimination claim outside of her new, three-part theory. [Doc. 19.]

An act must impact the terms and conditions of employment in order to constitute an adverse action under Title VII. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354, 144 S. Ct. 967, 218 L. Ed. 2d 322 (2024). The act must leave an employee "worse off with respect to the terms and conditions of [their] employment" in order to be actionable. *Phillips v. Baxter*, No. 23-1740, 2024 WL 1795859, at *3 (7th Cir. Apr. 25, 2024) (internal quotation marks omitted; citing *Muldrow*, *supra*). Courts have limited findings of adverse employment actions to things like "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). An adverse employment action is a required element of a Title VII claim. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

Spengler has presented no argument (other than her new theory about personal beliefs on race) that CESA 7 did not offer her a new contract for the Integration Director after May 2022 because of her race.[12] Indeed, the

---

[12] Spengler also, notably, does not explicitly identify an adverse employment action. However, CESA 7 will assume this action is the adverse employment action she premises her claim upon.

evidence demonstrates that CESA 7 did not offer Spengler another contract because it would lose funding for her position. (And the employee who accepted the role after Spengler was white. [Dkt. 97, ¶ 31.]) CESA 7 was under the impression, after repeated discussions with DPI, that DPI would not fund Spengler in the RPIC/RSN role because of concerns regarding how Spengler was fulfilling the terms of the contract and complaints regarding Spengler's behavior. CESA 7 needed the DPI funding for the RSN and RPIC roles, and services by CESA 7 would lapse if funding was pulled.

When DPI first approached Dickert regarding DPI's concerns about Spengler in October 2021, Dickert believed that he could work with Spengler and DPI to come to a mutual agreement to allow Spengler to continue in her position as RSN and RPIC, and he continued to be of the belief that he could work out the conflict between the parties to the benefit of CESA 7 until after the May 3, 2022 meeting when he completely understood that CESA 7 would not receive funding if Spengler continued in her role as RSN and RPIC, and that Spengler would not be able to attend the DPI trainings if she continued in her role as RSN and RPIC. [Dkt. 84, ¶ 56.] After attending the May 3, 2022 meeting, Dickert realized and recognized that CESA 7 could not

37

put Spengler in the RSN and RPIC roles unless CESA 7 was prepared to lose tens of thousands of dollars in funding and was prepared to forego all training of the RSN and RPIC coach (which, in effect, meant the school districts would not be receiving the same information that all other school districts would be receiving from DPI). [Dkt. 84, ¶ 56.]

CESA 7's decision not to put Spengler in the RSN and RPIC roles for the 2022-2023 school year was premised entirely on funding and training concerns and was made after meeting with DPI on May 3, 2022.[13] [Dkt. 84, ¶ 56.] Opting not to renew an employment contract for an employee whose reported behavior and work performance[14] threatened the employer's funding is a legitimate reason for nonrenewal (and is why Spengler's contract for Integration Director was not renewed).

---

[13] DPI had the right to terminate the Integrated Contracts if DPI felt CESA 7 was not fulfilling the terms of the agreements or meeting deliverables. [Dkt. 84-4 (CESA000070); Dkt. 84-5 (CESA000095).] Accordingly, DPI held substantial influence over CESA 7's decision regarding who to place in the RSN and RPIC roles, and CESA 7's understanding regarding funding and fears of the contract being terminated was well-founded.

[14] Spengler has argued that DPI's accusations about Spengler's behavior were false. [*See* Doc. 19, p. 51.] However, she has never argued nor presented evidence that CESA 7 knew DPI's accusations were false [*see* Doc. 19], and CESA 7 reasonably relied upon the concerns presented by DPI.

38

The evidence simply does not support Spengler's Title VII race discrimination claim and the District Court properly dismissed it.

### III. Spengler cannot establish a Title VII retaliation claim against CESA 7.

Title VII retaliation claims require evidence of three elements: (1) the plaintiff engaged in "protected activity"; (2) the plaintiff suffered an adverse employment action; and (3) "a causal connection between the protected activity and the adverse employment actions." *Miller v. Polaris Lab'ys, LLC*, 797 F.3d 486, 492 (7th Cir. 2015) (quotation marks and citation omitted). A plaintiff must demonstrate "'but-for causation' between the protected activity and the retaliation" which means they must establish that the "adverse action would not have happened without the activity." *Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 355 (7th Cir. 2023) (emphasis removed; citation omitted).

