**No. 25-2532**

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

BECKY SPENGLER,

     Plaintiff-Appellant

v.

COOPERATIVE EDUCATIONAL SERVICE AGENCY 7, also
known as CESA 7, et al.,

     Defendants-Appellees.

_____

**Appeal From The Eastern District of Wisconsin
District Court Case No. 22-CV-1199
The Honorable William C. Griesbach, Presiding**

_____

**REPLY BRIEF OF PLAINTIFF-APPELLANT
BECKY SPENGLER**

_____

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY S.C.
Ross W. Townsend
George Burnett
Attorneys for Plaintiff-Appellant

POST OFFICE ADDRESS:
231 South Adams Street
P.O. Box 23200
Green Bay, WI 54305-3200
(920) 437-0476
State Bar No. 1011622
E-mail: rwt@lcojlaw.com

- 1 -

## I.  TABLE OF CONTENTS

I.  TABLE OF CONTENTS ...................................................................................................2

II.  TABLE OF AUTHORITIES ........................................................................................4

III.  ARGUMENT..................................................................................................................5

   A.  Introduction................................................................................................................5

   B.  Analysis......................................................................................................................6

      1.  The District Court erroneously granted Defendants' motions for summary judgment on Spengler's race discrimination claim. ......................................................6

         a.  Spengler raised her race discrimination claim in the District Court......................6

         b.  DPI was Spengler's indirect employer. ................................................................6

         c.  Spengler suffered actionable harm. ....................................................................11

         d.  Spengler's race discrimination claim is not based on her disagreement with DPI's beliefs. ....................................................................................................13

         e.  Spengler adequately supported all three components of her race discrimination claim....................................................................................................14

            (i).  The evidence supports the first component of Spengler's race discrimination claim. ..................................................................................14

            (ii).  The evidence supports the second component of Spengler's race discrimination claim. ..................................................................................16

            (iii).  The evidence supports the third component of Spengler's race discrimination claim. ..................................................................................17

      2.  The District Court erroneously granted Defendants' motions for summary judgment on Spengler's retaliation claim. ................................................................19

         a.  Spengler's opposition to Defendants' conduct was "protected" by Title VII.......19

            (i)  Subjective Belief. ..............................................................................19

            (ii)  Objectively Reasonable. .....................................................................20

          b.  Spengler has provided proof of causation...........................................................26

            (i)  CESA 7's argument that Spengler has failed to show causation is meritless. ....................................................................................................26

            (ii)  Defendants' arguments regarding the timing of Spengler's opposition are meritless. ...................................................................................................27

3.  The District Court erroneously failed to consider the proper impact of evidence that Defendants provided false and pretextual reasons for the adverse actions taken against Spengler. ...................................................................................30

    a.  Proving up a prima facie case is not a precondition to a pretext analysis.............30

    b.  Evidence of Pretext......................................................................................31

4.  The District Court erroneously granted CESA 7's motions for summary judgment on Spengler's First Amendment claim. ...................................................................32

CONCLUSION..................................................................................................................33

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS..............................................34

CIRCUIT RULE 25(a) CERTIFICATION ......................................................................35

CERTIFICATE OF SERVICE ........................................................................................36

# II.  TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*Arnold v. United Airlines, Inc.*, 142 F.4th 460 (7th Cir. 2025) .................................................12

*Benuzzi v. Bd. of Educ.*, 647 F.3d 652 (7th Cir. 2011) .......................................................30

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ...............................................................18

*Calderon v. Martin County*, 639 F.2d 271 (5th Cir. 1981) .......................................................7

*Crawford v. Metropolitan Gov't of Nashville*, 555 U.S. 271 (2009) .........................................20

*Curl v. Reavis*, 740 F.2d 1323 (4th Cir. 1984) ...................................................................7

*Dey v. Colt Const.*, 28 F.3d 1446 (7th Cir. 1994) ...............................................................25

*Diemert v. City of Seattle*, 776 F.Supp.3d 922 (W.D.Wash. 2025) ............................................13

*Erickson v. Wis. Dept. of Corr.*, 469 F.3d 600 (7th Cir. 2006) ..............................................13

*Harris v. Allen County Board of Commissioners*, 890 F.3d 680 (7th Cir. 2018) .........................7

*Johnson v. Advocate Health*, 892 F.3d 887 (7th Cir. 2018) ....................................................7

*Love v. JP Cullen*, 779 F.3d 697 (7th Cir. 2015) ....................................................... 8, 9, 10, 11

*Mozee v. Jeffboat, Inc.*, 746 F.2d 365 (7th Cir. 1984) ...........................................................23

*Muldrow v. St. Louis*, 601 U.S. 346 (2024) .......................................................................12

*Murphy v. Caterpillar, Inc.*, 140 F.4th 900 (7th Cir. 2025) ...............................................30, 31

*Nischan v. Stratosphere Quality*, 865 F.3d 922 (7th Cir. 2017) ...............................................9

*Ortiz v. Werner*, 834 F.3d 760 (7th Cir. 2016) ...................................................................31

*Runkel v. City of Springfield*, 51 F.4th 736 (7th Cir. 2022) .................................................5, 31

*Scott v. Harris*, 550 U.S. 372 (2007) ...............................................................................31

*Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335 (7th Cir. 2024) ..............................................12

*Vassileva v. Chicago*, 118 F.4th 869 (7th Cir. 2024) .........................................................30, 31

*Vichio v. US Foods, Inc.*, 88 F.4th 687 (7th Cir. 2023) ........................................................30

**Statutes**

42 U.S.C. §2000e-3(a) ...............................................................................................23, 28

Wis. Stat. §116.045...................................................................................................6

# III. ARGUMENT

## A. Introduction.

In this appeal, Plaintiff Becky Spengler raises four claims. First, both Defendants – the Wisconsin Department of Instruction ("DPI") and CESA 7 – unlawfully discriminated against Spengler in the terms and conditions of her employment by demanding that she embrace DPI's belief that, solely because she is White, she has racial bias and culpability for racial inequity. Second, Defendants unlawfully retaliated against Spengler because she opposed those race-based terms and conditions of employment. Furthermore, Defendants offered false and pretextual reasons for their adverse actions, and summary judgment should therefore have been denied. Third, CESA 7 violated Spengler's Constitutional right to Equal Protection. Fourth, CESA 7 violated Spengler's First Amendment rights by retaliating against her because of what she believed and what she declined to believe.

Despite the voluminous record and wide-ranging catalog of Defendants' misguided arguments, the controlling law and record evidence – particularly when viewed in a light most favorable to Spengler – form ample grounds upon which a reasonable jury could rely to return a verdict in Spengler's favor on all four of her claims. *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022).

**B. Analysis.**

**1. The District Court erroneously granted Defendants' motions for summary judgment on Spengler's race discrimination claim.**

**a. Spengler raised her race discrimination claim in the District Court.**

CESA 7 argues that the Court should not consider Spengler's "three-part theory of racial discrimination" because Spengler did not raise that argument in the District Court.[1] (Doc. 29:27-30).[2] In both response briefs in the District Court, Spengler argued that, "DPI took action against Plaintiff because, *as a White person*, Plaintiff's views of DPI's race-based agenda were unacceptable." (ECF 113:11; 117:39). Spengler used a hypothetical "Black Becky Spengler" and quotations taken from DPI's documents to argue that, unlike "White Becky Spengler", if she were Black she could have agreed with DPI without personally confessing to racial bias and culpability for racial inequity. (ECF 113:11-12; 117:39-41). At the hearing on Defendants' motions, Spengler repeated and elaborated on that argument. (ECF 158:16-24).