### a. Spengler did not engage in protected activity.

Protected activities include "(1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir.

39

2013) (citation omitted). "Vague and obscure 'complaints' do not constitute protected activity." *Id.* (citing *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 850–51 (7th Cir. 2008)). The complaint must "indicate the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

In order to establish that a plaintiff engaged in a protected activity by "opposing an unlawful employment practice," the plaintiff must "not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (quoting *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019)).

"The objective reasonableness of the [plaintiff's] belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited

40

by the statute. That determination requires [the court] to ask whether the complained-of conduct entailed a motive that Title VII prohibits." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (internal citation omitted; internal quotation marks omitted). Prohibited conduct only includes "discrimination by employers against employees." *Logan*, 4 F.4th at 538. Accordingly, unless the plaintiff can establish that they opposed employer discrimination against employees, this element will not be satisfied. *Id.* at 538-39.

On appeal, Spengler enumerated 19[15] examples of purportedly protected activity to support her retaliation claim. [Doc. 19, pp. 39-44 (Examples A through S).] CESA 7 will address each in turn:

- Example A (Deposition testimony): Spengler's deposition took place after the alleged adverse action at issue (the non-renewal of her Integration

---

[15] In the District Court proceedings, Spengler identified 46 instances of allegedly protected conduct in discovery. [*See* Dkt. 85-26 (Second Amended Exhibit 5), pp. 9-20.] By only relying on 19 instances of allegedly protected conduct on appeal, she had waived her argument that any remaining alleged instances constituted protected activities by failing to develop an argument premised on other instances. *United States v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004) ("But he fails to develop the argument, so it is waived.")

41

Director contract), so there can be no but-for causation as to an adverse employment action.[16] *Hunt v. DaVita, Inc.*, 680 F.3d 775, 779 (7th Cir. 2012) ("But logic dictates that any inference of retaliatory intent must be based on the alleged retaliator's knowledge of the action allegedly retaliated for."). Additionally, her deposition testimony was never raised in the District Court as allegedly protected activity, so Spengler cannot rely upon it on appeal. [*See* Dkt. 85-26 (Second Amended Exhibit 5), pp. 9-20.] *See Packer*, 800 F.3d at 848-49.

- Example B (June 17, 2021): Dickert did not learn about Spengler's June 17, 2021 speech until after this lawsuit was filed. [Dkt. 84, ¶ 48.] Accordingly, there is no but-for causation as to an adverse employment action. *Hunt*, 680 F.3d at 779.

Example C (August 11, 2021): Dickert learned about Spengler's August 11, 2021 speech in October 2021, but did not perceive her statements to be complaints about illegal employment activities. [Dkt. 84, ¶ 50.] Indeed, on their face, Spengler's cited statements make no reference to employment

---

[16] CESA 7 will address Spengler's dispositive failure to identify an adverse employment action in the following subsection.

actions at all. Her comments are not protected because they are objectively unrelated to an illegal employment practice. *Tomanovich*, 457 F.3d at 663.

- Example D (September 8, 2021): Dickert did not learn about Spengler's September 8, 2021 speech until after this lawsuit was filed. [Dkt. 84, ¶ 51.] Accordingly, there is no but-for causation as to an adverse employment action. *Hunt*, 680 F.3d at 779.

- Example E (September 15, 2021): Dickert did not learn about Spengler's September 15, 2021 verbal speech until after this lawsuit was filed. [Dkt. 84, ¶ 52.] Accordingly, there is no but-for causation as to an adverse employment action. *Hunt*, 680 F.3d at 779.

- Examples F & G (September 15, 2021 chat): Dickert did not perceive her statements to be complaints about illegal employment activities. [Dkt. 84, ¶ 52.] Indeed, on their face, Spengler's cited statements make no reference to employment actions at all. Her comments are not protected because they are objectively unrelated to an illegal employment practice. *Tomanovich*, 457 F.3d at 663.