In light of the confusion in the District Court regarding her discrimination claim, Spengler asserts the same argument in this Court but clarifies that argument by breaking it down into three distinct components.

**b. DPI was Spengler's indirect employer.**

DPI argues that it was not Spengler's employer because, pursuant to Wis. Stat. §116.045, CESA 7 was Spengler's "direct and only employer." (Doc. 28:53). However, the question of

---

[1] CESA 7 also argues that, for the same reason, the Court should disregard Spengler's First Amendment claim. (Doc. 29:30). As discussed at pages 32-33, below, that argument is false.

[2] Documents filed in this Court are cited as "Doc. __:__," and refer to the number assigned to the document followed by the page number. The evidentiary record is cited as "ECF __:__." The number pre-colon references the docket number assigned to the document by the District Court as reflected in Document 1-2. The number after the colon refers to either the cited page number of that document, or, in the case of a document with numbered paragraphs, to the cited paragraph number. For citations to deposition transcripts, the number after the colon references the page of the original transcript.

indirect employer status under Title VII must be decided by federal – not state – law. *Curl v. Reavis*, 740 F.2d 1323, 1327 (4th Cir. 1984), *quoting Calderon v. Martin County*, 639 F.2d 271, 272-73 (5th Cir. 1981).[3]  Thus, the state statute cited by DPI is not controlling.

DPI argues that the evidence presented by DPI "weighs against" Spengler's contrary evidence.  (See e.g., Doc. 28:53).  Of course, the "weighing" of evidence is a job for the jury, not the Court on summary judgment, and DPI's claim that its facts are more convincing than Spengler's facts is an argument to be made to the jury during closing argument – not on summary judgment.  *Johnson v. Advocate Health*, 892 F.3d 887, 893 (7th Cir. 2018).

Third, a reasonable jury could conclude that DPI was Spengler's indirect employer.  In her response to DPI's Interrogatory No. 2, Spengler listed 35 different facts (with supporting record cites) "which demonstrate that DPI was Plaintiff's [indirect] employer."  (ECF 83-12:2-3).  Those facts encompass all five of the Knight-factors, and include:

1. The Control Factor.

- DPI dictated, participated in, and otherwise controlled the process and the decision to hire Spengler as Integration Director.  (ECF 118:7).

- The controlling agreements stated that, "[Spengler] will continue to be directed on these specific deliverables [i.e. the RSN and RPIC initiatives] by project-specific contacts at DPI"; DPI – not CESA 7 – had the power to directly supervise the day-to-day details of Spengler's work.  (ECFs 119:3.d.; 84-4:3).

---

[3] In *Harris v. Allen County Board of Commissioners*, 890 F.3d 680, 684 (7th Cir. 2018), this Court found that a state statute may be relevant *as evidence* "insofar as it describes the Plaintiff's position, including his duties and the way he is hired, supervised and fired."  In this case, the statute cited by DPI says nothing about who controlled Spengler's work or how she might be hired, supervised or fired. Consequently, the narrow exception noted by the Seventh Circuit in *Harris* has no applicability here.

- DPI monitored, reviewed and critiqued Spengler's job performance. (ECF 119:3.d.; 119-1:12.8, 12.9, 12.11).

- DPI had discretion to release or withhold funding based on its quarterly assessment of Spengler's work. (ECFs 119:3.f.; 84-4:11, 20).

- DPI demanded that Spengler spend 180-190 days per year on the RSN work and another 40-60 days per year on the RPIC work; Spengler spent the majority of her professional attention on the work for DPI. (ECF 119:3.a.)[4]

- Over the objections of CESA 7, DPI isolated and excluded Spengler from monthly RSN and RPIC cohort meetings. (ECF 119:3.e.; ECF 64:71-72; ECF 64-12:1-2).

- The annual integrated contracts between DPI and CESA 7 gave DPI control over not only *what* was to be done by the Integration Director, but also *how* that work was to be done. (ECFs 61-9; 84-4; 119:3.b.) *See Love v. JP Cullen*, 779 F.3d 697, 703 (7th Cir. 2015).[5]

- DPI terminated its indirect employment relationship with Spengler and insisted that CESA 7 remove Spengler from the Integration Director role. (ECF 119:3.i.; ECF 118:148-149.) CESA 7 Administrator Jeff Dickert testified that, although "they [DPI]

---

[4] Both Defendants argue that, in addition to the RSN and RPIC work, Spengler had other duties. (Docs. 28:5-6; 29:4). Nothing in the record suggests how much time she spent on those duties, and given that she was obligated to spend between 220 and 250 total days each year on the RSN and RPIC work, the time that she had left to spend on such peripheral duties was comparatively negligible.

[5] For example, the contracts dictated the qualifications of the Integration Director, (ECF 61-9:3-4; 84-4:3), and all contract deliverables, (ECFs 61-9:10, 20; 84-4:9-11, 20); DPI controlled execution of the deliverables, (ECFs 61-9:3; 84-4:3); DPI drafted all materials and required Integration Director to use those materials and DPI "branding," (ECFs 61-9:4; 84-4:3); DPI required attendance at multi-day monthly cohort meetings, (ECF 61-9:11, 20; 84-4:9-11, 20); and DPI controlled the dates, locations, and agendas for those meetings. (ECF 115:30).

wanted to tell us [CESA 7] that it was still our decision," the reality was that, "no, it's really not [CESA 7's decision.]"  (ECF 64:146-47).

DPI argues that it had no "ability to hire or fire Spengler."  (Doc. 28:54).  That is not true. As noted above, DPI controlled Spengler's hiring, and that fact alone distinguishes this case from the cases DPI cites – *Nischan v. Stratosphere Quality*, 865 F.3d 922, 929 (7th Cir. 2017) and *Love, supra,* 779 F.3d at 703.  DPI claims that its power to insist that CESA 7 remove Spengler from the RSN and RPIC work was not tantamount to the power to terminate her direct employment relationship with CESA 7.  The Knight factors require a weighing of all of the evidence, and the fact that DPI had enough control over Spengler's employment to successfully coerce CESA 7 to remove her from the role (even if not the power to force CESA 7 to terminate her direct employment) is just one piece of evidence of DPI's control that must be included in that weighing.

DPI also argues that, "at all relevant times … the day-to-day details of [Spengler's] employment were controlled by CESA 7."  (Doc. 28:56-57).  That claim is false.  Spengler spent between 220 and 250 days per year on the RSN and RPIC work, (ECF 119:3.a.), and Spengler was "directed on these specific deliverables [i.e. the RSN/RPIC work] by project-specific contacts at DPI."  (ECFs 119:3.d.; 84-4:3).  Although Dickert was Spengler's formal, "direct supervisor", (ECF 97:15), he did not "control" the "day-to-day details" of Spengler's work as DPI claims.

### 2.  The "Skill Set" Factor.

- DPI extensively trained Spengler.  (ECFs 119:3.c.; 84-4:9-11, 20).  In fact, DPI acknowledges that its role was "*training* and support[ing] Spengler."  (Doc. 28:54).