- Example H (September 16, 2021): Dickert did not learn about Spengler's September 16, 2021 speech until after this lawsuit was filed. [Dkt. 84, ¶

43

53.] Accordingly, there is no but-for causation as to an adverse employment action. *Hunt*, 680 F.3d at 779.

- Example I (September 20, 2021 meeting and email): As to the alleged conduct at a meeting, this was never raised in the District Court as allegedly protected activity, so Spengler cannot rely upon it on appeal. [*See* Dkt. 85-26 (Second Amended Exhibit 5), pp. 9-20.] *See Packer*, 800 F.3d at 848-49. Further, Spengler's declaration paragraph pertaining to this meeting is a sham declaration statement because she was explicitly asked at her deposition to relay what was discussed during the meeting, and the information in her declaration was not identified. [Dkt. 58, pp. 16-17 (59:12-61:11).] *See Craig v. Wrought Washer Mfg., Inc.*, 108 F.4th 537, 543 (7th Cir. 2024). Regardless, Spengler's purported statements in the meeting make no reference to employment actions at all, so they would not be protected because they are objectively unrelated to an illegal employment practice. *Tomanovich*, 457 F.3d at 663. As to Spengler's statements in her email, Dickert understood that Spengler was raising disagreement with some of DPI's messaging because she did not believe that it would be well-received by the school districts within the CESA 7 region, but Dickert did not perceive Spengler's

44

email as Spengler making complaints about any illegal employment prac-
tices. [Dkt. 84, ¶ 9.] Her comments in the email are not protected because
they are objectively unrelated to an illegal employment practice. *Toma-
novich*, 457 F.3d at 663.

- Example J (September 20, 2021 email): Spengler did not send this
email. [Dkt. 65-5.] Accordingly, she did not engage in any activity, let alone
protected activity.

- Example K (September 21, 2021): Spengler was not a participant in
this meeting. [Dkt. 64-6.] Accordingly, she did not engage in any activity, let
alone protected activity.

- Example L (October 5, 2021): Spengler did not send this email. [Dkt.
65-11.] Accordingly, she did not engage in any activity, let alone protected
activity.

- Example M (October 11, 2021): Spengler was not a participant in this
meeting. [Dkt. 64-14.] Accordingly, she did not engage in any activity, let
alone protected activity.

- Example N (February 23, 2022): The statements cited by Spengler in
her brief are statements made by *Dickert*. [Dkt. 110-1, pp. 1, 3.] Spengler did

45

not identify any activity that she engaged in on this date, and it should not be considered.

- Example O (February 24, 2022): Spengler did not send this email. [Dkt. 64-22.] Accordingly, she did not engage in any activity, let alone protected activity.[17]

- Example P (Discovery Responses): Spengler's discovery responses were provided after the alleged adverse action at issue (the non-renewal of her Integration Director contract), so there can be no but-for causation as to an adverse employment action. [Dkt. 59, p. 1 (May 21, 2024).] *Hunt*, 680 F.3d at 779. Additionally, her discovery responses were never identified in the District Court as allegedly protected activity, so Spengler cannot rely upon it on appeal. [*See* Dkt. 85-26 (Second Amended Exhibit 5), pp. 9-20.] *See Packer*, 800 F.3d at 848-49.

---

[17] Spengler also cited to DPI's responses to Spengler's written discovery requests, but DPI's responses do not identify any action by Spengler that would amount to anything that even remotely resembles protective activity. [Doc. 19, p. 43 (Example O, citing ECF 83-1, pp. 16-17, 30.).]

- Example Q (March 9, 2022 email): Spengler did not send this email. [Dkt. 64-23, p. 2.] Accordingly, she did not engage in any activity, let alone protected activity.