- One of the three basic functions of the RPIC initiative was to "Participate in professional learning," (ECF 61-9:20), and five of the six goals for that training involved DPI providing training and coaching to Spengler. (Id.)

DPI argues that the training is not indicative of indirect employer status in this case because the skills obtained in that training were transferable, but DPI provides no explanation or evidence to support that claim. (Doc. 28:61). Further, unlike the plaintiff in *Love*, *supra*, 779 F.3d at 704, the training provided by DPI to Spengler was not widely-applicable elsewhere as was the "safety training" in *Love*. Rather, the training provided by DPI to Spengler went to the very heart of what Spengler was hired to do. (ECFs 61-9:20, 84-4:9-11).

          3 and 4. <u>The "Responsibility for Costs" and "Form of Payment" Factors</u>.

- DPI provided 92% of the funding for Spengler's wages. (ECF 119:3.g.)

- DPI provided Spengler with all materials used in the work. (ECF 61-9:4).

- Spengler was prohibited from modifying DPI's materials or using materials from any other source without prior approval from DPI. ("For all deliverables, if an activity cannot be fulfilled as specified in the contract or supplemental guidance, Agency must receive prior approval from DPI to implement substitute or alternative options." (ECFs 84-4:4; 61-9:4)).

- DPI assessed Spengler's work each quarter and approved (or disapproved) the release of funds for that work. (ECFs 119:3.f.; 84-4:11, 20).

          5. <u>The "Length of Employment" Factor</u>.

The fifth Knight factor "examines the length of the employee's job commitment and/or the expectations of the parties." *Love, supra*, 779 F.3d at 705.

- The "expectations of the parties" were that Spengler would continue in her role for as long as the work was needed. (ECF 115:5).

- For four consecutive years, DPI renewed its contract without discussion or debate about whether Spengler would continue to fill that role. (ECF 119:3.h.)

The fifth Knight factor does not require a showing that the relationship between Spengler and DPI was "indefinite or permanent" as DPI claims. (Doc. 28:62). Instead, the question is whether the parties' expectations about the length of their relationship is, or is not, consistent with a typical employment relationship. *Love, supra*, 779 F.3d. at 705. Unlike the plaintiff in *Love, supra*, Spengler was not employed to construct a building or undertake a project where the parties could foresee that the work would necessarily be completed at a specific point in the future. Instead, the Integrated Contracts each had one year terms which were regularly renewed. (ECF 84:4). A reasonable jury could find that a one year, regularly-renewed commitment is consistent with an employment relationship.

The evidence provides adequate foundation for a reasonable jury to conclude that DPI was Spengler's indirect employer.

### c. Spengler suffered actionable harm.

Defendants argue that Spengler suffered no actionable harm. (Doc. 29:34-38, 49; Doc. 28:23). Defendants' argument fails first because DPI excluded Spengler from monthly RSN and RPIC cohort meetings. Examples of the 12 to 16 page "agendas" for those meetings (ECFs 81-7, 81-15, 81-25) make clear that the monthly cohort meetings were multi-day events attended by all state-wide RSNs and RPIC coaches, involving guest-facilitators, extensive training, strategizing and deliberations. (ECFs 84-4:10-11, 20; 61-9:11-12, 20-21). During those meetings, attendees also received "relevant information to be shared regionally as well as to build capacity for

implementation of specific innovations." (Id.)  The meetings were a significant and essential part of the Integration Director job, and when DPI isolated and excluded Spengler from those meetings, she suffered "some harm."  *Muldrow v. St. Louis*, 601 U.S. 346, 354 (2024).

Spengler also suffered actionable harm when DPI terminated its (indirect) employment relationship with Spengler and both Defendants permanently removed her from the Integration Director position – a move which resulted in her demotion to "a much less-desirable position that paid less than one-half of what [she] was making in the Integration Director role."  (ECF 115:42).

Third, even if the consequences from a race-based decision are not immediately felt, actionable harm occurs if consequence are likely to manifest in the future.  *See e.g., Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1336-37 (7th Cir. 2024)(Although a race-motivated delay in training had no immediate impact on the plaintiff's terms and conditions of employment, the employer's raced-based decision to delay the plaintiff's training constituted an actionable harm because "deferred training can mean deferred promotions or deferred raises."); *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 470-71 (7th Cir. 2025)(same).  When Defendants demanded that Spengler confess to racial bias and culpability for racial inequity because she is White, she suffered actionable harm because the consequences of those terms and conditions were likely to manifest in the future.  (In fact, the consequences did manifest when Spengler was excluded from cohort meetings and ultimately removed from her position because she refused to comply.)  Thus, Defendants' imposition of those race-based terms and conditions upon her constituted a distinct actionable harm.  *Thomas, supra*, 120 F.4th at 1336-37.

**d. Spengler's race discrimination claim is not based on her disagreement with DPI's beliefs.**

DPI claims that "disagreement with training materials … is not opposition to an unlawful employment practice." (Doc. 28:24-25, 39-41). While that may be true, Spengler does <u>not</u> base her claims on the fact that she disagreed with DPI. (Doc. 20:31-32). Rather, Spengler's Title VII claims are based on Defendants' demand that she personally and affirmatively agree with DPI that, because she is White, she has racial bias and culpability for racial inequity. If Defendants would have permitted Spengler to continue to do her job while allowing her to keep her own personal views about race (as she had done successfully for four years, ECF 119:3.h., 12; ECF 119-1), then this lawsuit might never have been filed. But Defendants were not content to agree-to-disagree. Instead, Defendants insisted that Spengler could not keep her job unless she first abandoned her beliefs on race and then embraced DPI's beliefs – including its belief that she and all Whites have racial bias and culpability for racial inequity.

The two cases cited by DPI – *Erickson v. Wis. Dept. of Corr.*, 469 F.3d 600, 605-06 (7th Cir. 2006), *Diemert v. City of Seattle*, 776 F.Supp.3d 922, 939-40 (W.D.Wash. 2025) – are distinguishable from this case because, in neither of those cases, did the employer demand that the plaintiff-employee abandon her contrary beliefs and affirmatively agree with the employer.

By taking the position that Spengler could not do her job unless she agreed with DPI, Defendants made her beliefs about race a "term" of her employment, and by removing her from her role because she refused to embrace DPI's beliefs, Defendants made Spengler's beliefs a "condition" of her employment. Because the demand that Spengler agree with DPI was tantamount to a demand that she admit to racial bias and culpability for racial inequity because she is White, Defendants violated Title VII.

**e. Spengler adequately supported all three components of her race discrimination claim.**

**(i). The evidence supports the first component of Spengler's race discrimination claim.**

DPI argues that none of the substantial body of evidence cited by Spengler (Doc. 20:19-24) adequately demonstrates that DPI believes that all White people have racial bias and are culpable for racial inequity. (Doc. 28:25-28).

First, DPI describes much of the evidence cited by Spengler with buzzwords such as "system-level descriptions," "concepts relevant to understanding educational inequities," and "sociological and academic terms." (Id.) But DPI offers no explanation for how such terms dilute the plain meaning of the cited evidence, or why a reasonable jury could not agree with Spengler's no-nonsense view of that evidence.