Example R (March 19, 2022 email): Spengler's email said that she believed "DPI has discriminated against [her] for [her] political views and for questioning the work around white privilege, etc." [Dkt. 84-24.] This is objectively not discrimination prohibited by Title VII, so it is not a protected activity. *Tomanovich*, 457 F.3d at 663. Further, the five-page attachment does not identify any complaints of employment discrimination based upon sex, race, national origin, or other protected class. [Dkt. 84-25.] Rather, it discusses Spengler's discomfort with discussing topics like privilege, race, and racial injustice and her fear of being – she perceived – the sole person in the group with politically conservative beliefs. [*See* Dkt. 84-25, p. 2.] This is not a protected activity because she is not opposing an unlawful employment practice. *See Northington*, 712 F.3d at 1065; *Tomanovich*, 457 F.3d at 663.

- Example S (May 12, 2022 email): While this email from Spengler does complain of race discrimination, Spengler's belief that she was complaining about an illegal employment practice prohibited by Title VII is objectively

47

unreasonable. Spengler believed that the "racial discrimination in the workplace" that she opposed was "the "left turn that we took us away from our focus from special education to a now very race-heavy sort of social justice focus, a race – race was at the center of those discussions, race became the vehicle with which we, you know, talked about our role as coaches, our role as RNS. And it wasn't just race, it was as white people, our position within that role. So as a white person as related to a black person, you know we – well, and I think the CCPP also then outlines very clearly in some of its definitions about white supremacy and whiteness and white being a dominant culture. So those certainly were examples where [she] did that. Those would be the opportunities [she] had to oppose that within those discussions related to some of those tools that we were presented with." [Dkt. 58, pp. 40-41 (156:10-157:4).] Her explanation demonstrates that she was not complaining of actual objectionable conduct under Title VII, so it is not protected activity. *Tomanovich*, 457 F.3d at 663. Notwithstanding the fact that her conduct was not a protected activity, she has not identified an adverse employment action for which this was purportedly the but-for cause. Accordingly, her claim fails, regardless.

48

In summary, only Example S could even plausibly constitute protected activity, but as shown herein, Spengler's claim of discrimination was objectively unreasonable and therefore it was not protected.

### b. Spengler did not identify an adverse employment action nor establish (or even argue) but-for causation.

Notwithstanding the fact that Spengler did not establish that she engaged in protected activity, Spengler's Title VII retaliation claim fails as a matter of law because she did not identify an adverse employment action nor articulate (or even argue) but-for causation between any specific protected activity and an adverse employment action. [*See* Doc. 19.] Rather, Spengler simply declares that "Defendants took adverse action against Plaintiff because she opposed Defendants' unlawful insistence that she agree with DPI's racially discriminatory beliefs about race." [Doc. 19, p. 44.] Spengler does not identify an adverse action that CESA 7 purportedly took nor explain how any instance of protected activity was the but-for cause of the action. Her failure to do so is dispositive of her claim. *Xiong*, 62 F.4th at 355 (but-for causation required to establish a Title VII retaliation claim).

49

Of the "examples" enumerated on pages 45 through 49, only Example P identifies an action purportedly taken by CESA 7: "CESA 7 removes Plaintiff from Integration Director role…." [Doc. 19, pp. 45-49.] The remaining enumerated events do not involve CESA 7 at all (e.g., Example A-C) or do not identify any action taken by CESA 7 (e.g., Example D-F).[18] The evidence Spengler cited, however, does not actually support her accusation. Document 64-59 is handwritten notes from Dickert (which does not say anything about removing Spengler from her position) and Document 58 is Spengler's deposition transcript (and the cited pages do not reference being removed from her position). Indeed, Spengler has not presented any actual evidence that CESA 7 "remove[d] Plaintiff from Integration Director role."

---

[18] Example Q is duplicative of Example P in that it alleges "CESA 7 would not allow Plaintiff to keep her job as integration director." [Doc. 19, p. 49.] Example Q relies upon Document 58 (which is discussed as part of the argument against Example P) and Document 85-12 (which is Spengler's own discovery responses; pages 4-6 and 18-22 of her discovery responses then cite to other interrogatory responses as well as a summary chart created by Spengler with further assertions and evidentiary citations therein). Her citation to Document 58 is inapposite for the reasons noted above, and her citation to the eight pages within Document 85-12 is deficient because Spengler does not identify evidence with specificity to support her contention. This Court (and the Appellees) should not have to scour her sprawling, cross-referencing discovery responses (which then require further cross-references to underlying documents) to understand her argument. *See Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995) ("It is not [appellate court's] task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with *reasonable particularity* the evidence that precludes summary judgment." (emphasis added)).