Next, DPI argues that a government entity "is entitled to say what it wishes and to select the views that it wants to express." (Doc. 28:27). While that may be true, DPI's point does not rebut Spengler's claim in her first component that DPI chose to express the view that all White people have racial bias and culpability for racial inequity. (Again, Spengler does not claim that DPI violated Title VII when it adopted and expressed those views; rather, Title VII was violated when DPI demanded that Spengler agree with those views.)

DPI then takes issue with two categories of facts that it cherry-picks from Spengler's evidence. First, DPI argues that two of the nine articles included in Spengler's supporting evidence (see Doc. 20:22-23) do not support Spengler's claim that DPI believes all Whites are racists. (Doc. 28:28). Spengler's brief quotes the relevant portions of those two articles which plainly say that all White people are "racists" or "participants" in racism unless and until they become "aware" of their "blind spots," or become "anti-racist." (Doc. 20:22-23). According to

- 14 -

these authors (and - by endorsement - DPI), the natural state of White people – unlike people of color – is to be racists.  DPI repeats the question posed by the District Court, "[If] all white people are inherently racist … why call on them to become anti-racists?"  (Doc. 28:28).  That question completely misses the point because whether DPI believes that the racism of White people is "inherent" (meaning incurable) or is just their natural-born state which they can overcome through introspection and activism and by becoming "anti-racists", these authors (and DPI by endorsement) are still espousing the view that, in matters of race, the natural state of all White people is different than everyone else, and Whites are – as a race – uniquely damaged.

DPI also disputes Spengler's argument that, within the context of race, the CCPP's criticisms of "coaches" can logically refer only to White coaches.  (Doc. 28:27, 35).  DPI chooses not to address the four arguments raised in Spengler's brief (Doc. 20:20, n. 5), and instead matter-of-factly claims that the CCPP is designed to address racial bias by coaches of all races.  (Doc. 28:27).[6]  If that were true, then one might expect that somewhere in the record, DPI might have made *even one* statement to the effect that racism by people of color is a problem that DPI is addressing.  Instead, Spengler has pointed to a substantial body of evidence showing that DPI focused solely on White racism. (Doc. 20:19-23).  In fact, nothing in the record – not one single document, statement or article – addresses racism by any specific race other than the White race.

A reasonable jury could rely on the evidence to conclude that DPI believes that all White people are uniquely afflicted with racial bias and have culpability for racial inequity.

---

[6]  DPI cites ECF 74-4:4, but neither the cited page nor any other page of the CCPP supports DPI's claim that the CCPP is designed to address racial-bias by non-White coaches.

**(ii). The evidence supports the second component of Spengler's race discrimination claim.**

DPI argues that DPI did not demand that Spengler agree with DPI. (Doc. 28:29-31). DPI ignores the bulk of Spengler's evidence and focuses on only two pieces of that evidence. (Doc. 20:23-27). First, DPI takes issue with Spengler's reliance on DPI's responses to three of Spengler's interrogatories. (Doc. 28:29-30). All three of those interrogatories asked DPI to explain prior statements by DPI regarding its alleged concerns with Spengler's behavior or performance. (Doc. 20:25-26). Each of DPI's responses indicate that, in DPI's view, Spengler's beliefs regarding the "Equity Mindset" competency were problematic. (Id.) Evidence of DPI's dissatisfaction with Spengler's beliefs on matters of race supports Spengler's claim that DPI first pressured and then insisted that she change those beliefs.

DPI also argues that the 2022-23 Integrated Contract cannot support Spengler's claim that Defendants insisted that she agree with DPI because that contract was "not in effect" when Spengler held the Integration Director position. (Doc. 28:31). In May 2022, both Defendants demanded that, as a condition of keeping her job for the upcoming 2022-23 school year, Spengler must commit to meeting DPI's expectations as those expectations were then articulated in the draft of the 2022-23 Integrated Contract, (Doc. 20:48-49), including having a "demonstrated commitment" to DPI's ideology and to "examining [her own] personal biases in the areas of race," among others. (ECF 61-9:3). Because Defendants used the draft of the 2022-23 Integrated Contract as a ledger of their demands, it follows that the document is relevant to support Spengler's claim that Defendants' demanded ideological conformity.

CESA 7 argues that that Spengler cites "no evidence to suggest that CESA 7 made any demand that Spengler" personally agree with DPI. (Doc. 29:34, n. 10). To the contrary, evidence cited by Spengler includes:

- Doc. 20:26-27, par. F.  The Integrated Contract – to which CESA 7 became a party – demands that the Integration Director have a "demonstrated commitment" to DPI's beliefs regarding race.

- Doc. 20:27, par. G; Doc 20:48, par. M.  CESA 7 informs Spengler that DPI's demands (as set out in the Integrated Contract) are "non-negotiable," and that, if she wishes to retain her role, Spengler can no longer speak out, "pushback" or "question" DPI.

- Doc. 20:28, par. N.  CESA 7 informs Spengler that she can keep the Integration Director role if she first commits to meet the requirements regarding racial beliefs expressed in the Integrated Contract.

- Doc 20:48-49, pars. O, P.  Because Spengler refuses to "confess to sins that [she has] not committed" or otherwise abandon her own personal beliefs about race, CESA 7 removes Spengler from Integration Director role.

- Doc 20:49, par. Q.  Because Spengler would not abandon her beliefs regarding race, and because she would not embrace DPI's beliefs, and in spite of her ability and willingness to continue to perform her job, CESA 7 removed Spengler from her job as Integration Director.

A reasonable jury could rely on the evidence presented by Spengler to find that both Defendants demanded that Spengler agree with DPI on matters of race.

> **(iii).  The evidence supports the third component of Spengler's race discrimination claim.**

While it is true that Defendants never demanded that Spengler utter the words, "I have racial bias and culpability for racial inequity," the evidence will permit a reasonable jury to

conclude that Defendants demanded that Spengler agree that, because she is White, she has racial bias and culpability for racial inequity.  (Doc. 28:32)[7].

DPI argues that Spengler cannot rely on hypotheticals or speculation to support her race discrimination claim.  (Doc. 28:33-35).  But Spengler does not rely on speculation.  Instead, she relies on facts (Doc. 20:19-27) to demonstrate that, if she had been Black, Defendants' demands that she agree with DPI would not have affected the terms and conditions of her employment in the same onerous way that they did because she is White.

As for "hypotheticals," the Supreme Court noted in *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) that "a but-for test[8] directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause."[9]  In *Bostock*, the Supreme Court applied at least two hypotheticals in its analysis and decision, *supra*, 590 U.S. at 659-60, one of which DPI cites in its brief.  (Doc. 28:33).  To paraphrase DPI and the Supreme Court, "If an employer fires a White employee for refusing to admit to racial bias but would not fire a Black employee for the same conduct, then race is a but-for cause of the decision."  (See Doc. 28:33, *citing Bostock, supra*, 590 U.S. at 660-61.)  That hypothetical mirrors Spengler's Title VII claims in this case.

---

[7]  DPI's claim that "the Department did not regulate Spengler's private beliefs" is, at best, a contested fact.  (Doc. 28:32)  A jury must decide whether, in light of all the evidence, DPI's claims about its tolerance of contrary views is credible.

[8]  With regard to the proper standard for causation in a discrimination case, the Court subsequently notes that Title VII now "allow[s] a plaintiff to prevail merely by showing that a protected trait was a 'motivating factor' in a defendant's challenged employment practice."  *Bostock, supra*, 590 U.S. at 657.