Even if Spengler could factually support her proposition, and if the Court were to overlook her failure to argue that the non-renewal constituted an adverse action, Spengler's claim still fails as a matter of law because she failed to establish (or even argue) but-for causation between protected activity and the adverse action.[19] [*See* Doc. 19.] Accordingly, her retaliation claim fails as a matter of law, and the dismissal should be affirmed.

c. **The Court need not even evaluate claims of pretext because Spengler cannot establish a prima facie claim; nevertheless, CESA 7 did not make any false claims about Spengler's performance.**

Spengler failed to establish a prima facie case of retaliation, so there should be no need to evaluate her allegations of pretext. *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006). Her dispositive failure aside, Spengler's accusations regarding CESA 7's actions are untrue.

Spengler claimed that CESA 7 "argued that [it] took the adverse actions[20] at issue because Plaintiff's job performance was poor" and that CESA 7's reasons are "demonstrably false and pretextual." [Doc. 19, pp. 50-51.] In support of her position, Spengler only cited to pages 7 and 8 of CESA 7's

---

[19] *See* Footnote 3.
[20] Again, Spengler does not identify what those adverse actions are.

51

Memorandum of Law in Support of Motion for Summary Judgment. On those specific pages, CESA 7 recounted how it had received reports of Spengler's disruptive behavior from DPI and how Spengler's supervisor at CESA 7, Dickert, was personally concerned with Spengler's documented use of certain language during DPI trainings. [Dkt. 99, pp. 7-8.] Spengler has set forth no evidence to suggest that Dickert was lying about the reports he received, that he knew he was receiving false or misleading reports about Spengler's behavior, or that Dickert's own concerns about Spengler's language were false – because there is no such evidence. It is undisputed that there were concerns about Spengler's performance raised to CESA 7 and that CESA 7 held its own concerns about her behavior. So, Spengler's assertion that CESA 7 made "false claims" is not supported.[21]

---

[21] Notably, Spengler did not raise the issue of pretext in opposition to CESA 7's motion for summary judgment at the District Court level. [*See* Dkt. 113.] She did argue, in opposition to CESA 7's argument that she could not establish a disparate treatment claim, that she was meeting CESA 7's legitimate expectations because she had "glowing performance reviews" and "a special raise" but that was the extent of her position. [Dkt. 113, pp. 22-23.] However, she never argued pretext (or anything about her job performance) with respect to her retaliation claim.

## IV. The District Court correctly dismissed Spengler's Equal Protection Claim.

"[T]he same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection." *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003). "An employee may prove a prima facie equal protection violation using the same indirect, burden shifting method used for Title VII claims." *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 926 (7th Cir. 2007).

Spengler's Equal Protection claim was appropriately dismissed because, like Spengler's Title VII claim, she cannot establish that she was treated differently because of her race.

## V. Spengler did not plead a First Amendment claim premised on her beliefs or refusal to believe.

Despite Spengler amending her Complaint twice, Spengler never brought a First Amendment claim premised on what she believed or refused to believe. Rather, she explicitly alleged that CESA 7 violated her right to speak and refrain from speaking. [Dkt. 33, ¶¶ 37.h., 41.b., 57.b., and 60.r.]

Despite her clear allegations in her Second Amended Complaint, Spengler argued in opposition to CESA 7's motion for summary judgment that CESA 7 also violated her First Amendment rights by retaliating against her

53

because of "her political beliefs," "what she believed," and "what she declined to believe." [Dkt. 113, p. 38.] In support of her assertion, Spengler cited four paragraphs of her Second Amended Complaint: 37.h., 41.b., 57.b., and 60.r. [*Id.*] Those four paragraphs unequivocally stated that CESA 7 violated Spengler's First Amendment rights "to speak and to refrain from speaking," [Dkt. 33, ¶ 37.h.], "to speak and to refrain from speaking," [Dkt. 33, ¶ 41.b.], "to speak, and her right to refrain from engaging in speech" [Dkt. 33, ¶ 60.r.], and her right to equal protection under the law [Dkt. 33, ¶ 57.b.]. Because Spengler explicitly alleged CESA 7 violated her First Amendment rights because of what she said and declined to say and did not allege that her First Amendment rights were violated in any other regard, the District Court correctly concluded that Spengler did not assert any other First Amendment claims.