[9] The District Court applied the correct methodology by comparing Spengler's situation with the result if her role had – hypothetically – been held by conservative Black author Thomas Sowell.  (Appen.:21).  The Court reached the wrong conclusion because it failed to complete the analysis.  (See Doc. 20:29).

CESA 7 argues that Spengler has failed to point to evidence of causation because "the evidence demonstrates that CESA 7 did not offer another contract because it would lose funding for her position." (Doc. 29:36-37). But Spengler has presented ample evidence that CESA 7 joined with DPI in demanding that Spengler agree with DPI and CESA 7 then chose not to renew her contract because she refused to do so. (Doc. 20:44-50). CESA 7's claims about its motivations are, at best, a controverted fact which must be decided by a jury.

**2. The District Court erroneously granted Defendants' motions for summary judgment on Spengler's retaliation claim.**

### a. Spengler's opposition to Defendants' conduct was "protected" by Title VII.

Spengler does not dispute Defendants' premise that, to support her Title VII retaliation claim, she must have a *subjective belief* that she is opposing unlawful conduct, and that her belief must be *objectively reasonable*, meaning that the conduct is the type of conduct that Title VII prohibits. (Docs. 28:37-38; 29:39-40).

#### (i) Subjective Belief.

DPI argues that Spengler did not subjectively believe that she was opposing unlawful conduct. (Doc. 28:45). The only evidence offered by DPI to support that argument is Spengler's deposition testimony where she declined to use the word "complain" to describe her objections to the CCPP. (Doc. 28:45-46). First, the testimony cited by DPI refers solely to Spengler's opposition to the CCPP, (ECF 118:118-22; ECF 57:16-20), and DPI cites no evidence regarding Spengler's beliefs concerning the legality of any other evidence relied upon by Spengler. (Doc. 20:39-44). Second, DPI did not ask Spengler about her beliefs. (ECF 57:16-20). Although the applicable statutory term is "oppose"(not "complain"), DPI repeatedly asked Spengler whether she ever "complained" about the CCPP. (Id.) Following counsel's repeated objections and

Spengler's repeatedly-stated concerns regarding DPI's use of the word "complain," Spengler testified that she would not use the word "complain" to describe her opposition to the CCPP, but that she "had questions" regarding the CCPP.[10] (ECF 118:118-19; Doc. 28:45-46). DPI did not ask Spengler to identify what those "questions" were, nor did DPI ask Spengler whether any of her questions included questions about the legality of the CCPP. (Id.) In fact, only five pages earlier in her deposition transcript, Spengler testified that, "I was … forced to believe in that work… and believe things about myself that were specific to race, and I believe that to be illegal." (ECF 57:10-11). The evidence demonstrates that Spengler had a subjective, good faith belief that Defendants' demand to admit to racial bias and culpability for racial inequity was unlawful.

### (ii)  Objectively Reasonable.

In her initial brief, Spengler references a twelve-page spreadsheet of evidence in the record which constituted Spengler's opposition and/or was indicative of Spengler's opposition to Defendants' unlawful conduct. (Doc. 20:38-39, ref. ECF 85-26:9-20). From that substantial body of evidence, Spengler selected nineteen examples and cited them in her brief as paragraphs A to S. (Doc. 20:39-44).

DPI argues that Spengler's citation in paragraph A to her deposition should be disregarded because that testimony constitutes "conclusory characterizations – untethered to concrete facts…." (Doc. 28:40-41). DPI is wrong. Spengler specifically testified that she objected to DPI insisting that "I must also believe in that language and that sort of philosophy that DPI was bringing into the workplace," and that, when she opposed DPI, DPI "turned up the

---

[10]  The Supreme Court has said that the statutory term "oppose" should be construed to "carry its ordinary meaning." *Crawford v. Metropolitan Gov't of Nashville*, 555 U.S. 271, 276-77 (2009). A reasonable jury could conclude that Spengler's repeated questioning indicated that she was not on board and otherwise "opposed" DPI's CCPP document.

heat" on her because, "as a White person," she was "pushing back" on DPI's beliefs. (ECF 58:12-13). She also testified that she objected to DPI's "equity mindset … if you didn't share the belief system, that you potentially were no longer able to do the job," (ECF 58:14), and she specifically complained that DPI's equity mindset allowed "no room in the language for me to say, 'I don't think I have biases against anybody based on race…. I was going to have to admit that I was oppressive, that I had biases against people of color." (ECF 58:16).

CESA 7 argues that paragraph A fails as evidence of protected opposition because Spengler was deposed after the adverse actions in this case were taken. (Doc. 29:41). Of course, Spengler does not claim that her deposition testimony *constitutes* protected opposition, but rather that it is *evidence of* Spengler's opposition. (Doc. 20:38-39).

DPI argues that paragraphs C-F and H are not evidence of protected opposition because "disagreement with the Department's views … is not opposition to an unlawful employment practice." (Doc. 28:39). Spengler's retaliation claim is *not* based on her "disagreement" with DPI, but rather is based on Spengler's opposition to Defendants' unlawful demands that, because she is White, she must – like DPI – believe that she has racial bias and culpability for racial inequity. Paragraphs C-F and H recount that Spengler was opposed to DPI's ideas regarding "mindsets," "Equity Mindset," and "blind spots," all of which reflect DPI's belief that all Whites have racial bias and culpability for racial inequity. Indeed, DPI acknowledges in its brief that Spengler's opposition included "whether she *personally agreed* with equity-related concepts." (Doc. 28:39).

CESA 7 argues that paragraphs C, F, G and I are not evidence of protected opposition because, although Dickert knew that Spengler was complaining, he "did not perceive" statements made by Spengler as "complaints about illegal employment activities." (Doc. 29:42-43). CESA

7's argument is based on Dickert's declaration and his assessment of whether – in his lay-opinion – Spengler's opposition met the legal definition of "illegal employment activities." (ECF 84:50, 52).[11] Although an employer's prior knowledge of the employee's conduct is a prerequisite to a Title VII retaliation claim, the employer's erroneous belief that such conduct did not oppose "employment activities" made "illegal" by Title VII is not a defense. 42 U.S.C. §2000e-3(a). Per the statute, the relevant issue is whether or not the conduct that the employee opposes is *actually* "made an unlawful employment practice by [Title VII]." (Id.) Nothing in the statute suggests that anti-retaliation protections are available only in cases where the employer has correctly concluded that the employee's conduct is the type of conduct that Title VII precludes. Such a rule would eviscerate Title VII's anti-retaliation provision because, if the statute's anti-retaliation protections are limited by her employer's lack of legal acumen, then no employee could be reasonably certain that her opposition would be "protected." After all, her employer might be ill-informed or might choose to escape liability by simply claiming that, "I didn't know." If the conduct that an employee opposes falls within the categories of conduct that Title VII prohibits, then – whether or not the employer knows it – the employee's opposition is "protected."

Regarding paragraph G, DPI argues that the September 15, 2021 "Chat" is nothing more than Spengler expressing her "frustration with the Department's beliefs about systemic racism." (Doc.28:41-42).[12] DPI chooses not to address the fact that the "BS" to which Spengler referred

---

[11] With regard to CESA 7's repeated claim that Dickert believed Spengler to be complaining only about DPI's "messaging," (Doc. 29:7, 9, 16, 18), Spengler never used that word to describe her opposition. (ECF 114:53). Instead, that term was adopted by CESA 7 for this litigation, and it amounts to nothing more than a strained, euphemistic re-packaging of what she actually said.