Now on appeal, Spengler points to additional paragraphs in her Second Amended Complaint as well as discovery responses to support her argument that she brought these additional First Amendment claims. Her argument still fails because the newly cited paragraphs from her Second Amended Complaint do not state First Amendment claims premised upon

54

her beliefs and refusal to believe, and her citations to her discovery responses are inapposite because information presented in discovery does not equate to notice of a new legal claim. *Colbert v. City of Chicago*, 851 F.3d 649, 656-57 (7th Cir. 2017) (citing *Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013)).

In order to state a First Amendment retaliation claim, a plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the [d]efendants' decision to take the retaliatory action." *Bridges v. Gilbert,* 557 F.3d 541, 546 (7th Cir. 2009). In the paragraphs cited by Spengler in her appellate argument, she notably never alleges that either her beliefs or refusal to believe were protected by the First Amendment. [*See* Doc. 19, p. 59 (citing Dkt. 33, ¶¶ 37.b., 37.e., 37.g., 37.h., 41.b.] Accordingly, she fundamentally failed to state such a claim.

Further, given the specificity with which Spengler summarized her claims in her Second Amended Complaint (*see, e.g.*, Dkt. 33, pp. 21-24 ("The

55

Claims")) and the specificity with which Spengler asserted her First Amendment claim (Dkt. 33, p. 23, ¶ r ("While acting under color of state law, CESA 7 subjected Plaintiff to a deprivation of her rights, privileges and immunities secured by federal law and the U.S. Constitution, including - but not limited to – Plaintiff's rights to equal protection under the law, her right to speak, and her right to refrain from engaging in speech. …")), it is apparent that Spengler was merely trying to shoe-horn additional claims at the eleventh hour.

Spengler's Second Amended Complaint did not provide sufficient notice to CESA 7 that Spengler intended to assert First Amendment claims premised on what she believed and refused to believe. Errant references to Spengler's beliefs in her sprawling 26-page Second Amended Complaint – not associated with her First Amendment Claims – would not have alerted any reasonable litigant of such a claim. Spengler could have amended her pleadings to include such a claim but did not do so.[22] CESA 7 is entitled to notice of the claims against it, and burying a claim within wayward references in

---

[22] Indeed, she could have asked the District Court to amend during summary judgment briefing, but did not do so. *See Schmees v. HC1.COM, Inc.,* 77 F.4th 483, 490 (7th Cir. 2023).

56

a lengthy amended pleading is not fair notice. *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023). Simply put, Spengler never asserted that her beliefs and refusal to believe were protected by the First Amendment. Therefore, the District Court correctly concluded – and this Court should affirm – that Spengler did not plead First Amendment claims premised on her beliefs and refusal to believe.

## CONCLUSION

For the reasons set forth herein, this Court should affirm the District Court's August 4, 2025 opinion and order which granted CESA 7's motion for summary judgment.

Dated at Madison, Wisconsin this 27th day of January, 2026.

AXLEY LLP

*/s/ Danielle Baudhuin Tierney*
Lori M. Lubinsky, State Bar No. 1027575
Danielle Baudhuin Tierney, State Bar No. 1096371
Attorneys for Defendant-Appellee CESA 7
2 East Mifflin Street, Suite 200
Post Office Box 1767
Madison, WI 53701-1767
Telephone: (608) 257-5661
Facsimile: (608) 257-5444
Email: llubinsky@axley.com
Email: dtierney@axley.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,167 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Font Size 13 Book Antiqua.

/s/ *Danielle Baudhuin Tierney*
Danielle Baudhuin Tierney

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2026 I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Plaintiff-Appellant Becky Spengler and Defendant-Appellee Wisconsin Department of Public Instruction are both registered CM/ECF users and will be served by the appellate CM/ECF system through counsel of record.

/s/ *Danielle Baudhuin Tierney*
Danielle Baudhuin Tierney