[12] CESA 7 points out that, following the September 15, 2021 RSN meeting, Spengler contacted a non-profit organization regarding a possible "discrimination suit against the state." (Doc. 29:6). CESA 7 does not explain why it included that fact in its brief, but to the extent that Defendants took adverse action

was "anti-racism." That term is a term of art used by DPI which – as explained by the term's creator (Abram X. Kendi) and its proponents (such as Kathleen Osta, ECF 115-4:3) – means that all White people are naturally racists until – with substantial effort – some of them can become "anti-racists." (Doc. 20:22-23). By referring to "anti-racism" as "BS", Spengler was opposing DPI's belief that, solely because she is White, she is a racist. DPI also argues that the Chat was "excessively disloyal or hostile or disruptive and damaging" to DPI. (Doc. 28:42). Spengler cited the same case (*Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 374 (7th Cir. 1984)) and addressed this argument in her initial brief. (Doc. 20:40-41). Certainly, a reasonable jury could rely on the evidence to conclude that the Chat stayed within proper professional bounds.[13]

DPI claims that, in paragraph H, Spengler "misrepresented" the September 16, 2021 conversation because "[DPI Director of the RPIC Program Rachel] Fregien was not declaring that Spengler was incapable of doing the job; she was asking Spengler how she intended to reconcile her stated concerns with the expectations of the coaching role." (Doc. 28:43). Per the transcript, the relevant part of the exchange began with Spengler stating that, even if she disagreed with DPI, she could do the job. Fregien responded – *not with a question* – but with a plain statement: "I want to push back on that last one. I don't think you can put your personal feelings aside and still do the job." (ECF 83-7:29). DPI falsely claims that Fregien was asking a

---

against her based on her search for help with a "discrimination suit", Defendants (again) unlawfully retaliated against Spengler in violation of Title VII. 42 U.S.C. 2000e-3(a).

[13] DPI argues that "Spengler did not dispute her peers' concerns" about her conduct. (Doc. 28:51). Spengler has never agreed with the absurd caricatures of her behavior offered by a subset of her former colleagues, and in this litigation, she has repeatedly objected to those comments and flatly disputed the validity of most of the statements made. (See ECF 118:35, 38, 58, 109, 114). Such disputes are issues for the jury. Spengler also notes that many of the comments cited by DPI were made anonymously, and all of the complaints from named colleagues came from the same three individuals who professed agreement with DPI's views on race and, in some cases, made biased comments of their own. (e.g. ECF 118:113 – "I feel that humoring a debate about the non-existence of racism acknowledges her views as worthy of attention and discussion."; ECF 118:110 – "I have no interest in hearing 'both sides' on anti-racism. Who would that be anyway? The grand duke of the KKK?").

question but now – ironically – accuses Spengler of "misrepresenting the record." Because this is a motion for summary judgment, the jury must ultimately decide who – Spengler or DPI – is guilty of "misrepresenting the record."

Regarding paragraph I, CESA 7 argues that, in the District Court, Spengler did not rely on her recollection of the September 20, 2021 meeting with CESA 7, and she cannot do so now. (Doc. 29:44). CESA 7 is wrong. Spengler filed her declaration as well as proposed facts in the District Court in which she specifically recounts the details of the September 20, 2021 meeting. (ECF 115:38; 114:15). Also invalid is CESA 7's argument that Spengler's declaration is a "sham affidavit." (Doc. 29:44). At her deposition, CESA 7 asked Spengler what she recalled about the September 20, 2021 conversation, and Spengler testified that she and Dickert discussed "equity mindsets," the CCPP, and "the new equity language." (ECF 58:60-61). Spengler testified about her recollection, and she did not testify that her testimony was an exhaustive list. CESA 7 did not follow-up with a request for further specifics. In any case, the facts included in Spengler's declaration are consistent with the topics that Spengler described in her deposition. (Compare ECF 58:60-61 with ECF 115:38). CESA 7 also argues that, during the September 20, 2021 meeting, Spengler "made no reference to employment actions." (Doc. 29:44). That argument is wrong because, during that meeting, Spengler complained about DPI's "insistence that all White people [including Spengler] have racial bias" and DPI's condemnation of any contrary view as an "unacceptable variation." (ECF 115:38).

Regarding paragraph L, DPI correctly points out that paragraph L does not correctly quote Dickert's October 5, 2021 email. (Doc. 28:44). That misquote was unintentional. In any event, the correct quotation of Dickert's email is reflected in DPI's brief and shows that Spengler complained to Dickert that she was "feeling bullied for having a different *mindset* than the

Department." (Id.)  As used within the RSN and RPIC initiatives, the CCPP's "Equity Mindset" obligates White coaches to confess to racial bias and culpability for racial inequity.  (Doc. 20:19-22).  Dickert's email is further evidence that Spengler opposed DPI's demand that she confess to racial bias.

DPI argues that paragraphs I through S should be disregarded and CESA 7 argues that paragraphs J-Q should be disregarded because that evidence reflects internal and third-party discussions in which Spengler did not directly participate.  (Doc. 28:44-45; 29:45-47).  First, nothing in the statute provides that an employee's opposition is protected only if it comes directly from the employee's mouth.  Instead, "a Title VII plaintiff may rely on circumstantial evidence to establish her employer's awareness of protected expression."  *Dey v. Colt Const.*, 28 F.3d 1446, 1458 (7th Cir. 1994).  Second, paragraphs I, J, K, L, N, Q, R, and S plainly prove that CESA 7 was aware of Spengler's opposition to DPI's "equity mindset," its "insistence that all White people have racial bias", its belief that "everyone is a racist," its focus on "a breakdown of one's whiteness," "bullying" based on Spengler's contrary beliefs regarding "privilege and bias," discrimination because Spengler "questioned" and refused to adopt DPI's beliefs regarding race, and Spengler's intention – in spite of Defendants' demands – to retain her own personal and contrary beliefs regarding race.  Paragraphs K, L, M, N, and Q indicate that CESA 7 passed that information on to DPI, and paragraphs K, L, M, N, O, P, and Q indicate that DPI understood that Spengler was complaining about the demand that she agree with DPI on matters of race including the demand that she agree that, because she is White, she has racial bias and culpability for racial inequity.

Regarding paragraph S, CESA 7 ignores the language of Spengler's May 12, 2022 email to CESA 7 (ECF 114:64) which, in relevant part, plainly states:

> I am fully able to effectively perform the actual work of an RSN and RPIC coach…. I will continue to maintain my own personal views and opinions regarding matters of race, and I will not agree to waive my right to express those views in the same respectful manner as any other employee of DPI and/or CESA 7 might express their views. I am not a racist nor do I harbor bias toward any person based on race, and I will not confess to sins that I have not committed.

Instead of addressing the actual email, CESA 7 cites Spengler's deposition and her general, somewhat-truncated *description of that email* to argue that she did not complain about "objectionable conduct under Title VII." (Doc. 29:48). First, the email itself best reflects what Spengler was trying to say in that email. Second, and in any case, Spengler's deposition testimony is not inconsistent with her email. She testified only regarding "examples" and she did not purport to provide an exhaustive list. (ECF 58:156-57.) Furthermore, she testified about the CCPP and how "as white people, our position within that role." (Id.) Finally, CESA 7 neither asked any follow-up questions nor requested clarification of Spengler's testimony. (Id.)

### b. Spengler has provided proof of causation.

#### (i) CESA 7's argument that Spengler has failed to show causation is meritless.

Spengler's brief alleges and demonstrates that CESA 7 (together with DPI) removed Spengler from the Integration Director role because she opposed Defendants' demand that she agree with DPI that she has racial bias and culpability for racial inequity. (Doc. 20:44-50, pars. M-Q). Yet, on a basis not clear to Spengler (or explained by CESA 7), CESA 7 argues that Spengler has failed to "establish (or even argue)" causation. (Doc. 29:49).[14]

Perhaps, CESA 7 is arguing that Spengler's argument and proof of causation is insufficient because she has failed to distinguish between evidence of general causation and the

---

[14] CESA 7 again argues that Spengler failed to identify an actionable harm, but that argument is meritless. (See pages 11-12, above).

"but for" causation standard that applies to a Title VII retaliation claim. But the District Court did not address any distinction between general causation and "but for" causation when granting CESA 7's motion, and Spengler had no duty in her initial brief to anticipate that, someday, CESA 7 might argue that the evidence of causation presented by Spengler fails to meet the more-demanding "but for" standard.[15] CESA 7 is essentially arguing that Spengler did not present *enough* evidence of causation, but questions regarding the sufficiency of the evidence are for the jury. Even under the higher "but for" standard, the evidence of causation presented by Spengler would allow a reasonable jury to conclude that, "but for" Plaintiff's protected opposition, CESA 7 would not have removed Plaintiff from her role.

### (ii) Defendants' arguments regarding the timing of Spengler's opposition are meritless.

Spengler does not dispute that, to support her retaliation claim, she must establish that (i) she engaged in conduct that constituted protected opposition within the meaning of Title VII, and (ii) Defendants were aware of that conduct prior to taking adverse action against her. Both Defendants argue that, even if Spengler opposed Defendants' unlawful conduct, she did so too late.

DPI argues that it had no knowledge of Spengler's "protected activity" until June of 2022 – at least a month after Defendants made the final decision to remove Spengler from her role. (Doc. 28:47).[16] The argument fails because DPI was undeniably aware of Spengler's conduct

---

[15] Even still, CESA 7 does not make that argument in its response brief, but instead relies only its waiver argument. (Doc. 29:49).

[16] DPI again argues that Spengler "never lodged a complaint of race discrimination directly" with DPI, and she "refused to categorize [her] actions as 'complaints.'" (Doc. 28:48). The statute does not require that notice of protected opposition come in the form of a "complaint" or come directly from the affected employee. (See pp. 19-20, 25, above).

long before June of 2022. (Doc. 20:38-44). The evidence presented by Spengler demonstrates that, beginning no later than August of 2021 and running through May of 2022, Spengler repeatedly "pushed back" on DPI's "anti-racism BS," its "Equity Mindset," its insistence that that every White person has racial "blind spots," etc. (Doc. 20:39-44). Such opposition began well-before DPI claims that it made the decision to exclude Spengler from monthly cohort meetings on October 4, 2021, (ECF 118:132), and many months before May of 2022 when DPI made the decision to terminate its relationship with Spengler, and both Defendants made the decision to remove Spengler from her role.

Apparently, DPI is arguing that its knowledge of Spengler's complaints was not sufficient notice of Plaintiff's protected opposition because DPI did not agree that her complaints were opposing conduct "made an unlawful employment practice by [Title VII]." 42 U.S.C. §2000e-3(a). Although a defense is available to the employer who was unaware of the employee's opposition at the time of the adverse action, it is no defense for that employer to claim that, although it was aware of the employee's behavior (i.e. her opposition), it did not know or believe that her opposition concerned conduct made unlawful by Title VII. 42 U.S.C. 2000e-3(a). If an employer's lack of information or bad information provided such a defense, then that rule would incentivize employers to remain uninformed, and it would disincentivize employees from opposing their employer's unlawful conduct out of concern that the employer might hold erroneous views about the law.

CESA 7 claims that it did not know that Spengler was engaged in protected opposition until it received her May 12, 2022 email. (Doc. 29:23-24). However, at some point shortly before Dickert sent an email to DPI Director of Special Education Julia Hartwig at 12:53 p.m. on September 16, 2021, (ECF 64-3:1), Dickert had a conversation with Spengler during which

Spengler complained that DPI was demanding that, at the beginning of meetings, she and other attendees must "introduce yourself and then you start the meeting by everybody has to admit to their white bias…."  (ECF 64:33).  Four days later, on September 20, 2021, Spengler met with Dickert and Timm, and during that meeting, Spengler complained about DPI's "insistence that all White people have racial bias," that "denying one's racial bias is an unacceptable variation," and that "all Integration Directors and coaches must embrace DPI's views."  (ECF 115:38). Following that meeting, Spengler sent Dickert a copy of DPI's Equity Mindset Cards and the CCPP, and she called Dickert's attention to the "Equity Mindset" provisions of the CCPP as the focus of her concerns.  (ECF 64-4).  Thus, by September 16, 2021 (and no later than September 20, 2021), CESA 7 had notice that Spengler opposed DPI's demand that she agree that "all White people have racial bias."  Moreover, the evidence is that, in the months following (and before Defendants removed her from her job), Spengler continued to oppose Defendants' unlawful conduct.  (Doc. 20:42-44, pars. L-S).

Thus, before October 4, 2021 (when DPI made the decision to exclude Spengler from monthly cohort meetings – ECF 118:132) and long before May of 2022 (when DPI terminated its relationship with Spengler and both Defendants removed Spengler from her role), both Defendants were aware that Spengler opposed Defendants' unlawful insistence that she abandon her beliefs and embrace DPI's belief that all White people have racial bias and are culpable for racial inequity.

A reasonable jury could rely on the evidence to conclude that both Defendants were aware of Spengler's protected conduct well-before they took any adverse actions against her.

**3. The District Court erroneously failed to consider the proper impact of evidence that Defendants provided false and pretextual reasons for the adverse actions taken against Spengler.**

The District Court found that, during the monthly RSN and RPIC meetings, Spengler "'openly – but respectfully and professionally – questioned, challenged and opposed' what she viewed as 'DPI's increasingly-radical views on race and systemic racism.'… The record supports Plaintiff's claim that she 'never raised her voice, spoke disrespectfully, used profanity or sarcasm, ignored requests or directions of DPI, or otherwise behaved unprofessionally toward DPI or any of her colleagues.'" (Appen.:11). Despite these findings, the Court made no ruling on the issue of pretext.

**a. Proving up a prima facie case is not a precondition to a pretext analysis.**

Both Defendants argue that, because Spengler has not established a prima facie case, this Court should ignore the damning evidence of pretext she has presented. (Docs. 28:49; 29:51). Defendants' arguments fail because, in a case "where a defendant offers a nondiscriminatory explanation for its employment decision … 'the prima facie case and pretext inquiries overlap,' so courts 'may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext.'" *Vassileva v. Chicago*, 118 F.4th 869, 874 (7th Cir. 2024), *quoting Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 663 (7th Cir. 2011); *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023)(same). "Pretext does not require an inference of unlawful animus, but it does *permit* that inference. This principle means that when a plaintiff has offered evidence permitting a reasonable inference of pretext, summary judgment should be denied." *Murphy v. Caterpillar, Inc.*, 140 F.4th 900, 911 (7th Cir. 2025).

Spengler has pointed to significant evidence that both Defendants offered false and pretextual explanations for their decisions. (Doc. 20:51-57). Consequently, this Court may

"skip the analysis" of Spengler's prima facie case[17] "and proceed directly to the evaluation of pretext." *Vassileva, supra*, 118 F.4th at 874. Because the evidence of pretext presented by Spengler permits an inference of unlawful animus, summary judgment should be denied. *Murphy, supra*, 140 F.4th at 911.

### b. Evidence of Pretext.

In *Scott v. Harris*, 550 U.S. 372, 380 (2007), the Supreme Court held that a party's sworn testimony does not necessarily create a material question of fact where that testimony is contradicted by incontrovertible video evidence. DPI attempts to distinguish *Scott, supra*, by claiming that the video evidence in this case does not "blatantly contradict" DPI's version of the events. (Doc. 28:50). But a showing of a "blatant contradiction" is not the standard. Rather, summary judgment should be denied where the evidence "permit[s] a reasonable inference of pretext." *Murphy, supra*, 140 F.4th at 911. As carefully set out in Spengler's brief, a substantial body of evidence demonstrates time and again that DPI plainly, intentionally, and "blatantly" lied about Spengler's behavior in those meetings. (Compare Doc. 20:51-56 with Doc. 28:8-14. See also ECF 118:30, 40-108). At minimum, plaintiff has offered evidence permitting a reasonable inference of pretext, and summary judgment should be denied. *Murphy, supra*, 140 F.4th at 911. In all cases, even if there is room to debate DPI's dishonesty, choosing between competing versions of the facts is a job for the jury, not the Court on summary judgment. *Runkel, supra*, 51 F.4th at 741.

---

[17] Spengler is proceeding in this case under the holistic framework established in *Ortiz v. Werner*, 834 F.3d 760, 765 (7th Cir. 2016). Even if, as Defendants claim, a prima facie case is a prerequisite to a pretext analysis, Spengler has presented ample evidence upon which a reasonable jury could rely to find that Defendants discriminated and retaliated against her in violation of Title VII. Therefore, even under Defendants' faulty reasoning, pretext analysis is appropriate in this case.

DPI also argues that "Spengler's opinion about her own performance is irrelevant to pretext analysis." (Doc. 28:49). While that may be true, Spengler does not rely on her own opinion to establish pretext. Instead, she relies on the numerous facts and records cited in the spreadsheet filed in the District Court. (ECF 119-1; ECF 119:12). Most of the information in that spreadsheet is directly from DPI and CESA 7, and none of that information constitutes Spengler's own "opinion" about her performance.

### 4. The District Court erroneously granted CESA 7's motions for summary judgment on Spengler's First Amendment claim.

CESA 7 argues that, in the District Court, "Spengler did not plead a First Amendment claim premised on her beliefs or refusal to believe," (Doc. 29:53), and that, consequently, she cannot raise such a claim now. (Doc. 29:30-34, 53). Among the provisions of her Complaint that Spengler cited in her District Court response to CESA 7's motion for summary judgment were paragraphs 37.h. and 41.b. In relevant part, those paragraphs provide:

- ¶37.h. – "Defendants' insistence that Plaintiff … **'demonstrate' her agreement** with Defendants' racist philosophy … violated Plaintiff's constitutional rights…."
- ¶41.b. – "Defendants repeatedly informed Plaintiff that she could not properly perform the Director of Integrated Services job **unless she believed and otherwise agreed with and embraced DPI's racist philosophy**, programs, and actions. Defendants' conduct violated Plaintiff's constitutional rights including, but not limited to, her rights to speak and to refrain from speaking."

(emphasis added). In Spengler's appellate brief, she quotes paragraphs 37.h. and 41.b. and she bolds the same language from those paragraphs. (Doc. 20:59).[18]

Despite the clear language of paragraphs 37.h. and 41.b. of the Complaint, and despite the fact that Spengler cited those paragraphs in the District Court and quoted those paragraphs in her appellate brief, and despite the fact that Spengler's brief bolds the pertinent language from

---

[18] Although not essential to this appeal, Spengler's initial brief also quotes and highlights three additional paragraphs - 37.b., 37.e., and 37.g. - from her Complaint. (Doc. 20:59). Like paragraphs 37.h. and 41.b., those three additional paragraphs also clearly assert Spengler's First Amendment "belief" claims.

those paragraphs, CESA 7 *still* argues that Spengler's Complaint fails to allege that her Constitutional rights were violated because of what she believed and what she declined to believe. (Doc. 29:54). To support its indefensible argument, CESA 7 completely ignores the highlighted language in paragraphs 37.h. and 41.b. and instead represents to this Court that those two paragraphs allege only that CESA 7 violated Spengler's rights to "speak and refrain from speaking." (Doc. 29:54). CESA 7's selective editing of Spengler's complaint is misleading. In any case, Spengler's Complaint clearly asserts that CESA 7 violated Spengler's Constitutional rights by retaliating against her based on what she believed and what she declined to believe.

## CONCLUSION

A reasonable jury could rely on the evidence presented by Spengler to return a verdict in her favor on her Title VII race discrimination and retaliation claims, her Equal Protection claims, and her First Amendment "belief" claims. The District Court's order and judgment (Appen.:1, 36) dismissing those claims should be reversed, and this matter should be remanded to the District Court for further proceedings.

Dated this 17th day of February, 2026.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:     /s/ Ross W. Townsend
        Ross W. Townsend, Bar No. 1011622
        George Burnett, Bar No. 1005964
        231 S. Adams Street/PO Box 23200
        Green Bay, WI 54305-3200
        (920) 437-0476
        rwt@lcojlaw.com

*5725570_5*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Cir. Rule 32(c) and the Order granting motion for leave to file reply brief in excess of 7,000 words (Doc. 35). After excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 8,913 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 12-point Times New Roman font.

Dated this 17th day of February, 2026.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:   /s/ Ross W. Townsend
       Ross W. Townsend, Bar No. 1011622
       George Burnett, Bar No. 1005964
       231 S. Adams Street/PO Box 23200
       Green Bay, WI 54305-3200
       (920) 437-0476
       rwt@lcojlaw.com

## <u>CIRCUIT RULE 25(a) CERTIFICATION</u>

I hereby certify that, pursuant to Cir. Rule 25(a), I have electronically filed Plaintiff-Appellant's Reply Brief.

Dated this 17th day of Ferbruary, 2026.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:     /s/ Ross W. Townsend
        Ross W. Townsend, Bar No. 1011622
        George Burnett, Bar No. 1005964
        231 S. Adams Street/PO Box 23200
        Green Bay, WI 54305-3200
        (920) 437-0476
        rwt@lcojlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that, on February 17th, 2026, my assistant (acting at my direction) electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated this 17th day of February, 2026.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.
Attorneys for Plaintiff-Appellant

By:    /s/ Ross W. Townsend
        Ross W. Townsend, Bar No. 1011622
        George Burnett, Bar No. 1005964
        231 S. Adams Street/PO Box 23200
        Green Bay, WI 54305-3200
        (920) 437-0476
        rwt@lcojlaw.com